**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| James Jones and Nicole Steels, on behalf of themselves and all others similarly situated, | Case No. |
| Plaintiffs, | |
| v. | |
| National Council of Young Men's Christian Associations of the United States of America ("YMCA of the USA"), an Illinois not-for-profit corporation, and Elinor Hite, former Senior Vice President of YMCA of the USA, | **Jury Trial Demanded** |
| Defendants. | |

## COMPLAINT

Plaintiffs James Jones and Nicole Steels, by and through their attorney, bring this action on behalf of themselves and all other similarly situated African-Americans against Defendants National Council of Young Men's Christian Associations of the United States of America and Elinor Hite and allege as follows:

## NATURE OF ACTION

1.     The National Council of Young Men's Christian Associations of the United States of America ("the YMCA" or "YMCA of the USA") is a not-for-profit organization that claims its mission is to put Christian principles into practice through programs that build healthy spirit, mind and body for all. Despite its claimed mission, the YMCA maintains a pattern-or-practice of systematically denying equal employment

opportunities to African-Americans because of their race or color or stereotypes about African-Americans.[1]

2.     Defendant YMCA has engaged in and continues to engage in a pattern-or-practice of intentional discrimination against African-Americans based on their race or color, including with respect to pay, promotion, assignment of work opportunities, performance evaluations and terminations of employment.  For example, based on discriminatory and subjective performance evaluations, African-Americans were and are denied compensation increases and opportunities for advancement because of their race or color.  Many African-Americans are also selected for termination as part of the organization's series of reductions-in-force based, at least in part, on their discriminatorily low performance evaluations.

3.     As part of the YMCA's pattern-or-practice of discrimination, since approximately 2004 African-American employees have earned less than non-African-Americans that held similar positions, African-Americans were promoted less frequently than non-African-Americans, African-Americans were hired into higher paying positions less frequently than non-African-Americans, and that the vast majority of African-Americans employed were employed in lower-earning positions.

4.     In approximately September 2005, YMCA of the USA hired Defendant Elinor Hite as Director, Human Resources and Organizational Development.  Ms. Hite's job was to help ensure the YMCA was not violating equal employment opportunity laws or policies intentionally or unintentionally.  Instead of ensuring

---

[1] This footnote is not an allegation requiring a response.  As used herein, the terms "race", "color", or "race or color" should be construed in the broadest possible manner

compliance with those laws and policies, Ms. Hite allowed Defendant YMCA of the

USA's pattern-or-practice of discriminatory conduct against African-Americans to

flourish.  Rather than remedy or address instances of discrimination against African-

Americans, as Plaintiffs tried to do, Ms. Hite chose to ignore or conceal them, in part

based on her own stereotypes about African-Americans.  In sum, she thwarted

Plaintiffs efforts to bring the YMCA's pattern or practice of discrimination to an end.

5.      Instead, as part of its pattern or practice of unlawful conduct, Defendants

forced Plaintiffs' employment with YMCA of the USA to end.  Defendants also

unlawfully discriminated and retaliated against Plaintiffs in other ways based on their

race or color and discriminated, as they did with many other African-American

employees.

6.      This lawsuit arises under the Civil Rights Act of 1866, as amended, 42

U.S.C. § 1981 ("Civil Rights Act of 1866" or "Section 1981")), Title VII of the Civil Rights

Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Illinois Human

Rights Act, 775 ILCS § 5/1 *et seq.* ("IHRA").

## JURISDICTION, VENUE AND PARTIES

7.      This Court has jurisdiction over Plaintiffs' federal law claims pursuant to

28 U.S.C. § 1331.  This Court also has supplemental jurisdiction over Plaintiffs' state law

claims pursuant to 28 U.S.C. § 1367(a).

8.      Venue is proper in this judicial district as the facts and events giving rise

to Plaintiffs' claims occurred in this judicial district, Defendant YMCA maintains its

corporate headquarters in this judicial district, Defendant Elinor Hite resides in this

---

and specifically to include stereotypes based on race or color.

judicial district and Ms. Hite and Plaintiffs were employed by Defendant YMCA at its corporate headquarters.

**Plaintiffs**

9.      James Jones, an African-American, was an employee of the YMCA from approximately August 2004 until approximately October 19, 2007.

10.      In approximately August 2004, YMCA of the USA hired Mr. Jones to serve as a Director of Training and Organizational Development in the YMCA's Human Resources department in its headquarters office in Chicago, Illinois.  At the time of his termination, Mr. Jones's title was Director of Training and Organizational Development.

11.      Nicole Steels, an African-American, was an employee of the YMCA from approximately November 1999 through approximately October 22, 2008.

12.      In approximately November 1999, YMCA of the USA hired Ms. Steels to serve as a Benefits Specialist in its headquarters office in Chicago, Illinois.  On approximately August 6, 2001, Ms. Steels was promoted to the position of Human Resources Generalist in the YMCA's Human Resources department.  On approximately May 1, 2005, she received a promotion to Senior Human Resources Generalist.  At the time of her termination, Ms. Steels's title was Senior Human Resources Generalist.

13.      Throughout their employment with the YMCA, Plaintiffs each satisfactorily performed their job duties.

**Defendants**

14.     National Council of Young Men's Christian Associations of the United States of America is organized, operated, and funded pursuant to state and federal law and maintains its headquarters in Chicago, Illinois.

15.     The YMCA of the USA is not a facility or local branch and it does not provide direct programs and services to the public.  The YMCA of the USA is charged with providing resources and consultation to the nation's local branches of the YMCA and acting as a model for programs and practices for those branches.

16.     Local associations or branches of the YMCA, like the YMCA of Metropolitan Chicago located at 801 North Dearborn Parkway, Chicago, Illinois 60610, are separate legal entities from YMCA of the USA.  Local branches or associations are required by the YMCA's national constitution to pay annual dues to the YMCA for operations and to support the YMCA mission.  The YMCA also receives a substantial amount of its funding – approximately ten million dollars annually since 2004 – from the United States government.

17.     The YMCA has been headquartered at 101 North Wacker Drive, Chicago Illinois 60606, since moving to Chicago in 1981.  Over the last five years, YMCA of the USA has been staffed by approximately 250-350 employees.  As of approximately September 2009, approximately 230 employees worked at the YMCA's headquarters in Chicago.

18.     Defendant Elinor Hite, a Caucasian, was employed by the YMCA as the Strategic Director for Human Resources/Organizational Development from approximately September 2005 until approximately September 2008.  Within

approximately one year of hiring Ms. Hite, the YMCA changed her title to Senior Vice President, Human Resources and Organizational Development.

19.     In 2008, Ms. Hite earned $150,156 in base compensation and $201,924 in other reportable compensation.  That year the YMCA paid Ms. Hite pursuant a severance agreement in which she agreed to "retire" as part of a "department restructure" in exchange for receiving approximately one year's salary in compensation and indemnification from any liability from Plaintiffs' legal claims.  Ms. Hite received more compensation in 2008 than any other YMCA employee except the Chief Executive Officer.

## FACTUAL ALLEGATIONS

**The YMCA Has A History Of Denying African-Americans Equal Opportunities**

20.     Though the local YMCA branches are separate entities, YMCA of the USA performs many human resources functions for member associations and local branches, such as: providing training on and maintaining employee benefit plans for member association employees; maintaining a website through which individuals can apply for jobs and promotions with these member associations or at YMCA of the USA; providing information on career paths available within YMCA's many different member associations or at YMCA of the USA; and consulting to local branches on issues including employment laws, employment relations, recruiting, and personnel planning, evaluation and selection.

