# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JAMES JONES, NICOLE STEELS, KAVON WARD, AND IONA TOLES, on behalf of themselves and others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 09 C 06437 |
| v. | ) ) | Judge John J. Tharp, Jr. |
| NATIONAL COUNCIL OF YOUNG MEN'S CHRISTIAN ASSOICATIONS OF THE UNITED STATES OF AMERICA ("YMCA of the USA"), an Illinois not-for-profit corporation, and ELINOR HITE, former Senior Vice President of YMCA of the USA, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs James Jones, Nicole Steels, Kavon Ward, and Iona Toles have filed this suit on behalf of themselves and other similarly-situated employees of the National Council of Young Men's Christian Associations of the United States of America (the "Y"), alleging claims of race discrimination and retaliation against the Y and Elinor Hite, the former director of the Y's human resources ("HR") department, pursuant to Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq.,* and the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq.* Now before the Court are the parties' respective objections to the Report and Recommendation of Magistrate Judge Arlander Keys issued on September 5, 2013 ("Report"). Judge Keys has recommended that the Court: (i) grant the defendants' motion to strike the report and testimony of one of the plaintiffs' proffered experts,

Dr. Anthony G. Greenwald; (ii) deny the defendants' motion to strike the report and testimony of another expert proffered by the plaintiffs, Dr. Mark Killingsworth; (iii) deny the plaintiffs' motion for class certification; and (iv) grant the defendants' motion to deny class certification. For the reasons set forth below, the Court overrules the parties' objections to Magistrate Judge Keys' thorough and persuasive Report and adopts the Report's recommendations in full.[1] This opinion assumes familiarity with Judge Keys' Report and will not repeat its descriptions of the relevant facts and legal arguments of the parties except as specifically necessary to address the parties' objections.

### 1. Defendants' Motion to Strike: Dr. Anthony G. Greenwald

Judge Keys recommended that the Court strike the report and testimony of one of the plaintiffs' retained experts, Dr. Anthony G. Greenwald. The plaintiffs object to that recommendation, asserting that it is unnecessary to address the defendants' motion as to Dr. Greenwald because they do not rely on Dr. Greenwald to support their motion for class certification.

There seems little point to this objection. While the plaintiffs are correct that *American Honda Motor Company v. Allen*, 600 F.3d 813 (7th Cir. 2010) does not *require* courts to rule on a *Daubert* motion before addressing class certification, that is beside the point. Whether or not the plaintiffs rely on Dr. Greenwald's report and testimony in support of their class certification motion, the defendants have raised a *Daubert* challenge to the use of Dr. Greenwald's report and testimony for any purpose; the defendants' motion is not limited to the context of class

---

[1] The Court notes, however, that the defendants' motion to deny class certification [Dkt. 306] was previously stricken by the prior district judge assigned to this case. *See* Dkt. 342 (granting plaintiffs' motion [Dkt. 323] to strike the defendants' motion to deny class certification). Accordingly, that motion is not at issue.

certification.[2] The parties have fully briefed the issues raised by that challenge and, accordingly, it would be appropriate for the Court to address it now, even if it were not directly relevant to the class certification motion. And in any event, the plaintiffs cited Dr. Greenwald's report in their class certification brief (Dkt. 359 at 3 n.1), in their objections to the Report's recommendation to deny their class certification motion (Dkt. 448 at 8 n.7), and they argued in response to the defendants' motion that it was relevant to the question of commonality (Dkt. 423 at 12-13), so the plaintiffs' contention that the Court should defer consideration of the motion is unpersuasive.

In their opposition to the defendants' motion, the plaintiffs maintain that they intend to use Dr. Greenwald's testimony "to educate the factfinder on general principles," quoting the text of the Advisory Committee Notes to Federal Rule of Evidence 702. Dkt. 423 at 5. Dr. Greenwald's opinions are based on his work developing the "Implicit Association Test" ("IAT"), which he states has been "validated with tens of thousands of participants in laboratory research studies." Greenwald Rpt. at ¶ 8-9. Dr. Greenwald's report does not describe the IAT process, but the plaintiffs do not dispute that it is a computerized exercise based on automatic word associations that test subjects make when shown pictures of individuals of various genders, races, and ethnicities. The photos are displayed for only milliseconds; then the test subjects are asked to make an association. "If a test-taker responds more quickly, say, to the pairing of photographs of African-American faces with negative character trait words than to the pairing of European-American faces with the same negative traits, the test-taker is said to exhibit an implicit negative stereotype toward African-Americans." Dkt. 403, Ex. B at 10-11.

---

[2] By comparison, the *Daubert* challenge to Dr. Killingsworth's report and testimony that the defendants submitted to Magistrate Judge Keys was expressly limited to its use in supporting the class certification motion. *See* Dkt. 405 ("Defendants' Motion to Strike the Reports and Testimony of Dr. Mark R. Killingsworth for Purposes of Class Certification"). The defendants submitted a separate motion addressing Dr. Killingsworth's opinions as relevant to the claims of the individual plaintiffs. *See* Dkt. 369.

The "general principle" Dr. Greenwald derives from IAT testing and which the plaintiffs wish to educate a jury about is "that bias or stereotypes—and particularly unconscious bias against African Americans, which is widely present in the American population—poses greater risk of manifesting itself in conjunction with subjective criteria." Dkt. 423 at 1. The plaintiffs state that Dr. Greenwald's testimony is offered only for the purpose of educating the jury about the general principle that people in the United States "operate on the basis of implicit biases—stereotypes—that function on an unconscious level even amongst good, well intentioned people and lead us to relatively favor whites and relatively disfavor blacks." Plt's Obj. at 8 n.7.