21.     Defendant YMCA plays an active role in selecting the Chief Executive Officer ("CEO") to run many of the local member associations.   Of the approximately 960 local YMCA associations (with over 2,200 branches), only approximately 10 have

African-American CEOs.  African-Americans are also under-represented in local branch Chief Operating Officer ("COO") and branch executive positions.

22.     The YMCA's long history of denying equal employment opportunities to African-Americans was described in a report provided to the YMCA in 2004 entitled "Barriers to Upward Mobility for African Americans in Liesure Services: A Case Study of the YMCA" by Willie Dean, Ph.D. ("the Dean Report").

23.     The Dean Report, dated May 2004 and provided to the YMCA shortly thereafter,  explored whether African-Americans had been marginalized into less prestigious positions through a stratified random sample surveying 50 black and 200 white YMCA managers.

24.     Mr. Dean worked with Dr. Kenneth L. Gladish, then the National Executive Director of YMCA of the USA.  Dr. Gladish provided assistance and support for the project, as well as an introductory letter to the subjects who participated in Mr. Dean's study.

25.     In concluding his report, Mr. Dean made the following recommendations to the YMCA's leaders and Board of Directors:

➢ "YMCAs must learn how to deal with personal biases and community attitudes to overcome the unfairness that is inherent in some of its personnel practices." (Dean Report, at 222).

➢ "The board must ensure that its members don't resort to homosocial reproduction when recruiting and hiring the CEO, that branch boards act accordingly when advising on the hiring of branch staff, and that staff responsible for hiring and promotion at all levels are also in compliance.  Doing

so will eliminate homosocial reproduction and treatment discrimination in the organization."  (Dean Report, at 224).

➢ "Minorities, who are qualified, should be invited to apply for senior positions throughout the organization." (Dean Report, at 226).

➢ "Efforts must be undertaken to end the practice of candidate profiling.  Some local and national staff 'filter' candidates and interject their personal biases into the staff selection processes."  (Dean Report, at 227).

➢ "*Address Barriers to Upward Mobility*.  The present study identified the following themes related to human capital (Becker, 1975) that suggest barriers to upward mobility in the YMCA do exist:  education, training …and experience." (Dean Report, at 228).

➢ "*Dismantle the 'Good Old Boy Network.'*  The 'good old boy network' perpetuated by some national consultants … creates a system where 'who you know' is more important than 'what you know' in terms of getting hired and promoted in the YMCA."  (Dean Report, at 232-33).

➢ "*Establish Meaningful Dialogue.*  … Most white respondents felt the YMCA was doing an effective job of reducing barriers to upward mobility; however, black respondents were not so approving."  (Dean Report, at 233).

26.     Mr. Dean's report concluded that "[b]arriers to upward mobility for minorities and females are real in the YMCA" and "[i]t is incumbent upon leaders in our field to recognize, study and work to eliminate their existence."  (Dean Report at 238).

27.     Subsequently, through a thesis study, James L. Miller, attempted to lead the YMCA movement toward a better understanding of white male privilege – and particularly a better understanding of white male privilege within the YMCA movement *by* white males.  Mr. Miller's thesis, dated August 2, 2006 and provided to the YMCA shortly thereafter, sought to address the underlying tensions that existed in the YMCA family, including the failure of the YMCA to attract and retain people of color and the inability of YMCAs to build diverse boards.  Mr. Miller suggested those in leadership positions could change the YMCA movement by understanding the effects white privilege has on building a culturally competent organization.

28.     Mr. Miller conducted an internet survey of 168 YMCA professional directors of various titles about their attitudes towards white privilege and employment opportunities within the YMCA movement.  Mr. Miller concluded that "[w]hite male privilege has paved the path for white males to reach the pinnacle of their careers much easier than non-white males" within the YMCA movement.  (Miller Thesis at 31).  Mr. Miller also concluded that "[w]ithout self-examination and dialogue, white males run the risk of perpetuating the system of oppression."  (Miller Thesis at 41).

29.     The Dean Report, the Miller Thesis and the numerous other internal complaints and charges of discrimination filed against Defendant YMCA (including Plaintiffs' charges) placed Defendant on notice of class-wide allegations regarding a pattern-of-practice of intentional discrimination and unintentional discrimination, job segregation, and denial of employment opportunities against African-Americans based on race and/or color.  The YMCA, having been under a voluntary agreement with the

Equal Employment Opportunity Commission in approximately 2004 or 2005, was not unfamiliar its record of denying African-Americans equal employment opportunities.

30.    Despite these reports and complaints, Defendant YMCA of the USA continued to deny African-Americans equal employment opportunities in years 2005 through 2009 as part of their ongoing pattern-or-practice of discrimination against African-Americans in favor of whites.

**Mr. Jones's And Ms. Steels's Employment With The YMCA**

31.    Upon his hiring in 2004, Mr. Jones initially reported to Strategic Director of Human Resources Steve Timmons (an African-American) from approximately August 2004 until Mr. Timmons resigned in approximately May 2005.

32.    Mr. Jones was asked to serve as interim Strategic Director but was not offered an increase in pay (as were other leaders who served in interim roles) until he requested it from then Chief Executive Officer Ken Gladish (white).  When that increase was granted temporarily, it was still not as large is increases granted to other interim director-level employees.

33.    In approximately September 2005, Ms. Hite was hired as Strategic Director of Human Resources and Organizational Development.  Throughout Ms. Hite's employment at the YMCA, both Ms. Steels and Mr. Jones reported directly to Ms. Hite.

34.    In approximately May 2006, YMCA of the USA hired Neil Nicoll as Chief Executive Officer effective June 26, 2006.  Prior to obtaining that position, Mr. Nicoll, a Caucasian, served as Chief Executive Officer of the YMCA's Seattle, Washington branch.  Mr. Nicoll had a long history of employment with local branches and

associations.  In approximately mid-2006, YMCA of the USA also hired Chief Operating Officer Kent Johnson, a Caucasian.

35.     Ms. Hite initially reported directly to CEO Nicoll, but her reporting structure was changed in late 2007 or early 2008 and Ms. Hite began reporting to COO Kent Johnson.

36.     As Human Resources employees for Defendant, Mr. Jones and Ms. Steels observed and were asked to participate in Defendant's discrimination and retaliation of African-American employees with respect to the terms, conditions, benefits and privileges of employment.

37.     Despite the YMCA's pattern-or-practice of discriminating and retaliating against African-American employees, both Ms. Steels and Mr. Jones refused to participate in such discrimination and retaliation.

38.     Instead, Ms. Steels and Mr. Jones each sought to notify the YMCA of such discrimination and retaliation in an effort to ensure compliance with applicable laws and each sought to remedy instances of conduct that created Defendant's pattern and practice by ensuring all employees – including African-Americans – received equal employment opportunities regardless of their color or race.

**The YMCA's Systemic Discrimination Against African-Americans**

39.     In approximately July or August 2005, the YMCA completed a salary review conducted by Hewitt & Associates ("Hewitt").  Ms. Steels worked with Hewitt in performing this salary review.  As part of the review, the YMCA reclassified all positions from its old salary structure to a new salary structure.  Decisions about

placement within the structure were ultimately made by the YMCA's Senior Leadership team.