The plaintiffs attempt to explain the relevance of this general principle by representing that they are offering Dr. Greenwald's opinions only to answer a question that may "nag" the jury, namely "how it is possible that so many different managers, presumably well-meaning (some of whom are blacks themselves) could so systemically disadvantage black workers?" *Id*. But that is no more than to say that the plaintiffs offer Dr. Greenwald's testimony as evidence of causation, and the plaintiffs concede as much: "Plaintiffs seek to rely on Prof. Greenwald's report and testimony … as evidence of general causation …." Dkt. 423 at 1. In this regard, it is significant that Dr. Greenwald does not merely opine that Americans *might* harbor implicit bias against African Americans that *might* manifest itself in the absence of objective information and criteria; he opines that "implicit or hidden biases . . . *are now established as causes of adverse impact* that is likely unintended and of which perpetrators are likely unaware." Greenwald Rpt. at ¶ 15 (emphasis added). Indeed, Dr. Greenwald opines that, in the absence of "clear evidence of either overt discriminatory intent or evidence to support race-neutral alternative explanations," *id.* at ¶ 14, "*it is more likely than not that adverse impact is a consequence of unintended discrimination*, which can be brought about by managers who remain unaware of having acted in

ways that produce adverse impact," *id.* (emphasis added). In other words, unless the evidence to the contrary is "clear," Dr. Greenwald maintains that it is "more likely than not" that implicit discriminatory bias accounts for any disparity between the treatment of African Americans and other racial groups.

Given these opinions, the Court does not credit plaintiffs' contention that Dr. Greenwald's testimony is for the limited purpose of educating the factfinder as to general principles and the plaintiffs do not attempt to defend the admissibility of his opinions on the basis that he has applied the general principles of his implicit bias theory to the facts of this case. As Judge Keys recognized, Report at 21, Dr. Greenwald's six-page report falls far short of providing a reliable basis to support an opinion that implicit bias of the Y's managers caused any disparity in performance evaluations, pay, or promotions at the Y.

Even at the level of general principles, the Court is not persuaded that Dr. Greenwald's testimony and opinions are adequately tied to the facts of this case to be useful to a jury. Even opinions about general principles have to be logically related to the factual context of a case to be admissible—those general principles must still "fit" the case—as the Advisory Committee Note to the 2000 amendments to Rule 702, on which the plaintiffs heavily rely, points out. But Dr. Greenwald's opinions do not fit; they are (so far as his report suggests, anyway) derived solely from laboratory testing that does not remotely approximate the conditions that apply in this case specifically or more generally in the context of an employer's decisions about employee compensation and work assignments. As the defendants point out:

> All Dr. Greenwald can tell us is that people who spontaneously react to virtual strangers in laboratory settings whom they will never meet or see again, with nothing at stake, will tend to make unconscious associations that are not favorable to blacks. … In this lawsuit, by contrast, we are considering deliberate business decisions in the workplace—not split second decisions in a

> laboratory—by individuals who know the people for whom they are making important decisions concerning their pay, promotions, and performance evaluations, in a setting where the decision-makers operate in a supervised environment and under the constraints of EEO policies and laws, the violation of which has serious consequences, including individual liability.

Dkt. 430 at 5. Neither Dr. Greenwald nor the plaintiffs establish a logical connection between the principle that hidden bias may be manifested in the absence of any other information and the premise that hidden bias says anything about the results of employment decisions made by supervisors and managers who are armed with abundant data and are personally invested in the results of the process.

The plaintiffs argue that Dr. Greenwald's opinions are no different than Judge Posner's observation in *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 672 F.3d 482, 489 (7th Cir. 2012), that "when there is uncertainty people tend to base decisions on emotions and preconceptions, for want of objective criteria." But that statement just highlights the disconnect between Dr. Greenwald's opinions and the facts of this case. In the context of employee evaluations, pay, and promotion decisions, there is not a "want of objective criteria"; supervisors have the first hand opportunity to observe and evaluate the competence of the employees they evaluate; that they bring subjectivity to this task does not make their decisions uninformed. Judge Posner's observation in *McReynolds* "fit" that case because there the practice under scrutiny did not involve decisions made on the basis of firsthand experience and evaluation but on the creation, by unaccountable employees, of "little fraternities"—broker teams—a practice that inherently involved the exclusion of employees who were not known or familiar to one

another.[3] *McReynolds* involved decisions made in an informational vacuum, so there was a connection to the premise of Dr. Greenwald's opinions. There is no such connection here.

The substantial disconnect between the abstract testing from which Dr. Greenwald's "general principle" is derived and the fact context of this case is particularly problematic given that Dr. Greenwald's opinions cross the line into the realm of causation and blur, if not erase altogether, the line between hypothetical possibility and concrete fact. The resulting risk that the jury would be unable to ascertain that line persuades the Court that, even if there were a minimally adequate "fit" between Dr. Greenwald's general principles and the facts of this case, it would nevertheless be appropriate to exclude his testimony under Federal Rule of Evidence 403 (permitting exclusion of evidence due, among other reasons, to a risk that it will confuse or mislead the jury). *See, e.g., Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 766 (7th Cir. 2013) (evidence that meets the requirements of Rule 702 may nevertheless be excluded under Rule 403); *Wallace v. Mulholland*, 957 F.2d 333, 336 (7th Cir. 1995) (affirming trial court's exclusion of evidence about likelihood that someone with party's condition would act in a particular manner; as the case was about that party's "actual behavior," the evidence "was probably irrelevant, and certainly prejudicial").