40.     The Hewitt salary review also revealed the need for many salary equity adjustments, including salary equity adjustments for African-Americans who were underpaid as compared to their peers at the YMCA and/or in the market generally. Rather than acting to adjust employees' compensation, the YMCA chose to wait until a full-time Strategic Director was found before taking any action to increase employees' compensation (against Mr. Jones's recommendation).

41.     Upon Ms. Hite's employment effective approximately September 2005, she chose not to implement the salary changes necessary as a result of the salary review conducted by Hewitt and, instead, conducted her own salary review.  As a result, when salary adjustments were made in approximately 2006, many African-American employees – including Mr. Jones, Ray Sykes, Grenada Stevens and Phyllis Lee – received a lower salary increase than they would have received if the recommendations made by Hewitt had been implemented.

42.     Since at least approximately 2006, YMCA of the USA maintained a salary structure pursuant to which each position was assigned a job grade ranging from "A" to "M." "A" is the lowest job grade and typically applies to "Administrative Assistant" positions, Office Services Assistant or other "Assistant" level positions. "M" is the highest job grade and is reserved for the President and CEO.

43.     Like the YMCA's previous salary structure, this salary grade structure reveals discrimination against and occupational segregation of African-Americans, who were relegated to the lowest paid positions.  Although the new salalry structure was

implemented, the behavior and conduct of the YMCA's supervisors managers remained the same.  As the salary structure reveals, as part of the YMCA's pattern-or-practice of discrimination, African-American candidates for higher paying positions – either through promotion or external hiring – frequently were overlooked.  Those African-Americans who were hired were denied opportunities to advance within the YMCA to higher level positions.

44.     In approximately 2007, Mr. Jones discovered that African-Americans were discriminated against with respect to purportedly merit-based compensation increases as part of the YMCA's discriminatory pay system in 2007.

45.     Under the YMCA's performance evaluation and compensation systems, managers were supposed to assign pay increases based on employees' performance within recommended guidelines applicable to all YMCA departments and employees. The policies and guidelines for the merit-increase compensation adjustment process were the same for each of the YMCA's managers and employees.  Each manager was supposed to conduct a written performance evaluation of the employees who reported to him or her and, based on that performance evaluation rating, assign a compensation increase within established guidelines.  Each manager's recommended increase in compensation then had to be approved by two levels of more senior management. Ultimately, before increases took effect, the Senior Leader within each YMCA department was required to review and approve all increases for employees in his or her department.

46.     Frequently, however, YMCA managers – including Ms. Hite – deviated from this process without penalty or punishment.  Some years, Ms. Hite assigned merit

increase compensation adjustments to Ms. Steels without ever completing written performance evaluations.  Other managers did the same thing or, alternatively, assigned compensation increases based on factors other than job performance.  In this way, Ms. Hite's and other YMCA of the USA managers' subjective biases – including biased perceptions about their employees' performance – affected compensation adjustments to the detriment of African-Americans.

47.     In summer of 2007, Mr. Jones discovered that approximately 80% of the employees who did not receive any merit increase for that year were African-American (though African-Americans constituted only approximately 20% of the YMCA's total employees).  Mr. Jones also discovered that approximately 30% of the YMCA's total employees who received a below-average salary increase were African-American (also disproportionate in comparison to African-American representation in the YMCA's workforce).  Further, Mr. Jones discovered that white employees were the recipients of all "outside-the-guidelines" favorable increases and that many non-African-Americans still received a merit-increase even though their performance did not warrant an increase.

48.     The evidence of systemic discrimination Mr. Jones encountered was only a small part of a larger pattern-or-practice of discrimination against African-Americans. From at least 2004 through the present, YMCA of the USA operated a discriminatory pay system based, in part, on discriminatory, subjective performance evaluations and, in part, on discriminatorily low starting salaries for African-Americans that under-valued their experience or skills due to stereotypes.  As a result, the YMCA maintains a

discriminatory job grade classification system pursuant to which African-Americans are segregated into lower-paying positions.

49.     The YMCA's discriminatory pay system was the result of numerous decisions made over time by the YMCA's virtually all white management team.  Prior to December 2006, all of the YMCA's "Senior Leadership" team was white.  Although Ms. Hite served as a member of the YMCA's "Senior Leadership" team, her predecessor Mr. Timmons, an African-American, did not.  From December 2006 to the present, the only non-white member YMCA of the USA's "Senior Leadership" team was its General Counsel, Angela Williams.  As General Counsel, Ms. Williams only supervises (directly or indirectly) approximately 3% of the YMCA's employees.

50.     African-Americans also were and are grossly under-represented in managerial or supervisory positions (i.e., positions with direct reports).  For example, in approximately November 2007, African-Americans held only approximately two of After Mr. Jones's termination in October 2007, only 2 of approximately 24 Director-level positions and were even more under-represented in more senior positions.  As part of the YMCA's pattern-or-practice of discrimination, the YMCA's virtually all white managers and supervisors made stereotyped decisions regarding African-Americans' compensation and excluded African-Americans from higher-level, higher paying positions.

51.     For example, as of approximately November 1, 2007, YMCA of the USA employed approximately 307 employees.  Of those employees, approximately 14 were Asian, approximately 53 were African-American, approximately 15 were Hispanic and approximately 212 employees were white.

52.     Of the 29 employees who were either Hispanic or Asian, only one employee held a position in job grade "A" – the lowest job grade.  Of the approximately 212 white employees, only seven (or approximately 4%) held a position in job grade "A."  In contrast, approximately nine of the 53 African-American employees held positions in job grade "A" (approximately 17%).

53.     Unlike whites, African-Americans were clustered into the lowest paying job grades.  For example, in November 2007, approximately 26 of 53 African-American employees (approximately 49%) held positions in the three lowest job grades ("A" through "C").  In contrast, only approximately 29 of 212 white employees (approximately 14%) held positions in those grades.  Similar disparities existed for other years in which YMCA of the USA used this job grade structure.

54.     African-Americans were prevented from advancing to higher level positions, in part, due to Defendant's performance evaluation system which also discriminated against African-Americans based on their race.  In 2007 and 2008, African-Americans were rated lower than Caucasian employees, on average, in each of the YMCA's departments.  Similar disparities occurred in those and other years as a result of stereotypes about African-Americans that were and are an ingrained part of the YMCA of the USA's culture.  Alternatively, the performance evaluation disparities in those and other years resulted unintentionally from application of a facially non-discriminatory performance evaluation and compensation system.

55.     The YMCA's national Board of Directors was not unaware of this problem.  In addition to being alerted to issues by the Dean Report, in approximately September 2008, Ms. Steels saw a copy of a presentation to the YMCA's Board of

Directors that described a study performed by outside consultants for the YMCA. According to the report she saw, the study confirmed that race-based disparities in performance evaluation rating existed in all departments at the YMCA in 2006 and/or 2007. This demonstrated that – either intentionally through stereotypes of more aversive forms of bias or, alternatively, unintentionally – managers discriminated against African-Americans based on their race or color.

56.     Throughout the years 2005 through the present, the YMCA's unlawful and discriminatory subjective performance rating system has resulted in African-Americans receiving lower raises and fewer opportunities for advancement to higher earning positions within the YMCA. Additionally, the YMCA's discriminatory performance evaluation system also resulted in African-Americans being selected for position eliminations instead of their white counterparts.