Finally, the lack of "fit" between Dr. Greenwald's opinions and this case is evidenced by the plaintiffs' inability to identify a purpose for admitting his testimony (other than as evidence

---

[3] In making this observation, Judge Posner in no way endorsed the validity of IAT testing; the plaintiff in that case offered no such opinion evidence and Judge Posner cited none. That suggests yet another reason to exclude Dr. Greenwald's testimony about the "general principle" of implicit bias: it is little more than a truism. That people may unconsciously base decisions on their biases in the absence of other data—or in Judge Posner's words, that "when there is uncertainty people tend to base decisions on emotions and preconceptions"—is not a concept outside the ken of the average juror. Dr. Greenwald's testimony, therefore, is unlikely to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

of causation). As noted, the plaintiffs' primary objection to Judge Keys' recommendation is that there is no need to exclude Dr. Greenwald's report and testimony in considering class certification because they do not rely on his opinions for that purpose. For what, then, do they rely on his opinions? They cannot use his opinions to support their intentional discrimination claims, since Dr. Greenwald's opinions speak only to the question of implicit, or hidden, bias—not intentional acts. And as we have seen, they are not relevant to establishing the plaintiffs' disparate impact claims (the claims they purport to advance on behalf of a class). If Dr. Greenwald's opinions are not relevant to either, then they will not be of assistance to the factfinder.

For all of these reasons, the Court overrules the plaintiffs' objections to Judge Keys' recommendation and grants the defendants' motion to strike Dr. Greenwald's report and testimony.

### 2. The Defendants' Motion to Strike: Dr. Mark Killingsworth

In support of their class certification motion, the plaintiffs offer the report and testimony of Dr. Mark Killingsworth, a professor of economics at Rutgers University, who opined, based on a number of multiple regression analyses he conducted on data from the Y, that there were statistically significant disparities between African Americans and other employees at the Y with respect to performance evaluations in 2007 and 2008, and with regard to compensation in 2005 through 2007.[4] This evidence is relevant to the issue of whether class members fare as well in terms of performance evaluations, pay, and promotions as do other employees of the Y—that is

---

[4] The road to these opinions was not straight or smooth, and is thoroughly recounted in Judge Keys' Report, at 26-29. For purposes of this opinion, the details of that path are not relevant. It should be noted as well, however, that Dr. Killingsworth ultimately found no statistically significant disparity in performance evaluations in 2009 and no statistically significant disparity in compensation in 2008, 2009, or 2010.

to say, whether there is any disparity between the class and other employees. It is also probative of the question of whether the disparities are the product of chance because it controls for certain variables that might otherwise account for the disparities.

It is largely on that basis that the defendants challenged the admissibility of Dr. Killingsworth's report and testimony; they argued that Dr. Killingsworth failed to control for important variables and committed other errors in selecting data that render his opinions unreliable. Judge Keys carefully reviewed these arguments concerning Dr. Killingsworth's opinions but concluded that he employed reliable methodology and that the defendants' criticisms concerning his choice of variables and data went to the weight to be given to the opinions rather than to their admissibility. This Court agrees, and will supplement Judge Keys' reasoning only to point out that it is entirely consistent with the Seventh Circuit's recent analysis of similar issues in *Manpower, Inc. v. Insurance Company of Pennsylvania*, 732 F.3d 796 (7th Cir. 2013), a case decided about a month *after* Judge Key's issued his Report and which further confirms the validity of his analysis and conclusions. *See generally id.* at 806-09 (noting that reliability "is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced," and highlighting "the latitude we afford to statisticians employing regression analysis" regarding, among other things, "the choice of independent variables to include"). *Manpower* confirms that Judge Keys' recommendation to deny the defendants' motion to strike Dr. Killingsworth's report and testimony was on the mark and the Court adopts the recommendation.

### 3. Plaintiffs' Motion for Class Certification

The plaintiffs seek to certify a class that includes:

> African American employees of the National Council of Young
> Men's Christian Associations of the United States of America (the

"Y") employed at any point from October 13, 2005 to September 30, 2008, excluding Leadership Group members and in-house counsel.

They seek to certify that class, however, only as to a specific issue, namely "whether the Y's compensation, performance review and promotion policies led to income disparities between black and white workers." Plt's Obj. at 1.[5] Judge Keys recommends denial of the plaintiffs' class certification motion for failure to satisfy three of the prerequisites for class certification set forth in Federal Rule of Civil Procedure 23(a): commonality, typicality, and adequacy. The primary dispute between the parties relates to the first of these prerequisites, though the question of the plaintiffs' typicality and adequacy as class representatives also bears discussion.

### a. Commonality

Critical to the evaluation of whether the plaintiffs have satisfied Rule 23(a)(2)'s requirement that there are questions of law or fact common to the class is the identification of the policy (or policies) that caused the disparate impact on which the plaintiffs' class claim is based. That is because, as the Supreme Court explained in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), merely proving that there is a race-based disparity in a material term or condition of employment between the members of a protected class and employees outside that class "*is not enough.* [T]he plaintiff must begin by identifying the specific employment practice that is challenged.*" Id.* at 2555 (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988)). The central dispute between the parties, which Magistrate Judge Keys resolved in favor of the defendants, is whether the plaintiffs have identified a company-wide policy bearing on

---

[5] In other words, they seek only certification of the question of the Y's liability for implementing an employment practice that caused a disparate impact on the Y's African American employees during the class period. The plaintiffs do not seek certification of their claims for back pay and other monetary equitable relief (which the plaintiffs occasionally, and erroneously, refer to as "damages"; compensatory or punitive damages are not available for disparate impact claims—*see McReynolds*, 672 F.3d at 483-84).

performance evaluations, pay, and promotions that causes a disparate impact on African American employees of the Y as a whole.