**Many Victims Of Defendants' Systemic Discrimination Exist**

57.     Since approximately 2003, numerous African-Americans in addition to Plaintiffs complained about the YMCA's pay increases, performance evaluations or denials of equal opportunities for African-Americans, including Phyllis Lee, Maurice Horsey, Mattie Wright, Granada Stevens, Marilyn Hudson and Glynda Bowers.

58.     Since 2003, many African-Americans in addition to Plaintiffs were overlooked for promotional opportunities, including Nicole Bradley, Sharnette Jones, Sher Bridges, Robin Lee, Sylvia Purnell, Earlie Mullin, Denise Howard and Yvonne Bibbs.

59.     Similarly, since 2003 numerous African-American employees in addition to Plaintiffs were fired or forced to resign in retaliation for raising internal complaints

or filing charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") or agreed to resign as part of resolution of their complaints, including Denise Howard, Mattie Wright, Marilyn Hudson, Debra Reed, Joanna Taylor, Ursela Tatem, Maurice Horsey, and Yvonne Bibbs.  Employees who raised complaints such as Deborah Reid, Phyllis Lee, Raymond Sykes and Sheri Bridges and did not resign were subjected to retaliation in an effort by YMCA to encourage them to leave the organization.  This treatment created an atmosphere that discourages other Afrcian-Americans from bringing forth reports of discriminatory practices.

60.     Indeed, YMCA's pattern of denying equal employment opportunities to African-Americans – and specifically the unequal application of the YMCA's performance evaluation system and merit-increase system – led to the departure of Senior Consultant of Diversity & Inclusion Nay Howell, an African-American, in early 2008.  In response to her complaint, Ms. Howell was retaliated against through selective enforcement of a largely-ignored company rule based on stereotypes.

61.     Numerous other examples of the YMCA's pattern-or-practice of discrimination and culture of stereotyped behavior towards African-American exist. For example, in approximately 2007, Ms. Hite and COO Kent Johnson made the decision to move African-American female Iona Toles away from the YMCA's main reception area because her "image" (as an African-American woman) did not fit the "image" that the YMCA wanted to present.  Ms. Toles was replaced with a less experienced, young, blonde white female.

62.     In approximately 2007, a Microsoft Certified African-American information technology employee, Berna Griffin, was terminated as part of a reduction-

in-force, but immediately replaced by a white Executive Assistant who did not possess

Ms. Griffin's qualifications but performed her duties.

63.     Ms. Hite's roll in perpetuating Defendant's pattern-or-practice of

discrimination resulted in each of the three African-American employees in YMCA's

human resources department who reported to her as of October 2007 (including

Plaintiffs) filing EEOC charges based on her discriminatory and retaliatory treatment of

them.

64.     Previously, in approximately December 2005 or January 2006, Ms. Hite

terminated Human Resources Specialist Veronica Robertson, an African-American with

over fifteen years experience, even though her performance ratings demonstrated she

was meeting expectations.  Although Ms. Hite claimed the reason for termination of

Ms. Robertson was a position elimination, Ms. Hite had already hired her replacement

– Emily Rutowski (white) – under a different title with substantially the same job

duties.  The YMCA was even forced to pay Ms. Rutowski a "signing" bonus because

Ms. Hite was not able to get rid of Ms. Roberston as quickly as she anticipated.  Ms.

Hite's termination of Ms. Robertson was because of her race.

65.     Although Ms. Hite hired an African-American administrative assistant,

Yvonne Bibbs, Ms. Bibbs was the lowest paid administrative assistant to a Senior Vice

President.  Ms. Hite told Ms. Bibbs she would have the opportunity to advance to a

recruiter position, but Ms. Hite never offered Ms. Bibbs that title or position even

though Ms. Bibbs had yeas of experience working in human resources.

**Unlawful Treatment Of Mr. Jones & Ms. Steels As Part Of The YMCA's Pattern**

66.     Like all other similarly situated African-Americans, Mr. Jones and Ms. Steels were injured by YMCA's pattern-or-practice of unlawful discrimination.

67.     In each year since Ms. Hite's hiring in 2005, Mr. Jones and Ms. Steels received discriminatory performance evaluations and were denied performance evaluation free from influence of racial bias and merit increases commensurate with their performance based on their race.

68.     In 2007 and 2008, Ms. Steels also was discriminated against based on her race by being denied the opportunity to telecommute.

69.     Ms. Steels also was discriminated against by Ms. Hite through intimidating and demeaning remarks that evidenced Ms. Hite's stereotypical views of African-Americans.

70.     Upon discovering evidence of Defendant's systemic compensation discrimination against African-Americans in approximately August 2007, Mr. Jones asked Ms. Steels to investigate the matter further.  Mr. Jones and Ms. Steels also presented their findings to then-Senior Vice President Elinor Hite.

71.     Though Ms. Steels offered to conduct a disparate impact review of the merit-increase process, Ms. Hite stated that she herself would conduct the disparate impact review.  Ms. Hite never discussed with Mr. Jones the results of the disparate impact review and only offered ambiguous replies to Mr. Jones's follow-up inquiries.

72.     Contrary to what she said she would do, Ms. Hite failed to conduct any further analysis and instead chose to allow the YMCA's discriminatory pay system to operate in 2007 and beyond.

73.     In discussions in approximately September 2007, Ms. Hite accused Mr. Jones and Ms. Steels of encouraging employees to bring discrimination claims against YMCA of the USA.

74.     In approximately September 2007, as a means of last resort, Ms. Steels filed an internal complaint of discrimination based upon race/color stating – among other things – that she had been denied a merit increase commensurate with her performance, that she had also been denied a formal, written performance review, and that she had been denied the ability to telecommute even though defendant permitted non-African-American employees to telecommute.

75.     Shortly before filing her internal complaint alleging race discrimination, Ms. Steels conferred with Mr. Jones about whether to file an internal complaint.  Ms. Steels was reluctant to complain because she feared retaliation from Ms. Hite for escalating the matter over her head.  Mr. Jones, also afraid of retaliation against Ms. Steels, informed Ms. Steels that he would talk to Ms. Hite.  Mr. Jones spoke with Ms. Hite about her treatment of Ms. Steels and offered Ms. Hite feedback about interacting with the African-Americans members of the Human Resources team.

76.     On approximately September 21, 2007, Ms. Steels dropped off her complaint letter to CEO Neil Nicoll's assistant.  Mr. Steels also e-mailed Mr. Nicoll informing him she had delivered the letter.  A week later, Mr. Nicoll sent Ms. Steels an e-mail indicating he would get in touch with her after his return from travel and meetings.

77.     Mr. Nicoll eventually met with Ms. Steels on October 3, 2007.  Mr. Nicoll did not address any of Ms. Steels's concerns except her complaint that a coworker was

allowed to telecommute and work from home while Ms. Steels was denied that term, condition, benefit or privilege, of employment.  Mr. Nicoll did mention, however, that dealing with complaints was not his strong suit.  Mr. Nicoll informed Ms. Steels that he had spoken with Ms. Hite about her complaint letter and suggested to Ms. Steels that her first step should be to address the matter with Ms. Hite, even after Ms. Steels informed him she had tried that already without success.