The plaintiffs identify the policy at issue as "the Y's forced performance grading policy" and the common issue they wish to certify as "whether the Y's forced performance grading policy, which in turn drove compensation and promotion, resulted in the income and job assignment disparities uncovered by labor economist Mark Killingsworth [one of plaintiffs' retained experts]." Plt's Obj. at 1.[6] One might imagine, then, that the plaintiffs would describe "the Y's forced performance grading policy" with some particularity. They do not. In their Objections, they say only that the policy "required [managers] to grade their direct reports, based on subjective criteria, and assign a numerical rating." Plt's Obj. at 5.[7] To the extent that this describes a policy, it can only be said to be a policy that requires employees to be evaluated based on subjective criteria.[8]

A company-wide policy that vests managers with the discretion to evaluate employees based on subjective criteria cannot be the commonality predicate for a class action. That was the Supreme Court's holding in *Wal-Mart*, where it reversed certification of a class comprising

---

[6] *See also id.* at 9 (plaintiffs are challenging "the Y's forced grading policy"); Plt's Obj. Reply at 5 (plaintiffs are challenging "the performance grading system").

[7] *See also id.* at 3 ("the common issue is whether the Y's forced performance grading system—which required managers to grade employees on a numerical scale"); Plt's Obj. Reply at 3 ("the practice is that employees be scored on a numerical scale, which is then used to determine their compensation and job assignment").

[8] As described by the plaintiffs, the "forced grading policy" is an amalgamation of a number of other policies, guidelines, and procedures employed by the Y during the class period to manage the process of evaluating, paying, and promoting employees. These are described in Judge Keys' Report at 5-9, and some are discussed more specifically below at 15-16. For purposes of considering the plaintiffs' class certification motion, the Court accepts the plaintiffs' characterization of the essence of those policies, guidelines, and procedures: a process by which managers are required to evaluate their employees based largely on subjective criteria and to base compensation and promotions on those subjective evaluations.

current and former female employees of Wal-Mart because the premise of their class claim—that Wal-Mart's policy of vesting discretion to make pay and promotion decisions with its local supervisors with only limited corporate oversight resulted in discrimination against them—was not susceptible to class-wide resolution because the plaintiffs failed to adduce evidence that "a common mode of exercising discretion pervades the entire company." *Id.* at 2554-55. *See also Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 896 (7th Cir. 2012) (*Wal-Mart* held that claims predicated on "discretionary acts by local managers [that] produced discriminatory effects" do not present a common question required by Rule 23(a)(2) and cannot be certified as a class).

Judge Keys' Report appropriately acknowledges the consequences of *Wal-Mart* (which was decided well after the plaintiffs filed this case) for the plaintiffs' class claims in this case. *See* Report at 45-47, 56-57 (reviewing *Wal-Mart* and concluding that it precludes certification of the plaintiffs' proposed class). After surveying the performance evaluation, pay, and promotion procedures employed by the Y, Judge Keys concluded both that the Y vested its supervisors and managers with substantial discretion and that there was no common policy or procedure uniformly applicable to the Y's employees because the procedures changed over time, offered many different avenues for pay raises and promotions, and were subject to ad hoc exceptions, thus creating myriad permutations that undermined the plaintiffs' assertion of uniformity.[9] Judge Keys' conclusion that the plaintiffs failed to identify a common policy that could be said to have affected the members of the putative class in the same way—as required to show that the class

---

[9] The number of possible decisional permutations applicable to this putative class, based just on the procedures discussed in the parties' briefs, outnumber the members of the class: 3 (different sets of evaluation criteria during the class period) x 9 (types of possible compensation adjustments) x 6 (paths to promotion) = 162 possible combinations of procedures that might account for any particular plaintiff's evaluations, compensation, and work assignment. By contrast, the plaintiffs estimate that the class includes approximately 85 members. This calculation does not even consider the number of different supervisors and managers with discretion to evaluate employees, grant raises, or promote employees.

members suffered a common injury—is consistent with, and required by, the Supreme Court's ruling in *Wal-Mart*.

The high degree of discretion and the myriad permutations that characterized the Y's procedures and practices regarding performance, pay, and promotions may explain why, in their objections, the plaintiffs refer only to "the Y's forced grading policy"—a term that does not appear at all in their class certification motion or briefs. In their Objections to Judge Keys' Report, the plaintiffs have attempted to avoid the import of *Wal-Mart* by combining what they had previously characterized as different policies and downplaying the degree of discretion afforded by those policies to supervisors by describing the combined system as a single "forced," *i.e.,* a mandatory, non-discretionary, "employment practice." By increasing the level of abstraction in defining the policy, the plaintiffs seek to identify and define the common, company-wide, policy that was missing in *Wal-Mart*.[10] But at that level of abstraction, the "forced grading policy" they describe in their Objections is so bereft of content as to be no policy at all; it is merely a policy directing managers to evaluate employees using subjective criteria. And at that level of generality, every company—even Wal-Mart—could be said to have a company-wide policy, and would be liable if there were a disparity in compensation or other conditions affecting employees who were members of a protected class. The plaintiffs argue that "[a]bsent effective oversight, subjective discretion will result in adverse outcomes for Blacks due

___

[10] The plaintiffs argue that the Report "mistakenly adopted … the premise that only policies that are 'discrete' or 'specific' and applied 'uniformly' are actionable," Plt's Obj. at 4, asserting that Title VII broadly prohibits not only discriminatory policies but also "employment 'practices,' which by their very nature are more amorphous and difficult to articulate." *Id.* This argument is off the mark in at least two respects. First, Judge Keys did not say that the plaintiffs' claims are not actionable; he said that they should not be tried as a class action. And second, the plaintiffs miss entirely the premise of the *Wal-Mart* decision: "recognition that this type of Title VII claim [a disparate impact claim based on an undisciplined system of subjective decisionmaking] 'can' exist does not lead to the conclusion that every employee in a company using a system of discretion has such a claim in common." 131 S. Ct. at 2554.