78.     Mr. Nicoll informed Ms. Hite about Ms. Steels' complaint letter on or before approximately October 3, 2009, the day he met with Ms. Steels.  Mr. Nicoll also provided Ms. Hite a copy of Ms. Steels's complaint.

79.     Based on how upset Ms. Steels was after her meeting with Mr. Nicoll, Ms. Steels's coworkers suggested that she contact the YMCA's Office of General Counsel about what was happening.  Ms. Steels was reluctant to do so, but another coworker reported the situation to the Office of General Counsel and objected to sending the victim of harassment back to the person who had harassed them for resolution.  Ms. Steels sent Mr. Nicoll an e-mail indicating she did not feel comfortable meeting with Ms. Hite and Mr. Nicoll responded that he would get a third party involved.  Ms. Steels also met with Assistant General Counsel Amy Bateson briefly, who indicated she would begin an investigation.

80.     In response to Ms. Steels's complaint, YMCA of the USA hired an outside firm – Ogletree, Deakins, Nash, Smoak & Stewart, P.C. ("Ogletree Deakins") – to investigate Ms. Steels's complaints and, as a result, many of the YMCA's employees – including Mr. Jones – were interviewed regarding Ms. Steels's complaint.

81.     Ogletree Deakins claims to be one of America's leading labor and employment law firms and touts itself as serving as advocates for management.  Robert P. Casey, a partner with Ogletree Deakins, authored the summary of the investigative report.  According to his website, Mr. Casey has practiced law for more than 30 years, exclusively representing management in all facets of labor and employment-related matters.

82.     Ogletree Deakins interviewed the following individuals as part of its investigation:  Nicole Steels on approximately October 4, 2007; Donna Russell on October 5, 2007; Elinor Hite on approximately October 8, 2007; Neil Nicoll on approximately October 8, 2007; James Jones on approximately October 10, 2007; Yvonne Bibbs on approximately October 10, 2007; Emily Rutowski on October 11, 2007; and Michelle VanDeventer on approximately October 11, 2007.

83.     Mr. Jones and Ms. Steels hoped that the YMCA hired the investigators to honestly and openly assess the validity of Ms. Steels's complaints of discrimination. Mr. Jones and Ms. Steels further hoped that Defendant would not retaliate against its employees for participating in the investigation.  Ms. Steels was so concerned about retaliation that she referenced it in her initial letter to Mr. Nicoll and again informed Mr. Casey she thought she would suffer as a result of having made the complaint.

84.     On approximately October 10, 2007, Mr. Casey interviewed Mr. Jones as part of Ogletree Deakins's investigation of Ms. Steels's complaint of discrimination.

85.     Mr. Jones honestly stated to Mr. Casey that Ms. Hite treated Ms. Steels differently than other non-African-American employees, that Ms. Hite was harder on

Ms. Steels than the non-African-American employees, and that Ms. Hite had general difficulty interacting with African-Americans.

86.     Mr. Jones explained to Mr. Casey that the verbal exchanges in team meetings, Ms. Hite's stereotyped attempts to "coach" Ms. Steels, and Ms. Hite's failure to complete thorough written performance evaluations (which enabled more subjective and biased decision making) all contributed to Mr. Jones's opinion that Ms. Hite was discriminating against Ms. Steels and other African-Americans, at least in part based on stereotypes.

87.     Based on information received by Mr. Jones and other employees, Mr. Casey concluded that other employees (not just Ms. Steels) perceived that Ms. Hite was harder on Ms. Steels than other employees and that minority staff perceived that Ms. Hite was not equal-handed in her treatment of them.

**Defendant Retaliated Against Mr. Jones By Terminating Him**

88.     Approximately one week after Mr. Jones was interviewed by Mr. Casey, Defendant informed Mr. Jones that his position was being eliminated, even though Defendant was not eliminating any other positions within Defendant's Human Resources department.

89.     Defendants' termination of Mr. Jones came only weeks after he pointed out to Ms. Hite that the YMCA's pay system and performance evaluation system were discriminating against African-Americans and only within weeks of Ms. Hite falsely accusing Mr. Jones of encouraging employees to bring discrimination claims against Y-USA.

90.     During a meeting discussing his termination with Assistant General Counsel Amy Bateson and Ms. Hite, Defendants claimed to be terminating Mr. Jones as part of reorganization necessary for budget cuts.  However, no other position in the Human Resources Department was eliminated in 2007.

91.     Defendants' claimed reason for terminating Mr. Jones was a made-up excuse to conceal their discriminatory and retaliatory motives.  As they had with Veronica Robertson previously, Defendants were using and alleged "position elimination" as an excuse for terminating an African-American that Ms. Hite and the YMCA no longer wanted employed because of race and, in Mr. Jones's case, because he opposed Defendants' discriminatory conduct.

92.     Shortly after Mr. Jones's termination, in late 2007 or early 2008, Defendants hired another individual to fill a position substantially similar to Mr. Jones's position.

**Ms. Steels Filed With The EEOC And Suffered Retaliation**

93.     On approximately December 21, 2007, Ms. Steels filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") because Defendants refused to address the discrimination she was experiencing.  After that point, Ms. Steels continued to experience discrimination (including by being denied the opportunity to telecommute) and also was retaliated against in numerous ways.

94.     In approximately March 2008, Defendant hired Lourdes Durren, a non-African-American, as a Senior Human Resources Generalist at a higher salary than Ms.

Steels's earned even though Ms. Steels had far more seniority with Defendant than Ms. Durren.

95.     In approximately May 2008, the YMCA posted another Senior Human Resources Generalist position (the same position Ms. Steels held) with the exact same duties as Ms. Steels's job.  Like Ms. Steels's position, the position reported directly to Ms. Hite.  The salary range offered on the posted position was $75,000-$92,000 annually with eligibility for a $10,000 bonus.  The proposed salary range for the newly posted Senior Human Resources Generalist position was higher than what Ms. Steels was earning in the same position at that time.  When Ms. Steels complained to the YMCA that this was further evidence of discriminatory treatment of her, the position was placed "on hold."

96.     In the past, the YMCA had hired a white Senior Human Resources Generalist performing the same duties as Ms. Steels at a higher salary.  Specifically, in approximately November 2005, Emily Gondek (white) was hired at a salary of approximately $73,000 annually, more than Ms. Steels was making performing the same position at that time.  Additionally, Ms. Gondek was allowed to telecommute, unlike Ms. Steels.

97.     On approximately July 7, 2008, in retaliation for Ms. Steels's efforts to oppose Defendant's pattern-or-practice of discriminatory conduct (including by providing information to the EEOC, who was investigating three EEOC charges filed by African-Americans who reported to Ms. Hite), Defendant's General Counsel Angela Williams sent an intimidating letter warning Ms. Steels not to copy any allegedly confidential records even though Ms. Steels had not copied any confidential records.

98.  Ms. Hite continued to discriminate and retaliate against Ms. Steels, including by denying Ms. Steels higher pay commensurate with her performance and the opportunity to telecommute, throughout the summer of 2008.

99.  Defendant Elinor Hite was forced to resign by Defendant YMCA of the USA.  Contrary to public statements by Defendants regarding the reasons for Ms. Hite's departure, Defendant YMCA of the USA forced Ms. Hite to resign because she continued to engage in discriminatory and retaliatory conduct towards Ms. Steels and other African-Americans.  Additionally, the YMCA learned that Ms. Hite's refusal to perform her job duties – including by assessing the YMCA's performance evaluation and pay systems to determine whether African-Americans were disparately impacted – created substantial legal liability for the YMCA of the USA.