to bias." Dkt. 359 at 3. But that is precisely the argument held to be inadequate to support class certification in *Wal-Mart. See* 131 S. Ct. at 2548 (plaintiffs "claim that their local managers' discretion over pay and promotions is exercised disproportionately in favor of men, leading to an unlawful disparate impact on female employees"). *Wal-Mart* held that a policy that essentially leaves pay and promotion decisions to the subjective discretion of supervisors is not a "common policy" that can support maintenance of a class action by employees of that company. The Y's "forced grading policy" is not meaningfully different than the practices at Wal-Mart.[11]

In attempting to distinguish the Y's "forced grading policy" from Wal-Mart's policy of managerial discretion, the plaintiffs both overstate the degree of discretion afforded to managers at Wal-Mart and understate the degree of discretion granted by the Y. Contrary to the plaintiffs' characterization, Wal-Mart did not vest its managers with unfettered discretion to pay and promote employees as they saw fit. Rather, and as the Supreme Court carefully noted, although the company granted broad discretion to managers to increase wages and to select employees for promotion, that discretion had limits and was subject to corporate oversight. Thus, Wal-Mart imposed limits on the size of raises that could be awarded and established compensation ranges for employees at various levels within the company. *See* 131 S. Ct. at 2547; *see also In re Countrywide Fin'l Corp. Mortgage Lending Practices Litig.*, 708 F.3d 704, 708 (6th Cir. 2013) (noting that *Wal-Mart* cabined supervisor discretion within limits defined by objective criteria). Similarly, while store managers were permitted to apply their own subjective criteria when selecting candidates to put on a management training track, the track itself was prescribed and the company set a number of objective requirements that candidates also had to meet in order to

---

[11] It should also be mentioned—though the plaintiffs do not do so—that, like Wal-Mart, the Y had specific written anti-discrimination policies in effect during the class period. *See* Dkt. 409-1, Table A.

qualify. *Id*. Promotions to higher positions were "similarly at the discretion of the employee's superiors after the prescribed objective factors are satisfied." *Id*.

None of these limitations, however, rendered Wal-Mart's approach to pay and promotions as anything other than one in which pay and promotion decisions were "generally committed to local managers' broad discretion." 131 S. Ct. at 2547. The same holds true at the Y, notwithstanding the fact that managerial discretion in determining pay and promotions was not unfettered. Judge Keys' Report details the many ways in which the Y vested managers with discretion regarding performance evaluations, promotion decisions, and pay, so it is not necessary to review them all here; a few examples will suffice. Starting with performance evaluations (the starting point for the plaintiffs' description of the "forced grading policy"), the Y vested discretion in managers to recommend numerical performance ratings (on a scale of 1 to 4, with 4 being the best rating) based in part on their evaluation of the degree to which the employee advanced the Y's "company-wide core values" of "honesty, respect, responsibility, and caring." It is difficult to imagine an exercise that would vest greater discretion in an organization's managers than grading an employee on his or her capacity for "caring," and other evaluation criteria are only slightly less subjective. The fact that the Y required supervisors to assign numerical grades, moreover, did not make the process either less subjective or discretionary.

As the plaintiffs' description of the "forced grading policy" acknowledges, the subjective performance evaluation process in turn drove decisions on pay and promotions. But the processes involved in those decisions introduced even more discretion, subjectivity, and variability into the process. With respect to pay, Judge Keys found that the Y provided, through its "Salary Administration Guidelines" (or, "SAG"), nine different types of salary adjustments

for employees, many of which (if not all) were dependent in whole or part on discretionary judgments by supervisors and managers. The SAG, moreover, were based on the Y's "Total Compensation Philosophy," which required consideration not only of the employee's performance (the product of subjective evaluation) but also of amorphous concepts such as "the organization's strategy, the employee's role in the organization, and the market value of the employee's job." And if supervisors somehow found these concepts insufficiently malleable, and the adjustment options too few (how could they have?), they were free to recommend ad hoc exceptions—a practice that, even plaintiffs acknowledge, "undercut the promise of consistency." Dkt. 359 at 5.[12] As for promotions, Judge Keys identified at least six different paths to promotion, all of which were also predicated upon the exercise of supervisor and managerial discretion.

In short, the Y's policies and procedures regarding employee performance evaluation, pay, and promotions were—like Wal-Mart's—largely discretionary. The fact that there was some structure to the evaluation, compensation, and promotion process does not change the fact that the structure reinforced the discretionary nature of the decisionmaking in this area. That supervisors evaluate candidates according to specific, but subjective, factors—the plaintiffs' description of the "forced grading process" employed by the Y—does not make the decisions produced by the process meaningfully less discretionary. *Bolden* made this point in rejecting the plaintiffs' attempt "to repackage local variability as uniformity," 688 F.3d at 893, and holding that the 14 separate policies the *Bolden* plaintiffs identified as presenting common questions all boiled down to a "policy of on-site operational discretion—[which] is the precise policy that

---

[12] Indeed, the plaintiffs argue that the policy of permitting managers to recommend *exceptions* to the SAG "led to large racial disparities in compensation," *id.*, thereby undermining their claim that the salary guidelines themselves caused such disparities.

*Wal-Mart* says cannot be addressed in a company-wide class action." *Id. See also Randall v. Rolls-Royce Corp.*, 2010 WL 987484, *8 (S.D. Ind. Mar. 12, 2010) ("Even if salary ranges are predetermined centrally … the fact that … supervisors have the discretion to apply adjustments, bonuses, and other incentives to effect [sic] a subordinate's salary creates a circumstance that is significantly subjective and unique to the individual—hardly a compensation-setting circumstance which is readily amenable to a common class-wide analysis."), *aff'd,* 637 F.3d 818, 820 (relying on the district court's "cogent analysis").