100.  Rather than terminate Ms. Hite for her discriminatory, retaliatory and unlawful conduct or even allow her to resign, however, the YMCA paid her a severance pursuant to which the YMCA agreed to indemnify Ms. Hite for any individual liability she might incur in exchange for Ms. Hite's agreement to retire.  Effectively, the YMCA chose to reward her unlawful conduct with an extra year's pay and, thereby, undermine any purported commitment by the YMCA to principals of non-discrimination and equal employment opportunity.

101.  After Defendant Hite's resignation, Defendant did not consider or choose Ms. Steels to serve as Interim Senior Vice President of Human Resources despite her qualifications, experience, and seniority.  The YMCA instead chose Carolyn Creager, an African-American who had not complained internally or externally of discrimination or retaliation, to serve as Interim Senior Vice President.

102.     Based on comparisons of percentage increase from the interim leader's salary in his or her former position to the interim leader's new salary as compared to the salary of the former leader, the YMCA paid Ms. Creager (an African-American) far less than has paid other interim leaders at that level.  When Ms. Steels learned of this, she began to lose hope that removal of Ms. Hite would change anything for African-Americans at the YMCA.

103.     Then, in approximately the first week of October 2008, the YMCA told Ms. Steels that it was raising her pay by less than 1% despite her outstanding performance.  This less than 1% increase resulted in Ms. Steels continuing to earn a salary lower than the salary range the YMCA had advertised in seeking applications for a  Senior Human Resources Generalist only a few months earlier.

104.     Through Defendant's unresponsiveness to her internal complaints and to her EEOC charge and through Defendant's retaliatory behavior against her and Mr. Jones, Ms. Steels now understood that the YMCA did not care about ending its history of systemic discrimination and retaliation.  Mr. Jones's and her repeated attempts to notify and remedy the YMCA's systemic discrimination and retaliation continued to fail even after Ms. Hite's removal.  Having given the YMCA as many opportunities to change as she could stand, she felt she had no choice but to resign to obtain equal treatment.

105.     Ms. Steels's was constructively discharged and her final day of employment with the YMCA was approximately October 22, 2008.

106.     After her constructive discharge, Ms. Steels was not given the option of retaining or even purchasing her laptop or cell phone, even though many other non-

African-American employees – including Lor Niforatos, who departed the same week as Ms. Steels – were given these options.  Similarly, Mr. Jones was denied the opportunity to retain or purchase his laptop.

**The YMCA's Pattern-Or-Practice Of Unlawful Conduct Continues**

107.    Ultimately, despite efforts by Plaintiffs to prevent further unequal treatment of YMCA employees, the YMCA chose to continue rather than remedy this well-documented pattern of discrimination that affected all African-American employees of the YMCA.

108.    Despite Plaintiffs' efforts, the YMCA failed to adopt or enforce policies or implement training necessary to prevent these deprivations of state and federally protected rights of Plaintiffs and other African-Americans to be free from discrimination based on their race or color.  Defendants' failure to act to prevent discrimination on the basis of race or color amounts to deliberate indifference to Plaintiffs' and other African-Americans' federally protected rights.

109.    Throughout 2008 and 2009, Defendants continued to engage in the pattern-or-practice of discrimination against African-Americans described above.

110.    YMCA also engaged in the practice of terminating employees as part of a "reduction-in-force" – occasionally for all employees in entire departments – and requiring terminated employees to re-apply for their positions.  Candidates for re-hire were hand-picked, sometimes even before the position eliminations were announced, and the YMCA's normal channels for reaching qualified African-American candidates were blocked.  The YMCA used this as another means of eliminating African-Americans from its workforce and/or forcing African-Americans to release their claims

of discrimination and retaliation by signing severance agreements.  Those African-Americans who were rehired, for example in the consulting group, often were paid less than their non-African-American counterparts despite their superior qualifications and experience.  The YMCA's conduct with respect to its alleged reductions-in-force demonstrates its efforts to perpetuate and conceal the systemic denial of equal employment opportunities to African-Americans rather than acknowledge and remedy it.

111.    Additionally, as Plaintiffs understand, the EEOC is currently investigating discrimination by YMCA of the USA in response to a charge of discrimination filed by former employee terminated in approximately 2009 as part of Defendants' ongoing reductions-in-force.  Shortly after that employee was terminated, her position was reposted with a higher salary grade.

**The YMCA Has Not Complied With Federal OFCCP or Grant Requirements**

112.    In 2007, the YMCA had an annual operating budget of over $80 million, of which approximately $10.66 million came from federal grants or other federal funding sources.

113.    As a condition of receiving these federal grants funds, the YMCA is required to file annually with the United States Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) or, alternatively, agree not to discriminate in employment opportunities as a condition of receiving grant funding.

114.    During the duration of Mr. Jones and Ms. Steels's employment with Defendant, Defendant failed to file with the OFCCP and/or comply with grant conditions regarding non-discriminatory treatment of employees, thereby concealing

from the federal government and general public the systemic discrimination against African-Africans.

**Plaintiffs' Filed Timely, Representative Administrative Charges With The EEOC**

115.    Plaintiff Nicole Steels initially filed her EEOC charge on December 21, 2007.  On approximately December 22, 2008, Ms. Steels filed an amended EEOC charge and asked that her amendment relate back to the date of original filing pursuant to 29 C.F.R. 1601.12(b).  Ms. Steels filed her amended charge on behalf of herself and all others similarly situated.

116.    A copy of Ms. Steels's initial charge and a copy of her amended charge are attached hereto as Exhibit A.  Plaintiffs incorporate all allegations in Ms. Steels's EEOC charges as if fully stated herein.

117.    On September 22, 2009, Plaintiff Steels (through her counsel) received her notice of right to sue from the EEOC.  This Complaint is filed within 90 days of Plaintiff Steels's counsel's receipt of Mrs. Steels's notice of right to sue.

118.    Plaintiff James Jones filed a charge of discrimination with the EEOC charge on June 17, 2008.  Ms. Jones asserted his charge on behalf of himself and all others similarly situated.

119.    A copy of Mr. Jones's charge is attached hereto as Exhibit B.  Plaintiffs incorporate all allegations in Mr. Jones's EEOC charge as if fully stated herein.

120.    On September 22, 2009, Mr. Jones (through his counsel) received his notice of right to sue from the EEOC.  This Complaint is filed within 90 days of Plaintiff Jones's counsel's receipt of Mr. Jones notice of right to sue.

121.     Each Plaintiff asked that their charges be cross-filed by the EEOC with the Illinois Department of Human Rights pursuant to a work-sharing agreement with the EEOC.  The EEOC cross-filed Plaintiffs' charges of discrimination.  The Illinois Department of Human Rights has adopted or will adopt the EEOC's determination.

**Defendants' Conduct Constitutes Is A Continuing Violation**

122.     Defendants conduct amounts to a continuing violation of applicable civil rights laws.  Defendants' series of improper acts as part of its pattern-or-practice should be treated as one continuous act because the YMCA's decision making process took place over a period of time and because the YMCA had, for a period of time, followed a practice of discrimination covertly rather than by way of an open notorious policy.