Ignoring the import of *Bolden*,[13] the plaintiffs argue that the Y's "forced grading policy" is more like the policy at issue in *McReynolds v. Merrill Lynch*, 672 F.3d 482 (7th Cir. 2012). In *McReynolds* (decided before *Bolden*), the Seventh Circuit reversed the denial of class certification in a putative employment class action in which the plaintiffs alleged that "a national policy allowing brokers to form and distribute commissions within teams" had created a disparate impact. *Bolden*, 688 F.3d at 897-98 (describing *McReynolds*). But *McReynolds* expressly stated that, "to the extent that Merrill Lynch's regional and local managers exercise discretion regarding the compensation of brokers whom they supervise, the case is … like *Wal-Mart*." 672 F.3d at 489. And in *McReynolds*, unlike here, in addition to granting discretion to managers to determine the compensation of their employees, the defendant company imposed an across the board policy that required managers to allow the company's *brokers* (*i.e.*, non-

---

[13] The plaintiffs did not cite *Bolden* in their Objections. In their reply brief, after the defendants cited *Bolden* in response to the plaintiffs' objections, the plaintiffs contend that *Bolden* is distinguishable because it did not involve any company-wide policies other than the policy granting supervisor discretion. In the process, they completely ignore the fact that the plaintiffs in that case (like the plaintiffs here) claimed that there were company-wide policies that required evaluation on the basis of subjective criteria and otherwise imposed structural requirements on the exercise of supervisor discretion and that the Seventh Circuit recognized those policies all "boiled down to" a general grant of operational discretion and did not meaningfully distinguish the policies from those at issue in *Wal-Mart*.

management employees) to engage in the practice alleged to have created a disparate impact (namely, forming broker teams and prescribing criteria for account distributions, that may have been influenced by team assignments). *That* policy, which institutionalized the practice and impact of broker teams, was a corporate policy, not an exercise of discretion by local managers and therefore distinguished Merrill Lynch from Wal-Mart.

There is no similar policy in this case. As noted, the "forced grading policy" described in the plaintiffs' Objections requires nothing more than "that employees be scored on a numerical scale, which is then used to determine their compensation and job assignment." Wal-Mart's policies prescribed that much. And to the extent that the plaintiffs are—contrary to their position that their focus is on the overall performance/compensation/promotion "employment practice"— alleging that any of the component pieces of "the forced grading policy" constitute the "company wide" policy that was missing in *Wal-Mart*, they fail to show how those policies do anything other than confirm the vesting of broad discretion in the supervisors and managers evaluating the Y's employees—just as did the "policies" identified by the plaintiffs in *Bolden*.

The only aspect of the Y's policies that even suggests any centralized restriction on the discretion provided to its supervisors and managers with respect to evaluation, compensation, and promotion decisions is the provision for centralized review of compensation and promotion decisions by the Y's most senior managers. In theory, if all pay and promotion decisions had to be vetted by a single decisionmaker, or a small, cohesive group, then there might be a basis to argue that it is the performance of that function, by that decisionmaker, that constitutes the common practice among employees claiming disparate impact. That is the point of *Wal-Mart* and *Bolden* in suggesting that classes limited to a single store or supervisor might satisfy the commonality requirement. *See* 131 S. Ct. at 2551; 688 F.3d at 899; *see also, e.g., Ladik v. Wal-*

*Mart Stores, Inc.*, 291 F.R.D. 263, 272 (W.D. Wis. 2013). But the evidence adduced in this case rebuts the plaintiffs' contention that there was any single individual or cohesive group that controlled, or even influenced, individual compensation and promotion decisions. While various documents indicate that "final approval" of pay and promotion decisions was vested in some combination of the Y's CEO, COO, Director of HR, and other members of senior management (the Y's "Leadership Group," comprising between 15 and 39 individuals), the evidence establishes that the recommendations of lower level direct supervisors and managers were almost always accepted; the plaintiffs point to no evidence showing that any member of senior management changed pay or promotion recommendations submitted to them for approval with any frequency, much less that they did so with a regularity that would establish them as a common denominator among the many such decisions.[14] The evidence presented by the plaintiffs establishes, at most, that the Y's senior managers exercised some limited corporate oversight of the process or employee evaluations, compensation, and promotions, but that limited oversight did not change the dominant feature of the Y's system, namely reliance on the subjective, discretionary, assessments and recommendations of the direct supervisors and managers of the Y's employees. The Y's degree of "corporate oversight" is not meaningfully different than Wal-Mart's. *See* 131 S. Ct. at 2547 (Wal-Mart exercises "limited corporate oversight" of the pay and promotion process but pay and promotion decisions "are generally committed to local managers' broad discretion").

---

[14] CEO Neil Nicoll, for example, testified that he reviewed data relating to pay and performance rating recommendations for the purpose of assessing whether departments were within budget, not for the purpose of adjusting individual decisions. Nicoll recalled disapproving only one compensation award during his tenure as CEO, and that was for a white employee. Dkt. 407-1 at 14. There is no evidence that defendant Hite ever changed a performance rating to the detriment of a putative class member, either. Report at 52.