123.     Plaintiffs timely challenged at least one discriminatory and retaliatory action that occurred as part of the YMCA's pattern-or-practice of unlawful conduct within 300 days of the act occurring.

124.     Plaintiffs' claims under the Civil Rights Act of 1866, as amended, relate to terms, conditions, benefits and privileges of employment or termination all occurring after the creation of an employment contract and, therefore, are subject to a four-year statute of limitations.

**Class Action Treatment Of Some Or All Of Plaintiffs' Claims Is Appropriate**

125.     Plaintiffs seek relief on behalf of themselves and all other similarly situated African-Americans employees pursuant to Fed. R. Civ. P. 23.

126.     Plaintiffs seek to represent all current and former African-American employees of the YMCA employed at any point since September 2005 who had his or her performance was assessed as part of the YMCA's annual performance assessment

process (regardless of whether a written performance evaluation was completed) or who was granted or denied a merit-based compensation adjustment at any point since September 2005.

127.    The class of individuals Plaintiffs seek to represent exceeds 40 employees. The class of individuals Plaintiffs seek to represent is so numerous that joinder of all members is impracticable.

128.    There are common questions of law or fact common to the class of individuals Plaintiffs seek to represent.

129.    The claims on which Plaintiff will seek certification are typical of the class of individuals Plaintiffs seek to represent.

130.    Plaintiffs and their counsel will fairly and adequately protect the interests of the class of individuals Plaintiffs seek to represent.

### COUNT I
**Race Discrimination (Denial Of Equal Terms, Conditions, Benefits Or Privileges Of Employment) In Violation Of Civil Rights Act of 1866, Section 1981 (All Plaintiffs Against All Defendants – Class & Individual Claim)**

131.    Plaintiffs replead the allegations contained in all paragraphs of this Complaint and incorporate them by reference as if fully set forth herein.

132.    Section 1981 of the Civil Rights Act of 1866, as amended, prohibits employers from subjecting their employees to discrimination with respect to terms, conditions, benefits or privileges of employment based on race or color, including with respect to performance evaluations, compensation, and promotional opportunities

133.    Section 1981 of the Civil Rights Act of 1866, as amended, also grants all persons within the jurisdiction of the United States the same rights to make and enforce

contracts and to the full and equal benefits of the law as is enjoyed by white citizens.

134.    Defendants denied Plaintiffs and all other similarly situated African-Americans equal terms, conditions, benefits or privileges of employment because of their race or color.

135.    Plaintiffs' and all other similarly situated African-Americans' race or color was a motivating factor for Defendants' conduct towards them.

136.    Defendants' actions were willful, intentional and/or done maliciously or with callous disregard or reckless indifference to Plaintiffs' and all other similarly situated African-Americans' federally protected rights.  Exemplary damages are warranted to prevent similar unlawful conduct by Defendants.

137.    Plaintiffs and all other similarly situated African-Americans were damaged by Defendants' conduct.

**COUNT II**
**Race Discrimination (Termination Of Employment)**
**In Violation Of Civil Rights Act of 1866, Section 1981**
**(All Plaintiffs Against All Defendants – Class & Individual Claim)**

138.    Plaintiffs replead the allegations contained in all paragraphs of this Complaint and incorporate them by reference as if fully set forth herein.

139.    Section 1981 of the Civil Rights Act of 1866, as amended, prohibits employers from subjecting their employees to discrimination with respect to terms, conditions, benefits or privileges of employment based on race or color, including with respect to termination of employment.

140.    Section 1981 of the Civil Rights Act of 1866, as amended, also grants all persons within the jurisdiction of the United States the same rights to make and enforce

contracts and to the full and equal benefits of the law as is enjoyed by white citizens.

141.     Defendants terminated Plaintiffs and other similarly situated African-Americans or forced them to resign because of their race or color.

142.     Plaintiffs' and all other similarly situated African-Americans' race or color was a motivating factor for Defendants' conduct towards them.

143.     Defendants' actions were willful, intentional and/or done maliciously or with callous disregard or reckless indifference to Plaintiffs' and all other similarly situated African-Americans' federally protected rights.  Exemplary damages are warranted to prevent similar unlawful conduct by Defendants.

144.     Plaintiffs and all other similarly situated African-Americans' were damaged by Defendants' conduct.

## COUNT III
### Retaliation In Violation Of Civil Rights Act of 1866, Section 1981
### (Plaintiffs Against All Defendants – Individual Claim)

145.     Plaintiffs replead the allegations contained in all paragraphs of this Complaint and incorporate them by reference as if fully set forth herein.

146.     The Civil Rights Act of 1866, Section 1981, prohibits individuals from retaliating against anyone who engages in protected activity, including by opposing conduct reasonably believed to be unlawful under the Civil Rights Act of 1866.

147.     Plaintiffs engaged in protected activity by opposing conduct by Defendants they reasonably believed was unlawful under the Civil Rights Act of 1866. Plaintiffs also engaged in protected activity by participating in an employer's internal investigation into allegations of conduct reasonably believed to be unlawful under the Civil Rights Act of 1866 – not only Ms. Steels' complaint to Mr. Nicoll, but also as part

of their job duties as human resources professionals.

148.    Defendants retaliated against Plaintiffs for engaging in protected activity.

149.    Defendants' actions were willful, intentional and/or done maliciously or with callous disregard or reckless indifference to Plaintiffs' federally protected rights. Exemplary damages are warranted to prevent similar unlawful conduct by Defendants.

150.    Plaintiffs were damaged by Defendants' conduct.

**<u>COUNT IV</u>**
**Race Discrimination (Denial Of Equal Terms, Conditions, Benefits Or Privileges Of Employment) In Violation Of Title VII**
**(All Plaintiffs Against The YMCA – Class & Individual Claim)**

151.    Plaintiffs replead the allegations contained in all paragraphs of this Complaint and incorporate them by reference as if fully set forth herein.

152.    Title VII prevents employers from denying employees equal employment opportunities with respect to terms, conditions, benefits or privileges or employment based on their race or color, including with respect to performance evaluations, compensation, promotional opportunities.

153.    The YMCA is an "employer" within the meaning of Title VII.  Plaintiffs were each an "employee" within the meaning of Title VII.

154.    The YMCA denied Plaintiffs and all other similarly situated African-Americans' equal terms, conditions, benefits or privileges of employment because of their race or color.

155.    Alternatively, the YMCA classified or segregated Plaintiffs and other similarly situated African-Americans intentionally or unintentionally on the basis of their race or color.

156.    Alternatively, the YMCA's facially neutral performance evaluation system and pay system, including annual merit increase adjustments, intentionally or unintentionally discriminated against Plaintiffs and all other similarly situated African-Americans by disparately or adversely impacting their terms, conditions, benefits or privileges of employment or employment opportunities.

157.    Plaintiffs' and all other similarly situated African-Americans' race or color was a motivating factor for Defendants' conduct towards them.

158.    Defendants' actions were willful, intentional and/or done maliciously or with callous disregard or reckless indifference to Plaintiffs' and all other similarly situated African-Americans' federally protected rights.  Exemplary damages are warranted to prevent similar unlawful conduct by Defendants.