The plaintiffs also attempt to distinguish *Wal-Mart* on the basis that it was a disparate treatment case, not a disparate impact case like this one. *See* Plt's Obj. at 7 (*Wal-Mart* "was brought and certified as a disparate treatment case"). That is simply wrong; *Wal-Mart* included disparate impact claims. *See* 131 S. Ct. at 2548 (plaintiffs "claim that their local managers' discretion over pay and promotions is exercised disproportionately in favor of men, leading to an unlawful disparate impact on female employees"); *id.* (describing the "basic theory" of plaintiffs' case to be that Wal-Mart's corporate culture permits subconscious bias to infect the discretionary decisions of supervisors).[15]

The purported distinction is, in any event, irrelevant. Whether the practice on which the claims are based is intentionally or inadvertently discriminatory does not matter; in either case, the plaintiff must still establish that the practice is the common cause of conduct for which the defendant is alleged to be liable under Title VII. That is why in *Wal-Mart* the Supreme Court expressly stated that its analysis was applicable to claims of disparate impact as well as disparate treatment. *See* 131 S. Ct. at 2551 ("Quite obviously, the mere claim by employees … that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once."). That is because there must be a common cause for the injuries claimed.[16] The plaintiffs do not explain why there is a need to identify a specific common policy that is the cause of disparate treatment class claims but not disparate impact claims.

---

[15] The plaintiffs similarly and erroneously contend that *Bolden* did not include disparate impact claims. *See* Dkt. 452 at 8. It did. *See* 688 F.3d at 897 ("According to plaintiffs—in *Wal-Mart* and this case alike—local discretion had a disparate impact that justified class treatment.").

[16] This does not mean that commonality requires each class member to have been affected by the policy in the same way—*e.g.*, that their pay was comparably diminished. That is a question of remedy. It means that the disparate impact the plaintiffs allege must result from a common policy. If it does not, then the class members cannot be said to have suffered a common injury.

The statistical evidence the plaintiffs offer adds nothing to the proof of the existence of a common policy that is the common cause of injury to the class members, as *Wal-Mart* and *Bolden* also make plain. In *Wal-Mart,* the Court rejected the proffered statistical evidence as an adequate basis to establish commonality, holding that even statistical evidence showing a disparity in every one of Wal-Mart's 3400 stores would not suffice to show causation—that is, in the absence of a common policy or procedure, mere statistics could not "produce a common answer to the crucial question *why was I disfavored*." 131 S. Ct. at 2552, 2554-56 (emphasis in original). The Seventh Circuit emphasized this point in *Bolden*: statistical evidence of a disparity simply "begs the question" of the cause of the disparity. 688 F.3d at 896. A well done multiple regression analysis may go a long way to establishing that there *is* a race-based disparity, ruling out the possibility that an observed disparity is simply the product of chance. But ruling out chance says only that *something*, or *some combination of things*, other than chance, is causing the disparity; it does not identify what that thing, or those things, actually may be. *See, e.g., Baylie v. Federal Reserve Bank of Chicago,* 476 F.3d 522, 524 (7th Cir. 2007) (regression analysis may tell us whether disparity in outcome is "the sort of variance that may occur by chance" but does not identify the cause of the adverse outcome). At most, Dr. Killingsworth's reports and testimony show that something, other than chance, caused a disparity in performance ratings between African American employees and other employees at the Y in 2007 and 2008, and in pay during 2005, 2006, and 2007. His analysis, however—derived from hundreds of employment decisions made by myriad decision makers, at different times, under mutable procedures and guidelines, in different departments, and in different office locations, concerning employees at varying levels of experience, responsibilities, and education—says nothing about what caused

these disparities—whether one thing ("the forced grading policy") or many things (the discretionary evaluations of individual supervisors and managers).

And indeed, the plaintiffs do not contend that Killingsworth's analysis has anything to say in this regard. As the defendants point out, the plaintiffs effectively concede that their statistical evidence does not prove that the Y's "forced grading policy" causes the reported disparities. *See* Plt's Resp. to Def's Objs., Dkt. 450, at 11. Rather, they argue that Title VII places "no burden on plaintiffs' *expert* to identify the challenged employment practice(s) or to prove that the practice(s) caused the disparity by ruling out every other potential explanation or cause for the disparities." *Id*. True enough. But as the proponents of class certification, the plaintiffs are required to adduce "convincing proof of a companywide discriminatory pay and promotion policy." *Wal-Mart*, 131 S. Ct. at 2556-57; *see also id*. at 2552 ("commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury"); *id*. ("a party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* … common questions of law or fact"); *id*. at 2554 ("significant proof" of a general policy is required to satisfy the commonality element).[17] If they do not do so through expert testimony, they must do so in some other way.

"There must," the plaintiffs maintain at the outset of their objections to Judge Keys' Report, "be *some* explanation for these gross disparities." Plt's Obj. at 1. Of course there is

---

[17] To the extent that the plaintiffs argue that to satisfy their burden under Rule 23(a) they need only "have identified the policies or practices they are challenging and allege the use of the results in the challenged disparities"—*see, e.g.*, Plt's Objs. at 7—that contention cannot be squared with *Wal-Mart*, or predecessor cases recognizing that Rule 23's requirements sometimes require resolution of merits issues at the class certification stage. *See Wal-Mart*, 131 S. Ct. at 2552-52; *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982); *Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481, 493 (7th Cir. 2013) (citing *Wal-Mart*); *Szabo v. Bridgeport Machines, Inc*., 249 F.3d 672, 676 (7th Cir. 2001) ("Before deciding whether to allow a case to proceed as a class action, therefore, a judge should make whatever factual and legal inquiries are necessary under Rule 23.").

"some" explanation, but there is no basis, on this record, to conclude that it is the same reason for all class members. To certify a class, the plaintiffs need to demonstrate (with "significant proof") that there is a *common* explanation—that the same explanation applies to the entire class. Judge Keys concluded that they had failed to do so. Report at 50 ("Plaintiffs do not support the claim … with evidence."). This Court agrees with that assessment. *Wal-Mart* holds that a policy that vests supervisors with broad discretion to make pay and promotion decisions, like the Y's, does not provide a common explanation for disparities in pay and promotions. The Court is bound by that assessment. Accordingly, the plaintiffs' motion for class certification must be denied because the plaintiffs have not met their burden under Rule 23(a)(2) to establish that there is even a single common question to be resolved on behalf of the putative class.