159.    Plaintiffs and all other similarly situated African-Americans were damaged by Defendants' conduct.

## COUNT V
**Race Discrimination (Termination Or Forced Resignation) In Violation Of Title VII (All Plaintiffs Against The YMCA – Class & Individual Claim)**

160.    Plaintiffs replead the allegations contained in all paragraphs of this Complaint and incorporate them by reference as if fully set forth herein.

161.    Title VII prevents employers from terminating an individual's employment or forcing them to resign based on their race or color.

162.    Defendants terminated Plaintiffs and other similarly situated African-Americans or forced them to resign because of their race or color.

163.    Plaintiffs' and other similarly situated African-Americans' race or color was a motivating factor for Defendants' conduct towards them.

164.    Defendants' actions were willful, intentional and/or done maliciously or with callous disregard or reckless indifference to Plaintiffs' and all other similarly situated African-Americans' federally protected rights.  Exemplary damages are warranted to prevent similar unlawful conduct by Defendants.

165.    Plaintiffs and other similarly situated African-Americans were damaged by Defendants' conduct.

## COUNT VI
### Retaliation In Violation Of Title VII
### (All Plaintiffs Against The YMCA)

166.    Plaintiffs replead the allegations contained in all paragraphs of this Complaint and incorporate them by reference as if fully set forth herein.

167.    Title VII prohibits employers from retaliating against anyone who engages in protected activity, including by opposing conduct reasonably believed to be unlawful under Title VII or by participating in an employer's internal investigation into allegations of conduct reasonably believed to be unlawful under Title VII.

168.    Plaintiffs engaged in protected activity by opposing conduct by Defendants they reasonably believed was unlawful under Title VII.  Plaintiffs also engaged in protected activity by participating in an employer's internal investigation into allegations of conduct reasonably believed to be unlawful under Title VII – not only Ms. Steels' complaint to Mr. Nicoll, but also as part of their job duties as human resources professionals.

169.    Defendants retaliated against Plaintiffs for engaging in protected activity.

170.    Defendants' actions were willful, intentional and/or done maliciously or with callous disregard or reckless indifference to Plaintiffs' federally protected rights.

Exemplary damages are warranted to prevent similar unlawful conduct by Defendants.

171.    Plaintiffs were damaged by Defendants' conduct.

## COUNT VII
**Race Discrimination (Denial of Equal Terms, Conditions, Benefits Or Privileges Of Employment) In Violation Of The IHRA**
**(All Plaintiffs Against The YMCA – Class & Individual Claim)**

172.    Plaintiffs replead the allegations contained in all paragraphs of this Complaint and incorporate them by reference as if fully set forth herein.

173.    The IHRA prohibits employers from denying employees equal employment opportunities with respect to terms, conditions, benefits or privileges or employment based on their race or color, including with respect to performance evaluations, compensation, and promotional opportunities.

174.    The YMCA is an "employer" within the meaning of the IHRA.  Plaintiffs were each an "employee" within the meaning of the IHRA.

175.    Defendants denied Plaintiffs and all other similarly situated African-Americans equal terms, conditions, benefits or privileges of employment because of their race or color.

176.    Plaintiffs and all other similarly situated African-Americans' race or color was a motivating factor for Defendants' conduct towards them.

177.    Plaintiffs and all other similarly situated African-Americans were damaged by Defendants' conduct.

## COUNT VIII
### Race Discrimination (Termination Or Forced Resignation)
### In Violation Of The IHRA
### (All Plaintiffs Against All The YMCA – Class & Individual Claim)

178.    Plaintiffs replead the allegations contained in all paragraphs of this

Complaint and incorporate them by reference as if fully set forth herein.

179.    The IHRA prevents employers from terminating an individual's

employment or forcing them to resign based on their race or color.

180.    Defendants terminated Plaintiffs and other similarly situated African-

Americans or forced them to resign because of their race or color.

181.    Plaintiffs' and other similarly situated African-Americans' race or color

was a motivating factor for Defendants' conduct towards them.

182.    Plaintiffs and other similarly situated African-Americans' were damaged

by Defendants' conduct.

## COUNT IX
### Retaliation In Violation Of The IHRA
### (All Plaintiffs Against All The YMCA)

183.    Plaintiffs replead the allegations contained in all paragraphs of this

Complaint and incorporate them by reference as if fully set forth herein.

184.    The IHRA prohibits employers from retaliating against anyone who

engages in protected activity, including by opposing conduct reasonably believed to be

unlawful under the IHRA or by participating in an employer's internal investigation

into allegations of conduct reasonably believed to be unlawful under the IHRA.

185.    Plaintiffs engaged in protected activity by opposing conduct by

Defendants they reasonably believed was unlawful under the IHRA.  Plaintiffs also

engaged in protected activity by participating in an employer's internal investigation into allegations of conduct reasonably believed to be unlawful under the IHRA – not only Ms. Steels' complaint to Mr. Nicoll, but also as part of their job duties as human resources professionals.

186. Defendants retaliated against Plaintiffs for engaging in protected activity.

187. Plaintiffs were damaged by Defendants' conduct.

**RELIEF SOUGHT – ALL COUNTS**

**I.   Injunctive Relief To Cease Unlawful Race Discrimination And Retaliation**

Defendants' unlawful racially discriminatory and retaliatory conduct must be attacked from several directions.  Accordingly, Plaintiffs respectfully request on behalf of themselves and all others similarly situated that the Court enter an order declaring Defendants violated the Civil Rights Act of 1866 (Sections 1981), Title VII, and/or the IHRA and directing that Defendant YMCA of the USA:

a) Reinstate Plaintiffs and all other similarly situated African-Americans terminated to their positions of employment with full seniority and benefits;

b) Conduct training for all managers regarding racial discrimination, retaliation and Defendants' policy regarding racial discrimination and retaliation;

c) Conduct training regarding how to prevent hidden and overt bias (including stereotypes) from impeding the advancement of African-Americans in the workplace;

d) Forbid future violations of the Civil Rights Act of 1866, Title VII and the IHRA or any other laws prohibiting race discrimination and retaliation in the workplace;

e) Adopt policies aimed at preventing and remedying any future violations that may occur, including an *effective* reporting procedure and *effective* investigation procedures that prevent retaliation; and

f) Notify all employees of the violation(s) and the remedy imposed by this Court.

## II.      Other Relief As The Court Deems Just And Equitable

Plaintiffs on behalf of themselves and all other similarly situated also

respectfully request that the Court order other equitable relief, including, but not

limited to an order:

a)  Enjoining Defendants from further unlawful conduct;

b)  Directing Defendants to Plaintiffs' and all other similarly situated African-
Americans lost past and future wages (including benefits), compensatory
damages, and punitive damages;

c)  Directing Defendants to pay Plaintiffs' attorneys' fees and costs (including
any expert witness fees); and

d)  Awarding all other and relief that the Court may deem equitable, just or
appropriate that is available under applicable law.

### JURY DEMAND

Plaintiffs demand a trial by jury of all issues raised in their Complaint.

Respectfully submitted,


/s/ J. Bryan Wood
_____
J. Bryan Wood
Attorney for Plaintiff

J. Bryan Wood  (No. 6270845)
THE LAW OFFICE OF J. BRYAN WOOD
542 S. Dearborn, Ste. 610
Chicago, Illinois 60605
Telephone:  (312) 545-1420
Facsimile:  (312) 577-0749
Email:  bryan@jbryanwoodlaw.com

Electronically filed on October 13, 2009