### b. Typicality and Adequacy

Judge Keys also recommends denial of class certification for the additional reason that the claims of the named plaintiffs are not typical of those of the putative class members, as required by Rule 23(a)(3). The Court agrees with this assessment. The Court also concurs that several of the named plaintiffs have conflicts that render them unsuitable class representatives, though this conclusion does not provide an additional basis for denying class certification because not all of the named plaintiffs have such a conflict.[18]

With respect to typicality, Judge Keys concluded first that for the same reasons that the plaintiffs have failed to identify a common policy that is the cause of the alleged disparate impact, the plaintiffs failed to demonstrate that their claims are typical of the claims of other

---

[18] Judge Keys analyzed all of the issues discussed below as questions of typicality under Rule 23(a)(3). As the Seventh Circuit noted in *Randall*, however, "the usual practical significance of lack of typicality … is that it undermines the adequacy of the named plaintiff as a representative of the entire class." 637 F.3d at 824. The Court therefore treats the question as one of adequacy, though for practical purposes it does not matter which of these two criteria is used.

class members, as required by Rule 23(a)(3). Report at 63. That logic is irrefutable; if the plaintiffs cannot establish that they were injured by the same conduct that injured other class members, then their claims cannot be typical of other members of the class. *See Falcon,* 457 U.S. at 157 n.13 ("The commonality and typicality requirements of Rule 23(a) tend to merge.").

With respect to adequacy, the parties' dispute arises primarily from the fact that the putative class includes both line employees and many managers and supervisors (the class includes all employees other than "Leadership Group" members, a group that comprises only the most senior executives at the Y). Thus, a number of class members (11 of 85, or 13%) participated in the evaluation process and therefore influenced pay and promotion decisions concerning other class members. *See* Dkt. 409-1, Table C. Plaintiff Jones is among this group of class-member managers. "The plaintiffs acknowledge that Jones made recommendations for employee performance evaluation ratings and, at his deposition, Mr. Jones did as well." Report at 65. Jones, for example, even participated in the review process for plaintiff Nicole Steels. Jones Dep., Dkt. 409-39 at 144:9-21.

In addition, Jones and plaintiff Steels worked in the Y's Human Resources Department and played substantial roles in developing, implementing, and administering the components of the Y's "forced grading policy." Plaintiff Jones was a manager in the Human Resources Department. For most of his tenure, he served as the Director of Training and Organizational Development, responsible for developing and implementing training programs for Y employees, but for several months in 2005 Jones served as the interim director of Human Resources, between the departure of HR Director Steven Timmons and the Y's hiring of defendant Elinor Hite to replace Timmons. Plaintiff Steels also worked in the HR Department at the Y, first as a benefits administrator and subsequently as an HR Generalist. As the defendants accurately

summarize, Jones and Steels helped to develop training materials and assisted with training for the performance evaluation process, worked on revising the Y's salary grade level definitions, and recommended that the Y create the SAG. Steels worked directly with the consultant hired to develop the SAG, helped revise performance management tools, updated performance evaluation forms, and claims to have overseen the Y's performance management system in 2007. Dkt. 407-1 at 21 & n.89.

That Jones and Steels worked in HR does not itself disqualify them as adequate class representatives, but that does not address the more relevant question of whether their participation in developing the policies and procedures that are alleged to be the common cause of the disparate treatment of African American employees of the Y does so. The plaintiffs argue that they were not the final decisionmakers regarding such matters, but that does not change the fact that—as Judge Keys found—"both had critical roles in the development, implementation, and administration of the very policies the lawsuit attacks as discriminatory." Report at 66. As the Seventh Circuit observed in *Randall,* "evidence that the plaintiffs participated in decisions … that, on their theory of the case, were discriminatory" gives rise to a conflict of interest. 637 F.3d at 824. Jones' conflict is particularly acute since he actually made recommendations concerning evaluations, pay, and promotions that may be attacked in this litigation as discriminatory. It does not matter, for purposes of conflict analysis, whether Jones and Steels were responsible for the final approval of decisions relating to employee evaluations, pay, and compensation, given their substantial roles. There plainly is potential for "tension" between their previous actions and the position of the disparate treatment claims of the class members, which are based on those actions; that tension justifies a conclusion that Jones and Steels are not adequate class representatives. *See Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir.

1993) (affirming denial of class certification where "tension exists" between prior action of plaintiffs' director when he was a member of another organization's board of directors and those of the plaintiff class).[19]

The plaintiffs advance no argument that plaintiff Ward is an adequate class representative. *See* Dkt. 359 at 16 (asserting only that "[t]hrough Steels, Jones and Toles, Plaintiffs represent" all segments of the putative class). That leaves only plaintiff Iona Toles. As to Toles, the only argument the defendants advance as to her adequacy is that she competed for a single promotion against another class member. Even if that is true (and the plaintiffs contest the point), the Court does not deem that fact to render Toles an unsuitable class representative. Accordingly, although the Court agrees that Jones and Steels are not adequate class representatives, Toles is, and so there is not a basis to deny class certification for failure to satisfy the requirements of Rule 23(a)(4).

*     *     *     *     *

For the foregoing reasons, the Court adopts the recommendations of Judge Keys and denies the plaintiffs' motion for class certification.

Enter: March 31, 2014

John J. Tharp, Jr.
United States District Judge

---

[19] The defendants appear to argue as well that the plaintiffs' proposed class is fatally compromised because it includes those, like Jones, who made recommendations about employee evaluations, pay, and promotions. The Court does not agree with that assertion. Jones has a claim to the same extent that any other putative class member may have one; he also has conflicting interests that render him unsuitable to pursue that claim on behalf of others.