# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **JAMES JONES, NICOLE STEELS, KAVON WARD, AND IONA TOLES,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 09 C 06437** |
| | ) | |
| **NATIONAL COUNCIL OF YOUNG MEN'S CHRISTIAN ASSOCIATIONS OF THE UNITED STATES OF AMERICA ("YMCA of the USA"), an Illinois not-for-profit corporation, and ELINOR HITE, former Senior Vice President of YMCA of the USA,** | ) | **Judge John J. Tharp, Jr.** |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs James Jones, Nicole Steels, Kavon Ward, and Iona Toles have filed this suit on behalf of themselves and other similarly-situated employees of the National Council of Young Men's Christian Associations of the United States of America (the "Y"), alleging claims of race discrimination and retaliation against the Y and Elinor Hite, the former director of the Y's human resources ("HR") department, pursuant to Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq.,* and the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq.* Now before the Court are the defendants' motions for summary judgment on the claims asserted by each plaintiff in the fourth amended complaint. For the reasons set forth below, the defendants' motions for summary judgment are granted in part and denied in part.

# I.    BACKGROUND

The following account of the facts is taken from the record and the parties' Local Rule 56.1 statements and responses. On a motion for summary judgment, the Court construes the facts in the light most favorable to the nonmoving party, *see Hanners v. Trent,* 674 F.3d 683, 691 (7th Cir. 2012) (citing *Coffman v. Indianapolis Fire Dep't,* 578 F.3d 559, 563 (7th Cir. 2009)), and "gives [the plaintiffs] the benefit of conflicts in the admissible evidence and favorable inferences from that evidence." *Smith v. Bray,* 681 F.3d 888, 892 (7th Cir. 2012) (citing *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 630 (7th Cir. 2011)). However, the Court may only consider "admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker,* 583 F.3d 979, 985 (7th Cir. 2009) (citing *Haywood v. Lucent Tech., Inc.,* 323 F.3d 524, 533 (7th Cir. 2003) (inadmissible evidence will not overcome a motion for summary judgment)).

## A.  James Jones

Plaintiff James Jones was hired on or about August 25, 2004, by Steven Timmons, the Y's Strategic Director of HR at the time.[1] Pl. 56.1 Resp., Dkt. 312 at 23, ¶ 29; Pl.'s Add'l Facts, Dkt. 312 at 62, ¶ 3. Jones was hired to assume the duties and responsibilities of Director of Training and Organizational Development ("OD"), the position Jones held until his employment was terminated by the Y on or about October 15, 2007. Pl.'s 56.1 Resp., at 47, ¶ 62. As Director of Training and OD, Jones was responsible for "rolling out" and conducting training for Y employees. Defs. 56.1 Stmt., Dkt. 270 at 12, ¶ 29. Although Jones disputes that Timmons was solely responsible for hiring him because, as Jones contends, "all hires [had to] be approved by

---

[1] The senior officer in the Human Resources department is referred to variously in the briefs as the "Strategic Director," "Director," or "Director of HR and OD." In 2006, defendant Hite's title was changed from "Director of HR and OD" to Senior Vice President. Pl. 56.1 Resp., Dkt. 312 at 4, ¶ 3.

[the Y's] leadership team … or CEO," Pl. 56.1 Resp., Dkt. 312 at 24 (response to ¶ 29), it is undisputed that Timmons was Jones' first supervisor. Defs. 56.1 Resp., Dkt. 375 at 4, ¶ 5.

Jones alleges that during his time at the Y he was subjected to racial discrimination (he is an African American) with respect to his level of compensation and the salary raises he received from the Y to bring his compensation in line with professionals in comparable positions ("equity salary increases"), the Y's failure to promote him, the compensation he received for serving as the interim Director of HR, his annual performance evaluations and merit pay increases, and his termination in October of 2007. He also complains that the Y retaliated against him for engaging in protected activities, which generally involve the concerns he expressed to Hite about the Y's policies and culture negatively impacting minority employees.

### 1. *Compensation, Performance Evaluations, and Merit Increases*

Jones' starting salary was set at $80,016. Pl. 56.1 Resp., Dkt. 312 at 30, ¶ 40. Jones told Timmons, before and after he was hired, that he felt his starting salary was too low, potentially because he was African American. Defs. 56.1 Resp., Dkt. 375 at 5, ¶ 8. As evidence of the disparity in his starting salary, Jones points to two other Caucasian, director-level employees, who were earning higher salaries than him when he was hired and throughout his employment at the Y. First, Sharon Rakowski, a director in HR, was earning a salary of $93,672, when Jones was hired.[2] *Id.* at 4, ¶ 6. Second, Kurt Kramer received a starting salary of $130,008, *id.* at 6, ¶ 10, and was hired into the "Y-University" department as Director of Program Leadership and National Training approximately one or two months before Jones was hired into HR. *Id.* at 5, ¶ 7.

---

[2] The defendants dispute this evidence because Jones cites portions of the record that have no foundation and that have not been authenticated. Defs. 56.1 Resp., Dkt. 375 at 4, ¶ 6. Moreover, the defendants note that from approximately July 9, 2001, to January 28, 2004, Rakowski held the highest-ranking position in HR. *Id.* at 4-5.

In a memorandum dated April 12, 2005, Timmons recommended that Jones' salary be increased to $98,500. Pl. 56.1 Resp., Dkt. 312 at 32, ¶ 41; Pl. 56.1 App., Dkt. 326-39, Tab 85a ("Human Resources Equity Review and Adjustments"). Timmons based his recommendation on a comparison of Jones' salary to internal and external data, and determined that the closest comparator to Jones' position, internally, was Kramer's position, Director of Program Leadership and Training. Defs. 56.1 Resp., Dkt. 375 at 6, ¶ 9.[3]  As a result, on May 1, 2005, Jones received an "equity raise," increasing his salary to $100,008, which Timmons was involved in securing. Pl. 56.1 Resp., Dkt. 312 at 32, ¶ 41.

That same year, Jones also received a "merit" salary increase. At the Y, annual merit increases were assigned as percentages of an employee's existing salary, based on a range correlated to the performance rating that the employee received for that year. *Id.* at 12-13, ¶ 17. The Y's 2005 fiscal year ran from July 1, 2004, to June 30, 2005. *Id.* Under the 2005 guidelines, the merit increase ranges were assigned to performance ratings as follows:

| Rating | Increase Range |
|---|---|
| Far Exceeds [Expectations]…………5% - 6% | |
| Exceeds [Expectations]……………..3.1% - 4.9% | |
| Meets Expectations…………………1% - 3% | |
| Below Expectations…………………0% | |

*Id.* at 13. In September 2005, Jones received a 3% merit increase, which corresponded to a "meets expectations" performance review, according to the 2005 guidelines. Pl. 56.1 Resp., Dkt. 312 at 32, ¶ 42.

---

[3] The defendants object to this evidence (a memo) on the grounds that the plaintiffs failed to authenticate it properly. The defendants, however, cite to the same memo in their appendix as evidence. This is an example, on the defendants' side, of the many unproductive squabbles between the parties about immaterial facts that have slowed the resolution of these motions.

Timmons resigned on or about June 3, 2005. *Id.* at 24, ¶ 30.[4] Thereafter, Jones served as the interim director of HR until approximately August 15, 2005. *Id.* During his time as interim director, Jones sought a salary increase from Dan Nussbaum, the Strategic Director of Y-University, and Ken Gladish, the Y's CEO at the time, to compensate for his additional duties and responsibilities. Defs. 56.1 Resp., Dkt. 375 at 7, ¶ 12. Although Jones did not receive additional compensation while he was serving as the interim director, *id.,* he did receive a one-time bonus of $7,616 on August 30, 2005. Pl. 56.1 Resp., Dkt. 312 at 38, ¶ 54. The parties do not dispute that the bonus Jones received was larger than the standard bonus awarded for serving in an interim position,[5] but Jones alleges that his interim bonus was discriminatory, in part, because of the delay in paying it. *Id.* at 39, ¶ 56. According to Jones, the Y's culture was one in which "a certain thing happens…without prompting or any begging…[for] one group and it happens when the other…group is kicking and screaming and jumping through hoops to get it done." *Id.*

On August 15, 2005, Elinor Hite assumed the full-time position of Director of HR and OD, and Jones resumed his duties as Director of Training and OD. From that point on, Jones

---

[4] Plaintiff maintains that this fact is not adequately supported, but nevertheless does not appear to dispute the fact. This is an example, on the plaintiffs' side, of the many unproductive squabbles between the parties about immaterial facts that have slowed the resolution of these motions.

[5] Specifically, the defendants state, and the plaintiff does not dispute, that Jones received a one-time bonus of $7,616 on August 30, 2005—"or about 37.5% of his existing salary." Pl. 56.1 Resp., Dkt. 312 at 38, ¶ 54. A 30% increase was the customary bonus for interim service under the Y's policies at the time. *Id.* It is unclear, however, how the parties calculate the 37.5% figure. For instance, according to the record, Jones was earning $100,008 annually in 2005. But $7,616 is only 7.61% of an annual salary of $100,008. Further, the $7,616 does not appear to be 37.5% of his monthly salary, or the salary he earned for the period he served as interim director—approximately June 3 to August 15, 2005. *Id.* Between that time period, Jones would have been paid roughly $11,540 (before tax). But again, $7,616 is approximately 66% of $11,540. In any event, the parties do not dispute that the plaintiff did receive a bonus for his interim work, and that the bonus was higher than the bonus customarily awarded under the Y's policies at the time.

reported to Hite. *Id.* at 24, ¶ 30. It is undisputed that Jones never pursued another position at the Y during his employment with the organization. *Id.* at 25, ¶ 31.

In mid-2005, before Hite took over as the director of HR, the Y's HR department conducted a compensation equity review.[6] *Id.* at 17, ¶ 22. The equity review was conducted to address, among other concerns, a lack of established or formal guidelines relating to salary administration and equity among positions. *Id.* The review involved three stages. *Id.* at 17, ¶ 23. First, HR reviewed all job descriptions and identified fifty benchmark positions representing 70% of the organization. *Id.* Next, the Y hired an external consultant, Hewitt Associates, Inc., to perform a market study of the benchmark positions ("Hewitt Study"). *Id.* at 17-18, ¶ 23. Finally, using the data from the market study, the Y established (1) salary bands and job grades; (2) job families and hierarchy; (3) policies and procedures for salary administration; (4) communication plans for all levels of the Company; and (5) training for managers. *Id.* at 18, ¶ 23.

In January 2006, as a result of the 2005 compensation study, Jones received a second equity increase, which brought his salary up to $115,008. *Id.* at 33, ¶ 43. Jones, however, complained that the equity increase he received was lower than the increase he should have received under the "Hewitt [S]tudy recommendations." *Id.* That same year, Jones continued to seek equity increases in an attempt to bring his salary in line with those he believed to be similarly-situated staff members. Defs. 56.1 Resp., Dkt. 375 at 7, ¶ 13. On or about July 2, 2006, Jones sent Hite a memorandum titled "Salary Adjustment—Director, Organizational Development," in which he requested a raise. Pl. 56.1 Resp., Dkt. 312 at 34, ¶ 45. In that memorandum, Jones provided "benchmarks" for his own salary, which consisted of external data

---

[6] The record does not reflect who initiated this compensation review.

from third-party sources and internal data relating to two Y directors: Laura Fortson and Kramer.[7] *Id.*

Jones acknowledges that his request for an equity raise was granted, in part, through the merit increase he received for fiscal year 2006, in addition to a lump sum payment. *Id.* at 37, ¶ 51. Specifically, Jones received a 5.5% merit increase, the largest in HR for that year, and an additional $2,500. *Id.* at 37, ¶ 51. This raise increased Jones' salary to $123,844. *Id.* The Y's fiscal year for 2006 ran from July 1, 2005, to June 30, 2006. *Id.* at 13, ¶ 18. Under the guidelines for 2006, the following merit increase ranges were assigned to performance ratings as follows:

| Rating | Increase Range |
|---|---|
| Far Exceeds [Expectations]…………. | 5.5% - 7.0% |
| Exceeds [Expectations]…………….. | 3.5% - 5.5% |
| Meets Expectations…………………. | 0.5% - 3.5% |
| Below Expectations……………….... | 0% |

*Id.* at 13-14, ¶ 18. Approved increases were effective September 1, 2006. *Id.*

In September 2007, Jones received a 3% merit raise, which increased his salary to $127,704. *Id.* at 37, ¶ 52. The Y's fiscal year for 2007 ran from July 1, 2006 to June 30, 2007. *Id.* at 14, ¶ 19. Under the guidelines for 2007, the following merit increase ranges were assigned to performance ratings as follows:

| Rating | Increase Range |
|---|---|
| Far Exceeds [Expectations]…………. | 5.0% - 6.5% |

_____

[7] It is undisputed that Fortson was not in Jones' department, had more years of experience at the Y than Jones, and had a different supervisor. Pl. 56.1 Resp., Dkt. 312 at 35, ¶ 46. For fiscal year 2006, Fortson received a merit increase of 4.7%, and in fiscal year 2007, Fortson received a performance rating of "exceeds expectations." Pl. 56.1 Resp., Dkt. 312 at 35, ¶ 47.

It is also undisputed that Kramer was not in Jones' department and, at least at some points, had a different supervisor than Jones. *Id.* at 35-36, ¶ 48. From approximately July 6, 2004, to June 30, 2007, Kramer reported to Susan Rittscher. *Id.* at 36, ¶ 48. From approximately July 1, 2007, until September 2008, Kramer reported to Terri Radcliff. *Id.* In fiscal year 2006, Kramer received a merit increase of 4.3%. *Id.* at 36, ¶ 49. In fiscal year 2007, Kramer received a merit increase of 2.9%. *Id.*

Exceeds [Expectations]……………..3.25% - 5.25%
Meets Expectations…………………1.0% - 3.5%
Below Expectations………………... 0%

*Id.* at 16, ¶ 20. Approved increases were effective September 1, 2007. *Id.*

## 2. *Position Elimination*

In late June 2006, Neil Nicoll took over as the Y's CEO. Defs. 56.1 Resp., Dkt. 375 at 8, ¶ 15. During his first 90 days on the job, Nicoll directed Hite to reduce the headcount in the HR department. *Id.* The defendants assert that during the first or second quarter of 2007, Hite informed Nicoll that she was going to eliminate Jones' position in order to reduce headcount, in accordance with Nicoll's directive. Pl. 56.1 Resp., Dkt. 312 at 43, ¶ 59. According to Hite, the position elimination was postponed, however, to allow Jones to take medical leave (approximately March 16 to June 22, 2007), then bereavement leave (October 1 to October 4, 2007), and finally, so that Jones could participate in an interview with Robert Casey (on October 10, 2007), an attorney with Ogletree, Deakins, Nash, Smoak & Stewart, P.C. ("Ogletree"), hired by the Y to investigate Steels' complaint of a hostile and intimidating work environment (explained below). *Id.* at 43, ¶ 59; at 45, ¶ 60; Def. Resp., Dkt. 375 at 12, ¶ 21. Jones' employment was terminated on October 15, 2007, five days after he was interviewed by the law firm. Pl. 56.1 Resp., Dkt. 312 at 47, ¶ 62.

Jones alleges that Hite's decision to eliminate his position, and thereby terminate his employment, was both discriminatory and in retaliation for the protected activities that he engaged in during the final months of his employment in 2007. Jones' retaliation claim hinges, in part, on the timing of Hite's decision—specifically, if the decision to eliminate his position was made prior to Jones' protected activities, Hite's decision could not have been made in retaliation for those protected activities. To that end, Jones disputes the timing of Hite's decision to eliminate his position, citing evidence that suggests Hite did not make the decision to terminate

his position until much later in the year, after he had raised concerns about the effect of the Y's policies on minority employees. For instance, at some point between January 2007, and April 2007, when Jones took medical leave, Hite discussed expanding Jones' job responsibilities to include training local YMCA branches and associations. Defs. 56.1 Resp., Dkt. 375 at 11, ¶ 20 (citing Jones Decl., Dkt. 325-30, Tab 30 at ¶ 9). After that initial discussion, however, Hite never mentioned the opportunity again. *Id.*

Hite also testified that, as of May 2007, she "had no intentional name in mind" for a further position elimination. *Id.* at 11-12, ¶ 21. Moreover, on May 12, 2007, while Jones was on medical leave, Hite drafted a chart detailing possible ways to reorganize the HR department. *Id.* (citing Pl. 56.1 App., Dkt. 326-4, Tab 54 ("Plaintiff's Deposition Exhibit 205")). In a box on the chart titled "what if," Jones' initials ("JNJ") appear. *Id.* at 12, ¶ 23. Next to that box, under the title "concerns," Hite again wrote "JNJ" and "very solid OD skills + HR generalist skills." *Id.* According to Jones, this is evidence that, at least at that point, Hite was considering keeping Jones, and had included him in her possible reorganization scenarios. Moreover, Jones contends that Hite noted the race of each employee next to their corresponding positions on the chart. For example, next to the draft organizational tree, under the title "staffing thoughts" at the top of the memo, Hite wrote "WF" and "BM" next to two positions. *Id.* According to Jones, these are abbreviations for "white female" and "black male," respectively. *Id.* Hite testified that she could not recall why she had written "WF" and "BM" on the chart. *See* Hite's Dep., Pl. App., Dkt. 362, Tab 8 at 465:7-12; *see also id.* at 465:7-12 (testimony that she was "not quite sure what [she] was doing there" with respect to writing "BM" on the chart).

Based on this evidence, Jones argues that a fact finder could infer that Hite did not decide to eliminate his position until September or October 2007. Resp., Dkt. 334 at 23. In a declaration

attached to his response to summary judgment, however, Jones states that "[w]hen [he] met with Ms. Hite in late August 2007 to discuss [his] review, she did mention my position would be eliminated." Jones' Decl., Pl. App., Dkt. 325, Tab 30 at ¶ 16.

On or about October 15, 2007, Jones was terminated. Pl. 56.1 Resp., Dkt. 312 at 47, ¶ 62. Hite told Jones that his termination was in connection with the elimination of a position, and that the position elimination was part of a reorganization necessary for budget cuts. *Id.* at 49, ¶ 63; Defs. 56.1 Resp., Dkt. 375 at 19, ¶ 34. Moreover, Jones believed that the budget cuts were mandated by the CEO. Pl. 56.1 Resp., Dkt. 312 at 49, ¶ 63. At the time, Hite asked Jones if he had any questions, and Jones said he did not. Defs. 56.1 Resp., Dkt. 375 at 19, ¶ 34.

Jones contends that the justification for his termination is dubious, however, based on, among other things, the culture and environment in the HR department, the allegedly discriminatory performance evaluations and merit increases he had received, the allegedly discriminatory hiring decisions he had observed, and Steels' pending complaint of discrimination. Pl. 56.1 Resp., Dkt. 312 at 49-50, ¶ 64. Jones also questions the honesty of Hite's explanation based on the manner in which Hite purportedly investigated Maurice Horsey's (an African American employee) 2006 complaint of harassment and racial discrimination against Jim Kauffman, Horsey's supervisor. *Id.* at 52, ¶ 65. Horsey told Hite that he felt his performance review was "very, very subjective," and that Kauffman had made "slurs and jokes" at his expense. *Id.* During the investigation, however, Hite relayed to Jones that Nicoll believed Horsey was a poor performer and lazy. *Id.* Moreover, Hite never inquired about Horsey's complaints of slurs and jokes, but only addressed the issues with Horsey's performance evaluations. Defs. 56.1 Resp., Dkt. 375 at 10, ¶ 18. According to Jones, he objected to the discriminatory manner in

which he believed Horsey was being treated, and questioned whether Nicoll had ever worked with Horsey, and therefore, whether Nicoll was in a position to evaluate his work ethic. *Id.*

Jones also challenges the explanation he was given for his termination because he believed that Veronica Robertson had been given the same explanation for her termination, which, according to Jones, was not accurate. Pl. 56.1 Resp., Dkt. 312 at 53, ¶ 67. Robertson was purportedly terminated in connection with Nicoll's directive to reduce the budget and headcount in HR. However, after Robertson was terminated, Hite hired another employee, Emily Rutkowski (a white female), who assumed the same responsibilities as Robertson, meaning that neither the budget nor headcount were reduced. *Id.* at 54. Moreover, Rutkowski was paid a signing bonus because her start date was delayed while Robertson's termination was being effectuated. *Id.* Similarly, on October 25, 2007, after Jones' termination, Hite sent Steels an email about posting an opening for a Senior HR Generalist position, Defs. 56.1 Resp., Dkt. 375 at 22, ¶ 40, despite the fact that the justification for Jones' termination was to reduce headcount in HR. A few weeks later, Hite emailed Nicoll, notifying him that she had found "an excellent candidate" for that position, and stating that the candidate was "Hispanic." *Id.*

Jones also points to direct evidence that Hite improperly considered race while deciding how to reorganize the HR department. Specifically, sometime prior to Jones' termination, Hite also created an "HR/OD" chart that reflected Hite's "Desired State" for the department "effective" November 1, 2007. Defs. 56.1 Resp., Dkt. 375 at 19, ¶ 35 (citing Pl. 56.1 App., Dkt. 326-3, Tab 53 ("Plaintiff's Deposition Exhibit 204")). In handwritten notes, under the portion of the reorganization chart depicting HR as it was "desired," Hite wrote a number of "issues" that she was considering. *Id.* These issues included "leave," "potential," "passion," "cost," and "effectiveness." *Id.* The first issue listed, however, was "race." *Id.* Moreover, in her deposition,

Hite testified that she "always look[ed] at multiple factors whenever [she's] reorganizing…like job capabilities and race and gender." *Id.* Hite did not explain why she wrote "race" as an issue on the chart. Hite's Dep., Pl. App., Dkt. 362, Tab 8 at 494:20-25; 495:1-25.

The parties also dispute whether Jones' responsibilities were absorbed by employees not within his protected group (African American), which, as explained in detail below, is necessary to demonstrate racial discrimination in a claim involving a mini-reduction-in-force ("RIF"). The defendants contend that after Jones was terminated, his duties were absorbed by the HR department generally. Pl. 56.1 Resp., Dkt. 312 at 47, ¶ 62. Jones disputes this, but fails to support his contention with relevant and admissible evidence, other than a single citation to testimony by Hite, in which she states that Jones' "functions could be re-designated or not done within the HR department."[8] *See id.* at 48. The remainder of Jones' citations are irrelevant, referring generally to an open position for an HR generalist, and not to whether his duties were absorbed by HR, another department, or any other select number of employees not in his protected group.[9] *Id.* at 48-49.

---

[8] Jones cites to an "employee info spreadsheet," Pl. 56.1 App., Dkt. 328, Tab 128, but fails to lay a foundation for or authenticate this piece of evidence, which was offered in its native, Microsoft Excel format. Moreover, Jones cites to the investigative report conducted by Ogletree, but fails to lay a foundation for this document, either as non-hearsay or as falling within an exception to the hearsay rule. *Id.*

[9] Jones states that in response to an interrogatory concerning the assumption of his duties after his termination, the defendants stated that "[t]o the extent any of James Jones['s] responsibilities remained after his position was eliminated, they would have been absorbed by Michelle VanDeventer, Project Coordinator HR/OD and/or Elinor Hite, Director of HR and OD." Defs. 56.1 Resp., Dkt. 375 at 21, ¶ 38. Both of those employees are Caucasian. However, the portion of the record that Jones cites does not support this proposition. In fact, that portion of the record supports very little because it is merely a list of objections to the plaintiff's interrogatories, *see* Pl. 56.1 App., Dkt. 328, Tab 118 ("Defendants' Second Supplemental Objections and Response to Plaintiff's Discovery Requests Issued April 6, 2011"), and does not contain the quoted language to which Jones refers.

After his termination, Jones signed and filed an EEOC charge, alleging race discrimination, on June 6, 2008. Defs. 56.1 Resp., Dkt. 375 at 23, ¶ 42. The EEOC received the complaint on June 17, 2008.[10] *Id.*

### 3. *Protected Activities and Retaliation*

Jones alleges that Hite and the Y retaliated against him for engaging in protected activities during his employment. In 2006, Jones questioned and called for an adverse impact review of the merit system[11] and "interven[ed] to push for individual changes when questions were raised by individuals regarding their" merit increases. Pl. 56.1 Resp., Dkt. 312 at 56, ¶ 72. In 2007, Jones objected to the initial findings of Horsey's investigation (described above). *Id.* Jones also reviewed the merit increases for 2007, Defs. 56.1 Resp., Dkt. 375 at 16, ¶ 29, and on September 8, 2007, sent Steels an email titled "Merit Increases," in which he stated that he had received "a couple questions" from the staff regarding the increases ("September 8 email"). Pl. 56.1 Resp., Dkt. 312 at 56-57, ¶ 73. In that email, Jones expressed a concern that upcoming "layoffs will probably impact minorities and older workers more than others" if the Y "follow[ed] their [then] current pattern," in addition to concerns he had with merit increases for that year. Defs. 56.1 Resp., Dkt. 375 at 16, ¶ 29. According to Jones, his email was meant to convey the message that "there seemed to be some glaring inequities and [they] need[ed] to follow up to determine whether there really [were] inequities or [whether] there [was] another explanation for those numbers." *Id.* Steels responded to this email, copying Hite, with data

---

[10] The Court notes that the record does not include Jones' (or any of the plaintiffs') EEOC right to sue letter. Despite that omission, the defendants have not challenged any of the plaintiffs' claims on the basis that no letter was issued or that this lawsuit was not timely filed.

[11] Jones describes his "call for an adverse impact review" as "possibly" protected activity in his response to the defendants' statement of fact. *See* Pl. 56.1 Resp., Dkt. 312 at 56, ¶ 73.

regarding the percentages of African Americans and the merit increases they had received. Pl. 56.1 Resp., Dkt. 312 at 57, ¶ 74.

Jones also claims he engaged in protected activity when he (1) had a conversation with Hite regarding the findings and data in the September 8 email, (2) had a conversation with Hite regarding racial tensions in HR, (3) opposed Emily Gondek's (a Caucasian Senior HR Generalist) proposed referral program, which, according to Jones would have disadvantaged minority employees, and (4) followed up on concerns in the strategic sourcing department regarding promotion and compensation issues that negatively impacted minorities. *Id.* at 58, ¶ 75.

According to Jones, he also discussed specific employee merit increases with Hite after the September 8 email. Defs. 56.1 Resp., Dkt. 375 at 17, ¶ 31. For example, Jones brought up a situation involving an African American woman, Phyllis Lee. *Id.* According to Jones, "even though…Lee's managers had approved a certain level [merit] increase…Hite refused to award it." Jones Decl., Dkt. 325, Tab 30 at ¶ 19. Jones told Hite that what happened to Lee was wrong, and that the incident could easily be considered racial discrimination, given how Lee had been treated. Defs. 56.1 Resp., Dkt. 375 at 17, ¶ 31. According to Jones, after this discussion, Hite accused him of encouraging people to sue the Y. *Id.* at 17, ¶ 31. Hite, however, denies making this statement. *Id.*

Furthermore, according to Jones, the conversation he had concerning racial tensions with Hite involved the way that Hite treated Steels and Yvonne Bibbs, another African American employee in HR. *Id.* at 13, ¶ 24. In particular, Jones believed that Hite treated Steels and Bibbs in a way that was based on stereotypes of African Americans. *Id.* at 13, ¶ 25. For instance, both Steels and Bibbs were single mothers, and Hite asked Jones whether all of Steels' children were

from the same father and noted that neither woman was married. *Id.* According to Jones, Hite also appeared surprised when African Americans were articulate. *Id.*

Jones was also concerned because during a weekly meeting he had with Hite in August or September of 2007, Hite told him that there would be a change at the front desk, where Iona Toles, an African American woman, worked as a receptionist. *Id.* at 15, ¶ 28. Toles' nickname was "the voice of the Y," because even when she did not answer the phone, her voice was on the pre-recorded greeting. *Id.* Jones later discovered, after his termination, that Toles was replaced with a young Caucasian woman. *Id.* Finally, Jones claims that he engaged in protected activity when he took part in the Ogletree investigation of Steels' complaint on October 10, 2007. *Id.* at 18, ¶ 33; Pl. 56.1 Resp., Dkt. 312 at 58, ¶ 76.

Jones maintains that Hite retaliated against him for these actions during the six months prior to his termination. Pl. 56.1 Resp., Dkt. 312 at 59, ¶ 78. Examples of Hite's retaliation, as alleged by Jones, include: (1) accusing him of encouraging people to sue the Y; (2) instituting a "documentation campaign" designed to "set up discipline," but that did not actually result in discipline, (3) inhibiting Jones' ability to perform his job by restricting his contact with senior leadership, and (4) changing her level of supervision and telling the employees under Jones not to bring their issues to him. *Id.* Further, Jones believes that his final performance review and, as explained above, the eventual elimination of his position, were retaliatory. *Id.* at 60, ¶ 79. As evidence that his position elimination was retaliatory, Jones notes that, shortly after his termination, another individual was hired to fill a position substantially similar to his own. *Id.* at 60, ¶ 80.

As evidence of retaliatory motive, Jones also points to notes that Hite wrote in September 2007, describing Jones as "divisive," "insubordinate," and "argumentative." Defs. 56.1 Resp.,

Dkt. 375 at 17, ¶ 32. Hite contends that at least part of that feedback was from Dennis Cruckson, in the form of emails attached to the notes. *Id.* at 18, ¶ 32. Hite also asked Jones why African American employees approached him when they had problems, and then instructed Jones to go to her first before talking to Y leadership team members. *Id.*

## B. Nicole Steels

Steels and Jones worked in the HR department during roughly the same period, and their claims derive from and rely on much of the same evidence.[12] Steels worked at the Y from approximately November 1999 until October 2008, when she resigned. Defs. 56.1 Resp., Dkt. 381 at 3, ¶ 3. From November 29, 1999, until August 2001, Steels worked as a Benefits Administrator. *Id.* In August 2001, the Y promoted Steels to HR Generalist. *Id.*; Pl. 56.1 Resp., Dkt. 313 at 16, ¶ 24. She held that position until May 2005, when she was promoted to Senior HR Generalist. Pl. 56.1 Resp., Dkt. 313 at 16-17, ¶ 26. Overall, during her employment with the Y, Steels received two promotions. *Id.* at 31, ¶ 46. Additionally, Steels earned a master's degree in human resource management in 2002, was certified as a "Senior Professional in Human Resources" ("SPHR") prior to the end of her employment with the Y,[13] and earned a SPHR certification in 2007. Defs. 56.1 Resp., Dkt. 381 at 3, ¶ 3.

---

[12] Jones and Steels filed a combined response to the defendants' motions for summary judgment. *See* Resp., Dkt. 334.

[13] Steels testified that she earned a SPHR certification that had expired a year prior to her deposition. Steels' Dep., Pl. App., Dkt. 326, Tab 5 at 13:21-14:3. There is no other record evidence regarding this certification. However, an internet search for that term reveals that the HR Certification Institute ("HRCI") administers the exam for that certification. *See* HR Certification Institute, *available at www.hrci.org* (last visited May 1, 2014). The HRCI website explains that the SPHR certification is designed for the professional who "plans…HR policy…[and] focuses on the 'big picture,'" among other responsibilities. *See id.*, *available at www.hrci.org/sphr/* (last visited May 1, 2014).

Steels alleges that the Y discriminated against her based on her race with regard to compensation, performance evaluations, merit and equity increases, failure to promote, and a refusal, by Hite, to allow her to telecommute after her maternity leave. Steels also alleges that Hite created a "hostile and intimidating" work environment, *id.* at 4, ¶ 5, which, among other factors, ultimately resulted in the Y constructively discharging her and retaliating against her for engaging in protected activities.

### 1. *Compensation, Performance Evaluations, and Merit Increases*

Steels claims that the compensation, performance evaluations, and equity and merit increases she received as a Senior HR Generalist were discriminatory. *See, e.g.,* Pl. 56.1 Resp., Dkt. 313 at 25, ¶ 38. In particular, Steels claims that her performance ratings and compensation were discriminatorily low when compared to the salaries and merit increases of Emily Gondek, Michelle VanDeventer, and Lourdes Durren, all of whom also worked in HR, as well as other unidentified Y employees who worked outside of HR. *Id.* More generally, Steels claims that Hite failed to timely complete and provide her with evaluations so that she was aware of Hite's expectations. *See generally* Defs. 56.1 Resp., Dkt. 381 at 11-12, ¶ 18; 12-13, ¶ 20; 14, ¶ 24.

As of January 2004, Steels was earning a salary of $48,696. Pl. 56.1 Resp., Dkt. 313 at 24, ¶ 35. After her promotion to Senior HR Generalist in May 2005, her salary was increased to $58,008. *Id.* Steels also received a 3% merit increase on September 1, 2005, which brought her salary to $59,760. *Id.* In comparison, Gondek was hired in November 2005 as a Senior HR Generalist at an annual salary of $70,000. *Id.* at 26, ¶ 40. VanDeventer began working in the HR department as a Project Coordinator at an annual salary of $42,500. *Id.* at 28, ¶ 41.

Around January 16, 2006, Steels received an equity salary increase, which brought her salary to $68,712. *Id.* at 24, ¶ 36. For fiscal year 2006, Steels received a performance rating of

"meets expectations" and a merit increase of 2.9%. *Id.* at 20, ¶ 30; *id.* at 25, ¶ 36. That merit increase brought Steels' salary to $70,728. *Id.* at 25, ¶ 36. That same year, Gondek received a rating of "exceeds expectations," *id.* at 23, ¶ 33, and a merit increase of 4%. *Id.* at 26, ¶ 40. Moreover, VanDeventer received a 4.25% merit increase, which corresponded to a performance rating of "exceeds expectations." *Id.* at 28, 41. This raise increased VanDeventer's salary to $49,656. *Id.*

For 2007, Hite gave Steels a rating of "meets expectations" and a merit increase of 3.8%.[14] *Id.* at 21, ¶ 31; *id.* at 25, ¶ 37. At that point, Steels' salary was $73,080. That year, Gondek received a 3.3% merit increase, which corresponded to a rating of "meets expectations." *Id.* at 23. In September 2007, VanDeventer received a rating of "exceeds expectations" in a review that was prepared by both Hite and Jones. *Id.* She also received a 4.5% merit increase, which increased her annual salary to $51,912. *Id.* at 28, ¶ 41.

In approximately April 2007, Gondek became a part-time employee and her salary was reduced by 80 percent. *Id.* at 26-28, ¶ 40. On approximately January 1, 2008, Hite hired Lourdes Durren, a Hispanic woman, as a Senior HR Generalist. *Id.* at 28, ¶ 42. Durren's starting salary was $78,000, which was higher than Steels' salary at the time ($73,080). *Id.* Durren worked for the Y for approximately four months and did not receive a salary increase during her time with the Y. *Id.* at 29, ¶ 43.

In March 2008, the Y posted another opening for a Senior HR Generalist, with a starting salary range of $75,000 to $92,000, which again, was higher than Steels was earning at the time.

---

[14] It appears that this raise was actually above the range for "meets expectations" ratings. Steels disputes that she received a 3.8% salary increase in 2007, but relies on evidence that lacks foundation and authentication. See Pl. 56.1 Resp., Dkt. 313 at 25, ¶ 37. Steels also disputes that she received a rating of "meets expectations," but, again, does not respond with relevant record evidence. *See id.* at 20-21, ¶ 30.

*Id.* at 30, ¶ 44. According to Steels, the Y placed this opening "on hold," and eventually withdrew it all together after Jones cited it as an example of discrimination in his EEOC charge, which he filed after his termination. *Id.* at 30, ¶ 44.

Steels also claims that the Y discriminated against her by failing to promote her, while promoting other employees in HR. For example, in May 2008, Hite promoted VanDeventer to the position of HR/OD System Supervisor. Pl. 56.1 Resp., Dkt. 313 at 32, ¶ 47. Along with the new position, VanDeventer's salary was increased to $57,800. *Id.* Steels claims that she was not aware of this position (though as discussed *infra*, it is not at all clear why Steels would have been interested in pursuing this position, which paid substantially less than she was already making). *Id.* Similarly, after Hite's resignation, the Y hired Carolyn Creager, an African American woman, to act as interim director of HR in September 2008. *Id.* at 32, ¶ 48. At the time she was hired, however, Creager had approximately 25 years of HR experience. *Id.* Finally, Steels alleges that, in an attempt to remedy past discrimination, the Y gave her a retroactive 1% salary increase in early October 2008. *Id.* at 30, ¶ 45. According to Steels, however, this increase was too little too late, and was "nothing in comparison" to the salary she actually deserved. *Id.*

### 2. *Telecommuting*

Steels alleges that Hite also discriminated against her by refusing to allow her to telecommute in 2007 and 2008, while allowing Gondek to telecommute from another state. Pl. 56.1 Resp., Dkt. 313 at 33, ¶ 49. It is undisputed, however, that shortly after Hite became Steels' supervisor in August 2005, she allowed Steels to work from home for an extended period (possibly as long as one year, though the record is not entirely clear). *Id.* at 34, ¶ 50. And after Steels returned from maternity leave in March 2007, Hite allowed her to work from home one day per week for two months. *Id.*

However, on April 30, 2007, Hite informed Steels that she needed to return to working in the office full time. *Id.* at 34, ¶ 51. In comparison, and as explained above, two weeks after returning from maternity leave, on April 1, 2007, Gondek became a part-time employee, earned only 20% of her annual salary, and was allowed to work from home one day per week. *Id.* at 34, ¶ 52. Then in August of the same year, Gondek moved to Philadelphia and began working remotely. *Id.* At that time, however, Gondek stopped acting as a Senior HR Generalist, and only worked on discrete projects. *Id.*

### 3. *Constructive Discharge*

On or about October 9, 2008, Steels submitted a letter of resignation to the Y. Pl. 56.1 Resp., Dkt. 313 at 47, ¶ 67. According to Steels, she resigned because the Y had left her with no choice but to do so. *Id.* Steels contends that she was constructively discharged based on Hite's treatment of her, the alleged discriminatory performance evaluations and merit increases she received, VanDeventer's May 2008 promotion, and Hite's lack of desire to correct the inequity in her overall base salary. *Id.* Moreover, Steels alleges that the Y was not dedicated to solving her issues or creating an environment in which she could be successful, particularly after she saw a presentation given to the Y's board that concluded that minorities were being disadvantaged in the Y. *Id.* Ultimately, Steels concluded that she had to leave the Y if she wanted to advance her career. *See* Defs. 56.1 Resp., Dkt. 381 at 29, ¶ 52.

Sometime in September 2008, Steels met with Karen Mitrenga, who was the Senior Director of HR at Wrightwood Capital. Pl. 56.1 Resp., Dkt. 313 at 48, ¶ 70. On or about September 26, 2008, Mitrenga offered Steels a job at Wrightwood. *Id.* Mitrenga then sent Steels a job offer on October 1, 2008, which Steels accepted. *Id.* Her starting salary at Wrightwood was $82,500. *Id.* at 49, ¶ 71. Steels requested a start date of October 27, 2008. *Id.* at 49, ¶ 70. Steels

told Mitrenga that she did not want to start working at Wrightwood for another month so that she could make sure she was leaving the Y team "in good shape." *Id.* at 49, ¶ 71. Steels did not feel, however, that her move to Wrightwood Capital was a "step up" from her position at the Y, because her new job entailed less responsibility. Defs. 56.1 Resp., Dkt. 381 at 30, ¶ 54.

#### 4. *Protected Activities and Retaliation*

Steels alleges that she was retaliated against for engaging in protected activities. Pl. 56.1 Resp., Dkt. 313 at 41, ¶ 56. In particular, Steels claims that she engaged in protected activity when she wrote a letter on September 21, 2007, to Nicoll (the Y's CEO), in which she complained about Hite's treatment of her. *Id.* Although the letter did not contain or mention the words "race," "color," or "discrimination," Steels contends that she was complaining about discrimination, *id.,* and included words that she thought addressed that issue. Defs. 56.1 Resp., Dkt. 381 at 15, ¶ 25. Specifically, the letter complained about "inequities in treatment" concerning performance management training sessions, performance review assessments, staff projects, and telecommuting options. Pl. 56.1 Resp., Dkt. 313 at 41, ¶ 57. The letter also noted that Hite had made "offensive comments, [performed] acts of intimidation…and [demonstrated] a harassing nature towards some work assignments." *Id.* Steels also requested that "measures be taken to prevent any acts of retaliation against her." *Id.* The letter did not, however, mention any complaints about pay or promotions. *Id.*

On October 3, 2007, Steels met with Nicoll to discuss the letter. *Id.* at 42, ¶ 58. According to Steels, Nicoll spent very little time discussing her complaints during their meeting. *Id.* Instead, Nicoll focused on his overall concerns with HR, informed Steels that the Y needed to reevaluate the HR team, and discussed potential staff reductions. *Id.* Steels also claims that she told Nicoll she thought her letter was based on or related to race discrimination. *Id.*

At some point after her meeting with Nicoll, Steels also met with Amy Bateson, the Y's Assistant General Counsel, to discuss her letter. *Id.* at 42, ¶ 59; *see also* Steels' Dep., Pl. Appx., Dkt. 362, Tab 5 at 590:15-19. Bateson told Steels that the Y was planning an investigation of her complaint. Pl. 56.1 Resp., Dkt. 313 at 42, ¶ 59. The Y then hired a law firm, Ogletree, Deakins, Bash, Smoak & Stewart, to conduct an investigation. *Id.* at 43, ¶ 60. The Y also hired John Behr, an outside consultant, to serve as a coach and liaison between Steels and Hite to help solve their communication issues. *Id.* at 44, ¶ 62. Despite these measures, however, on December 21, 2007, Steels filed a discrimination charge with the EEOC. *Id.* at 44, ¶ 63.[15] According to Steels, after she filed her EEOC charge, Behr became aggressive and argumentative with her. *Id.* at 45, ¶ 64.

Furthermore, after Hite learned about Steels' EEOC complaint, she made handwritten notes about Steels. Defs. 56.1 Resp., Dkt. 381 at 15, ¶ 27. Specifically, Hite noted her "attendance," "attitude," that she met with people behind closed doors, and that she "runs" to Jones with her issues. *Id.* Hite also wrote that it was "intrig[uing] [that] [Steels had] felt this way since 8/05," and described Steels as "insubordinate, subversive, and distrustful." *Id.* Steels claims that the Y retaliated against her for sending the September 2007 letter and filing an EEOC charge of discrimination by, among other things, failing to promote her, giving her an inadequate retroactive salary increase in October 2008, failing to adequately complete her performance reviews and assigning her discriminatorily low ratings and merit increases, and by constructively discharging her. *See, e.g.,* Pl. 56.1 Resp., Dkt. 313 at 45-46. Steels also contends that Hite's failure to assign her completed performance evaluations led to Steels being passed over for the interim director position. Defs. 56.1 Resp., Dkt. 381 at 26, ¶ 47.

---

[15] Steels amended her EEOC charge on approximately December 28, 2008. Pl. 56.1 Resp., Dkt. 313 at 44, ¶ 63.

### C. Iona Toles

Plaintiff Iona Toles is an African American woman and, as far as can be discerned from the record, is currently employed by the Y as a Contact Center Representative. Toles alleges that the Y discriminated against her on the basis of her race. Specifically, she claims that the Y paid her less than Caucasian administrative employees, failed to place her in Pay Grade B despite her many years of experience and service at the Y, and failed to promote her on three different occasions because she is African American. *See* Pl. Resp., Dkt. 318 at 1, 6-7.

#### 1. *Compensation Claims*

Toles began working at the Y's Chicago office on a temporary basis around 1989 or 1990. Pl. 56.1 Resp., Dkt. 311 at 21, ¶ 33. In 1991, she was hired as a full-time secretary at a starting salary of $18,000. *Id.* at 21-22, ¶ 33. Then in 1997, Toles applied for and received a promotion to Administrative Secretary and Receptionist for the Department of Association Advancement. *See id.* at 22, ¶ 34. As a result of the promotion, Toles' salary increased to $22,500. *Id.*

Throughout her time at the Y, Toles avers, she made contributions to the organization for which she never received recognition. For instance, while Toles was acting as the backup receptionist in the early 1990's, she arranged to have a computer placed at the reception desk so that she could perform secretarial work when time allowed. Defs. 56.1 Resp., Dkt. 378 at 12, ¶ 29. In 1997, after Toles had assumed the position of full-time front desk receptionist, she put together a handbook that explained the procedures for handling routine inquires and directing calls, so that any temporary worker could cover the front desk in her absence. *Id.* With the help of an unidentified coworker, Toles later drafted a proposal for a call center. *Id.*

In 2001, the Y created a "Contact Center" to handle the Y's calls. *Id.* at 12, ¶ 29; Pl. 56.1 Resp., Dkt. 311 at 22, ¶ 35. Toles contends that her proposal was the basis, at least in part, for the creation of the Contact Center. Defs. 56.1 Resp., Dkt. 378 at 12, ¶ 29. Toles then applied for and received a promotion to the position of Contact Center Analyst in the Internal Support Services Group. Pl. 56.1 Resp., Dkt. 311 at 22, ¶ 35. With that promotion, Toles' salary increased to $30,000. *Id.* Toles was also required to reapply for her position as the front desk receptionist, Defs. 56.1 Resp., Dkt. 378 at 2, ¶ 4, and was selected to continue in that position. *Id.*

The following presents an incomplete record of the performance ratings and merit increases that Toles received from Rick Snell, a Caucasian male, who took over as the manager of the Contact Center around May of 2003, Pl. 56.1 Resp., Dkt. 311, at 24, ¶ 38, as recounted in the parties' Local Rule 56.1 statement of facts and responses.[16] Beginning in fiscal year 2003, Snell gave Toles an overall performance rating of "meets expectations." *Id.* Further, Snell gave Toles an overall rating of 66.3 in fiscal year 2004.[17] *Id.* at 24, ¶ 39. Neither party has provided information on the merit increase and amount of compensation that Toles received for these years.

In September 2005, Toles received a 2.3% merit pay increase, which corresponds to a "meets expectations" performance rating for that year, bringing her annual salary to $35,208. *Id.* at 25, ¶ 40. Toles complained to Snell that the merit increase she received was inadequate. *Id.* at 26, ¶ 41. In 2006, Snell gave Toles a rating of 80.35 (out of 100) on her performance review. *Id.*

---

[16] There is no information in the record regarding Toles' salary or the merit pay increases she received, if any, for the years 2003 and 2004. Nor is there information that explains the rating scale employed to evaluate Toles or how it related to the 1-5 scale used to evaluate the other defendants.

[17] As mentioned in the footnote above, there is no information in the record explaining this performance evaluation scale, or how this scale maps to the scale used to evaluate Jones, Steels, and Ward. Presumably, Toles received a 66.3 out of a possible 100 total points.

at 27, ¶ 42. Toles also received a 2.9% merit pay increase that year, which brought her salary to $36,240. *Id.* Toles again complained about this increase and asked whether Snell could use the department's budget to provide additional increases to Toles and other employees in the Contact Center. *Id.* at 27, ¶ 43. Then in 2007, Toles received a performance rating of "2.3," Defs. 56.1 Resp., Dkt. 378 at 22, ¶ 53, and a 2.7% merit increase, which brought her salary to $37,224. Pl. 56.1 Resp., Dkt. 311 at 28, ¶ 44. Toles also complained about the adequacy of this increase. *Id.*

For fiscal year 2008, Snell gave Toles a performance rating of "meets all requirements"[18] (or a rating of "2"). *Id.* at 33, ¶ 52. According to the plaintiff, Toles also received a 2.25% merit increase this year. *See id.* at 33-34. However, according to the plaintiff's statement of additional facts, Toles was earning the same salary in 2008 as she had in 2007—$37,224. *See* Defs. 56.1 Resp., Dkt. 378 at 10, ¶ 25. Given this discrepancy, it is unclear whether Toles actually received a merit pay increase for 2008 or if the record recites an incorrect salary for 2007.

In 2009, Snell gave Toles an overall rating of "meets expectations." Pl. 56.1 Resp., Dkt. 311 at 34, ¶ 53. Toles also a received a 3.4% merit increase in March of that year, bringing her salary to $38,480. *Id.* at 35, ¶ 54. This increase compensated Toles for her performance over the course of a year and a half and corresponded to a yearly increase of 2.2%. *Id.*; *see also* Defs. 56.1 Resp., Dkt. 378 at 20, ¶ 49. For fiscal year 2010, Snell gave Toles an overall performance rating of "meets expectations," which included ratings of "below expectations" in three categories of the review. Pl. 56.1 Resp., Dkt. 311 at 38, ¶ 61. Toles spoke with Angela Williams, who had recently taken over responsibility for the Contact Center, *id.* at 38, ¶ 60, about the review and to

---

[18] Although the defendants' statement of facts describes Toles' performance rating for fiscal year 2008 as "meets all requirements," the Court assumes this corresponds to the "meets expectations" rating used by the Y.

dispute the "below expectations" ratings. *Id.* Thereafter, Williams set up a meeting between Toles and Snell to discuss the scores that Toles had received. *Id.* at 38, ¶ 62.

In the meeting, Toles asked that her performance review reflect the fact that she was out of the office on medical leave for knee surgery and therapy for four months of the review period, and that her duties had been modified, subject to doctor's orders. *Id.* Due to restrictions prescribed by her doctor, Toles had to walk away from her desk for 15 minutes of each hour, which decreased her availability to answer phone calls. *Id.* at 38-39, ¶ 62. Following the meeting, Snell recalculated Toles' metrics based on the medical leave and accommodations she had received. *Id.* Specifically, Snell changed the "below expectations" ratings to "meets expectations," and kept the overall rating of "meets expectations" the same. *Id.* at 39, ¶ 63. Toles, however, believes that Williams directed Snell to change the ratings just to keep her happy. *Id.* As a result, Toles' final performance rating for fiscal year 2010 was "meets expectations" and she received a 2.25% merit pay increase, which brought her salary to $39,346.21. *Id.* at 40, ¶ 64.

### 2. *Failure-to-Promote Claims*

Toles also alleges that she was denied promotions and that in one particular instance the Y concocted a plan to remove her from her position at the main reception desk and deny her a promotion because, as an African American, she did not fit the "right image" for the Y. Specifically, in March 2008, the Y posted a job opening for a Receptionist/Data Processing Clerk, stationed at the front desk on the fourteenth floor of the Y's offices as part of a "restructuring" of the front desk position to focus more heavily on data entry. Pl. 56.1 Resp., Dkt. 311 at 30, ¶ 47; Defs. 56.1 Resp., Dkt 378 at 3, ¶ 5. The fourteenth floor is where visitors to the Y are greeted, and where Toles had been stationed as a full-time receptionist at the time that position was "restructured." According to the Y, this new position required very strong typing,

data entry, and software skills, and was classified in Pay Grade B—a step up from Toles' Pay Grade A. Pl. 56.1 Resp., Dkt. 311 at 30, ¶ 47.

Toles applied for the position and took a typing test. *Id.* Toles also interviewed with Snell and Jensen. *Id.* Johanna Pistell, who up to that point had been a temporary worker under Jensen, also applied and took the same typing test. *Id.* at 31, ¶ 48. Pistell outperformed Toles on the test and ultimately received the position in May 2008. *Id.*; Defs. 56.1 Resp., Dkt. 378 at 4, ¶ 8. However, the parties dispute whether the new position truly required data entry skills and additional responsibilities, with less of a focus on call center duties. Toles contends that the two positions were essentially the same. *See, e.g.,* Pl. 56.1 Resp., Dkt. 311 at 31, ¶ 48.

Snell told Toles that she did not receive the promotion because she lacked the necessary "technical skills," and because Pistell performed better on the typing test. Defs. 56.1 Resp., Dkt. 378 at 8, ¶ 19. However, Toles remained a Contact Center employee, but acted as Pistell's backup—a claim that the Y disputes. *Id.* at 4, ¶ 9; Pl. Resp., Dkt. 311 at 31-32, ¶ 48.

As a result of the "restructuring" and Toles' failure to obtain the promotion, her desk was relocated from the main reception area on the fourteenth floor to the less busy fifteenth floor. According to Toles, Kent Johnson, the Y's Chief Operating Officer, stated that Toles did not fit the "right image" for the Y.[19] Defs. 56.1 Resp., Dkt. 378 at 4, ¶ 8; Pl. 56.1 Resp., Dkt. 311 at 28-29, ¶ 45. As explained above, Toles believes that this is the actual reason a "new position" was created—as an excuse to remove her from the main reception area and keep her in Pay Grade A. Toles testified that she was removed from the front desk and that Jensen and Johnson were responsible. Pl. 56.1 Resp., Dkt. 311 at 28-29, ¶ 45.

---

[19] At her deposition, Toles averred that there was documentary evidence that Johnson said she did not fit the right image for the Y. However, that document was never located. *See* Toles' Dep., Pl. App., Dkt. 362, Tab 6 at 185:10-189:24.

On another occasion in 2010, the Y posted a position for a Contact Center Team lead. Pl. 56.1 Resp., Dkt. 311 at 35, ¶ 55. According to Toles, four internal candidates, all African American women, applied for the position: Toles, Sylvia Purnell, Nancy Upke, and Nicole Bradley. *Id.* at 36, ¶ 55. However, none of the African American employees received the promotion. *Id.* Toles contends, and the Y disputes, that after a Caucasian man declined the position the Y decided not to fill it and withdrew the opening. *Id.*

That same year, the Y also posted two positions for Conference Center Coordinators. Pl. Resp., Dkt. 311 at 36, ¶ 56. According to Toles, these positions were stationed at the reception desk on the Y's newly renovated floor of conference rooms. Defs. 56.1 Resp., Dkt. 378 at 5, ¶ 11. The job posting stated that the position required experience in conference and event planning, in addition to computer proficiency and "highly refined customer service and interpersonal communication skills." *Id.* Further, the job description required applicants to have the "ability to perform cost analysis and projections, proficiency in Microsoft Office, excellent computer skills, and experience in webinar and equipment expectations." Pl. 56.1 Resp., Dkt. 311 at 36, ¶ 56. Toles contends that she had the required computer skills and could have learned the necessary software programs, had she been given the opportunity. *Id.*

However, Jim Mellor, the Director of Finance, promoted Nicole Bradley, an African American woman, out of the Contact Center, and hired Richard Marsoun, a Caucasian man, to fill those positions. *Id.* at 36, ¶ 56. According to the Y, Marsoun had prior Conference Center Coordinator experience at a local YMCA. *Id.* Bradley and Marsoun were given a starting salary of $41,300 and placed in Pay Grade C. Defs. 56.1 Resp., Dkt. 378 at 12, ¶ 28. Toles, however, remained in Pay Grade A, as she had throughout her time at the Y. *Id.* Toles also contends that

she was asked to serve as a backup conference center coordinator, but the Y disputes this claim. *Id.* at 6, ¶ 14.

### D. Kavon Ward

In September of 2008, Plaintiff Kavon Ward, an African American woman, was hired as the Y's "Public Policy Manager" at the Y's Government Relations Office in Washington, D.C. Pl. 56.1 Resp., Dkt. 310 at 10-12, ¶¶ 16, 20. According to the defendants, Ward was hired based on her experience with, and passion for, the Y's programs—almost all of which she participated in at the Harlem YMCA in her youth. *See id.* at 12, ¶ 19. Nevertheless, shortly after she was hired, Ward's professional relationship with the D.C. Y began to deteriorate. Indeed, according to the record before the Court, Ward's time at the Y's D.C. office was tense and marked by confrontations with her co-workers and supervisors, culminating in her termination. Ward alleges that her termination was racially discriminatory and retaliatory. She further contends that she received discriminatory compensation and performance reviews.

According to Ward, the atmosphere in the Y's D.C. office generally, and in the public policy department particularly, was loud and aggressive. The public policy team was led by Audrey Haynes, a Caucasian woman and the Y's Senior Vice President and Chief Government Affairs Officer, who reported directly to CEO Nicoll. Defs. 56.1 Resp., Dkt. 372 at 3, ¶ 3. Haynes was also a member of the Y's "Leadership Team," a group of senior executives to whom all employees at the Y reported. *Id.* Richard Bland, a Caucasian man and the Y's Director of Federal Government Relations, and Katie Adamson, a Caucasian woman and the Y's Director of Health Partnerships and Policy, were also lobbyists in the D.C. office who reported to Haynes. *Id.* at 3, ¶ 4; Pl. 56.1 Resp., Dkt. 310 at 11, 13, ¶¶ 18, 21.

Employees in the D.C. office described Haynes as a "demanding" boss with "high expectations." Defs. 56.1 Resp., Dkt. 372 at 3, ¶ 5. Bland also testified that Haynes used a raised voice at times, has been "harsh to almost everybody in the office," and once slammed a door in his face. *Id.* Another employee described Haynes as having a "very loud commanding presence" and that the public policy side of the D.C. office was generally loud. *Id.* Further, a former employee, Torrence Montgomery, recounted that Haynes had slammed books, doors, and pens in her interactions with other employees, and that nearly everyone in the office had had an encounter with Haynes in which she yelled or vented. *Id.* at 4, ¶ 6.

In September 2008, Ward applied for the position of Public Policy Manager. Pl. 56.1 Resp., Dkt. 310 at 10, ¶ 16. The Public Policy Manager represented the Y on children, youth, and family issues and also lobbied on behalf of the "Y movement" by promoting its legislative priorities and agenda on Capitol Hill. *Id.* at 11, ¶ 17. The job description the Y posted for the Public Policy Manager position states a salary range of $70,000 to $85,000 and a requirement of "5-7 years [of] work experience on Capitol Hill." *Id.* (citing Defs. Appendix, Dkt. 262, Tab 27 at 1). Ward did not have the required work experience, but disputes that the experience was truly required by the Y as a condition of employment. S*ee id.* at 11. That said, when she applied, Ward did have some experience, having served as a fellow at the Congressional Black Caucus Foundation in 2007. Defs. 56.1 Resp., Dkt. 372 at 2, ¶ 2; *see also* Ward's Dep., Pl. App., Dkt. 362, Tab 7 at 239:11-4.

After applying, Ward interviewed with Haynes and Bland. Pl. 56.1 Resp., Dkt. 310 at 11-12, ¶ 18. During that interview, Bland noted that while Ward did not have the requisite 5 to 7 years of work experience, he liked the fact that she had experience with the Harlem YMCA. *Id.* at 12, ¶ 19. Bland further noted that Ward spoke with passion about her experience at the Harlem

YMCA and its programs and believed that passion would make her an excellent advocate for the Y. *Id.* The defendants contend that they hired Ward on that basis, despite her lack of experience. *Id.* Ward, however, contends that she was chosen because she was the best applicant from a pool of 50 candidates. *Id.* at 12.

Ward was hired on September 16, 2008, at a starting salary of $70,000—the lowest end of the salary range for the position. *Id.* at 12, ¶ 20. The defendants contend that Ward stated that her desired salary was $70,000 on her application. *Id.* at 10, ¶ 16. Ward, however, contends that she requested a starting salary of $80,000, but was told that the Y would only pay her $70,000. *Id.* at 10. Ward avers that the only reason she stated $70,000 as her desired salary was because she did not fill out the application until after she was informed she would be hired and that the Y would only pay her $70,000 as a starting salary. *Id.* at 10-11. It should also be noted that, pursuant to her offer letter, Ward was not eligible for a merit pay raise until 2010. *Id.* at 12, 20.

Once hired, Ward was the only African American employee on the public policy team, which included Haynes, Bland, and Adamson. Defs. 56.1 Resp., Dkt. 372 at 2, ¶ 2. She reported directly to Bland, who in turn reported to Haynes. Pl. 56.1 Resp., Dkt 310 at 12-13, ¶ 20. Ward also contends that at times she took direction directly from Haynes. *Id.* at 13.

For the period between January and June 2009, Ward received positive feedback from Bland, and was scored as "exceeding expectations" in six of nine subject matters covered by her review. Defs. 56.1 Resp., Dkt. 372 at 8, ¶ 15. In the manager comment section of the review, Bland even noted that Ward "should be commended for working on developing the full range of skills required in her position in her first 10 months on the job." *Id.* However, based on the record, it does not appear that this review truly reflected the relationship between Ward and the other lobbyists in the D.C. office during this period of time.

Specifically, in January of 2009, and what would be the first of a series of clashes between Ward on one hand, and Bland and Haynes on the other, Bland attempted to coach Ward concerning her tone around the office. *Id.* at 4, ¶ 8; Pl. 56.1 Resp., Dkt. 310 at 13, ¶ 22. During this conversation, Bland commented that Ward should watch her tone, particularly around Haynes, because as an educated African American woman, she could be perceived as strident and aggressive (hereafter the "January 2009 Comment"). Pl. 56.1 Resp., Dkt. 310 at 13-14, ¶¶ 22-23; Defs. 56.1 Resp., Dkt. 372 at 4, ¶ 8. Ward took the comment as Bland's "understanding of what…[Haynes] thought of [her]." Defs. 56.1 Resp., Dkt. 372 at 4, ¶ 8. Ward also contends that Caucasian lobbyists spoke aggressively to each other and that it was unfair to single her out for criticism based on her race. *Id.* According to the plaintiff, Bland then apologized for making the comment and asked Ward not to report him or tell anyone what he had said. *Id.* at 5, ¶ 8.

Despite Bland's purported request not to repeat what he had said, Ward reported the January 2009 Comment to HR Director Jackie Gordon (Hite had left the Y in October 2008), who worked in the Chicago office, stating that she thought the comment may have originated with Haynes or that Bland was repeating a sentiment that Haynes had expressed. *Id.* at 5, ¶ 9; Pl. 56.1 Resp., Dkt. 310 at 15, ¶ 24. In particular, Ward believed the comment may have originated with Haynes because, as Ward testified, Haynes cut her off during meetings, gave her directives that contradicted Bland's, and on occasion assumed that Ward was not doing her job or that she was "crazy." Defs. 56.1 Resp., Dkt. 372 at 6, ¶ 10; Pl. 56.1 Resp., Dkt. 310 at 16, ¶ 25.

Pursuant to Gordon's advice, Ward emailed Haynes on June 22, 2009, to schedule a meeting to discuss communication issues, as well as Haynes' professional expectations. Defs. 56.1 Resp., Dkt. 372 at 6, ¶ 11. If the meeting went well, Ward also planned to discuss the January 2009 Comment. *Id.* On June 23, 2009, Haynes told Ward, via email, that if she wanted

to meet outside the office, they could do so on July 1, 2009. Pl. 56.1 Resp., Dkt. 310 at 17-18, ¶ 29.

At the meeting on July 1, Ward expressed her concerns to Haynes. *Id.* at 18. According to Ward, however, Haynes denied having any communication issues and stated that any problem must lie with Ward herself. Defs. 56.1 Resp., Dkt. 372 at 6, ¶ 11. After the meeting, Ward reported the outcome of the meeting to Gordon, which Ward felt was disappointing. *Id.* at 6, ¶ 11; Pl. 56.1 Resp., Dkt. 310 at 19, ¶ 31. Gordon offered to speak with Haynes, Bland, or both of them, but Ward told Gordon she was not sure if she wanted Gordon to intervene at that time. Pl. 56.1 Resp., Dkt. 310 at 19, ¶ 31. Gordon then informed Amy Bateson, the Y's Associate General Counsel, Angela Williams, the Y's General Counsel, and CEO Nicoll about Ward's concerns about the January 2009 Comment and the way in which Haynes conducted public policy meetings. *Id.*

The professional relationship between Ward and Haynes hit another bump on July 10, 2009. On that day, Haynes sent Ward an email asking her to skip a congressional hearing in order to take part in a conference call with the White House. Defs. 56.1 Resp., Dkt. 372 at 6, ¶ 12; Pl. 56.1 Resp., Dkt. 310 at 20, ¶ 33. In that email, Haynes also added that "going to hearings every day for the sake of going is not necessarily the best use of time but this is between you and [Bland]." Defs. 56.1 Resp., Dkt. 372 at 6, ¶ 12; Pl. 56.1 Resp., Dkt. 310 at 20, ¶ 33. Ward replied, writing that she was "not sure where that comment [came] from perhaps one of you [Bland or Haynes] can enlighten [her]." Defs. 56.1 Resp., Dkt. 372 at 6, ¶ 12. After reading the email, Bland went into Ward's office to tell her that her response was inappropriate and disrespectful. *Id.* Hearing raised voices, Haynes joined them in Ward's office. *Id.*

Haynes and Bland admonished Ward that her tone and communication style were disrespectful. *Id.* at 7, ¶ 13. Ward responded that she thought it was unfair that Caucasian employees could "slam doors at one another, hang up phones on one another, scream back and forth at one another, and then because [Ward] speak[s] with passion and conviction [she is] told that [she] should watch [her] tone because unfortunately as an educated black woman [she] can come across as aggressive." *Id.* Ward also told Haynes about Bland's January 2009 Comment. Pl. 56.1 Resp., Dkt. 310 at 21-22, ¶ 35. Haynes responded that Ward should not make the issue "about race." *Id.*

At some point during this confrontation, Ward looked away from Haynes and Bland and focused on her computer screen. *Id.* at 7, ¶ 14. Haynes responded by moving the computer screen, reaching across Ward's desk, and then grabbing Ward's face and turning it back so that Ward was looking directly at her. *Id.* Ward later reported this incident ("July 10 Meeting") to Gordon. *Id.*

A few months later, in October 2009, Gordon told Haynes that Ward had reported the January 2009 Comment. *Id.* at 8, ¶ 16; Pl. 56.1 Resp., Dkt. 310 at 19, ¶ 32. Upon returning to the D.C. office, Haynes began documenting criticisms of Ward in a log, writing that "I [Haynes] began keeping this log in mid-October [2009] after hearing that [Ward] had made several calls to our HR department, consulted other Y colleagues and word had gotten back to our CEO that she was unhappy with her treatment for lack of a better characterization." Defs. 56.1 Resp., Dkt. 372 at 8-9, ¶ 17.

More problems arose in January 2010 when Bland gave Ward her second performance review covering the period from July to December 2009. *Id.* at 9, ¶ 19. Defendants contend that this was Ward's year-end review for fiscal year 2009, but the plaintiff avers that this was not a

"year-end" review, but only covered the specified time period. Pl. 56.1 Resp., Dkt. 310 at 25, ¶ 39. Ward completed her self-assessment for that review using the scores she had received from Bland for the previous period, January to July 2009. Defs. 56.1 Resp., Dkt. 372 at 9, ¶ 19. However, Bland told Ward that he needed to lower her scores from the previous review because CEO Nicoll was requiring supervisors to give out fewer 3's ("exceeds expectations") and 4's ("far exceeds expectations"). *Id.* Ward did not believe that her performance warranted lower scores, or that CEO Nicoll had directed supervisors to give fewer "exceeds" and "far exceeds" ratings. *Id.* Afraid that Haynes and Bland were trying to "push her out" of the Y, however, Ward decided to sign the less-favorable performance review. *Id.*

Thereafter, Bland submitted the review to Haynes for her approval. Pl. 56.1 Resp., Dkt. 310 at 26, ¶ 41. Haynes, however, did not approve the review and attempted to lower Ward's scores even further so that she would not receive higher than a 2 ("meets expectations") in all categories. *Id.* at 27, ¶ 41; Defs. 56.1 Resp., Dkt. 372 at 10, ¶ 20. According to the defendants, Haynes told Bland that the lowered scores that Ward had signed off on did not accurately reflect her performance. Pl. 56.1 Resp., Dkt. 310 at 26, ¶ 41.

Around February 1, 2010, Bland presented the modified review with even lower performance scores to Ward for her signature, again explaining that CEO Nicoll wanted more rigorous assessments of performance before employees received a rating higher than 2, or a "meets expectations" rating. *Id.* at 27, ¶ 42. Ward, however, refused to sign the modified review. *Id.* Ward then complained to Gordon, explaining that Bland had lowered her scores from her previous review, and that Haynes had lowered her scores even further. *Id.* at 28; Defs. 56.1 Resp., Dkt. 372 at 10, ¶ 20. Ward contends that the lowered scores were discriminatory and

given in retaliation for her prior complaints of racial discrimination. Pl. 56.1 Resp., Dkt. 310 at ¶¶ 27, 41.

Because Bland did not receive Haynes' approval for the review Ward signed off on in January 2010, Gordon instructed Bland and Haynes to return the scores to what they had been prior to Haynes lowering them. *Id.* at 28, ¶ 43. Around February 3, 2010, Bland then presented Ward with a revised review which contained the scores that Ward originally signed off on. *Id.* at 28, ¶ 44. However, that review contained comments that the original review did not, which, according to Ward, indicated that she was not performing her job adequately. *Id.* at 28-29. The defendants contend that the comments were left in by mistake, were subsequently deleted, and that the final review was identical to the original version that Ward signed in January. *Id.* at 28-29, ¶ 44. Ward contends that the critical comments were not left in as a mistake, but with the expectations that Ward would sign the review without actually reading them. *Id.* at 29.

On February 3, 2010, Bland also began keeping a log titled "Memorandum to File Re: Kavon Ward Substandard Performance." Defs. 56.1 Resp., Dkt. 372 at 11, ¶ 23. Around this time, Gordon flew to D.C. to meet with Haynes, Bland, and Ward to discuss the 2009 performance review and other issues. Pl. 56.1 Resp., Dkt. 310 at 30, ¶ 45. Gordon spent the day in D.C. and met with each employee individually and as a group. *Id.* Gordon offered to hire a career coach for Ward and assigned her a mentor. *Id.* Ward complained that Gordon had not offered to hire a career coach for either Haynes or Bland. *Id.* at 30, ¶ 45; Defs. 56.1 Resp., Dkt. 372 at 11, ¶ 22. In response to Ward's complaint, Gordon recommended coaching for Haynes and Bland as well. Defs. 56.1 Resp., Dkt. 372 at 11, ¶ 22.

On April 8, 2010, Bland emailed Haynes a copy of the notes he had been keeping on Ward. *Id.* at 12, ¶ 24. Haynes redlined the notes and responded that "[t]his is about the fourth I

have of these, either on Performance or Attendance." *Id.* Haynes then suggested that Bland consult with Monica Vinluan, who was experiencing "challenges" with Sam Becknell, another African American employee. *Id.* According to Haynes, Vinluan had purportedly had success dealing with Becknell by placing him on a 90-day improvement plan. *Id.* Vinluan later fired Becknell. *Id.*

Tensions between Ward and Haynes hit another high (or, low) point on April 12, 2010. The trouble began when Ward responded to an email sent to the public policy team. In her response, Ward indicated that she had been forwarding the team's "Monday morning memos" to the Youth and Family Team, which was headed by Barbara Roth. Pl. 56.1 Resp., Dkt. 310 at 32, ¶ 47. Haynes replied to Ward, indicating that Ward should have received permission from the public policy team before forwarding the public policy team's memos. *Id.* Ward was upset with Haynes' response, and avers that Haynes would not have "called out" Caucasian employees, such as Bland and Adamson, in the same manner. *Id.* at 33.

That same day, tensions boiled over when Haynes, Bland, Ward, and other team members held their weekly staff meeting ("April 12 staff meeting"). *Id.* at 33, ¶ 48. During the meeting, the defendants contend, and Ward disputes, that Ward turned her chair toward Haynes and stared at her for the duration of the meeting. *Id.* Haynes allegedly slammed a book on a table and told Ward that she did not appreciate the way in which Ward was looking at her. *Id.* According to Ward, Haynes yelled and berated her. Defs. 56.1 Resp., Dkt. 372 at 12, ¶ 25.

Ward called into work sick the next day, April 13, 2010. *Id.* at 13, ¶ 26; Pl. 56.1 Resp., Dkt. 310 at 33, ¶ 49. Ward also reported Haynes' "outburst" to Gordon. Defs. 56.1 Resp., Dkt. 372 at 13, ¶ 26. Specifically, Ward lodged a written complaint alleging that Haynes was "harassing" her. *Id.* Gordon testified that she considered Haynes' conduct during the April 12

staff meeting "inappropriate" and "serious," *id.* at 13, ¶ 27, and responded by scheduling a coaching session so that a third party could talk to Haynes and Bland to "stop the madness." *Id.* at 13, ¶ 27.

Ward returned to work the next day, on April 14, 2010. *Id.* at 14, ¶ 28. According to Ward, Bland was upset that she had missed work the previous day and demanded to see a doctor's note. *Id.* Ward explained that she needed to take a day due to the incident that occurred at the April 12 staff meeting. *Id.* Ward contends that Bland then told her that she should be "careful" because when she gets upset or looks at Haynes and Bland a certain way, "there could be consequences such as what occurred on [April 12]." *Id.* Ward then emailed Gordon again, complaining that Bland had threatened her to "be careful" and that Haynes and Bland were retaliating against her, and seeking permission to present her complaint directly to CEO Nicoll. *Id.* at 14, ¶ 29; Pl. 56.1 Resp., Dkt. 310 at 34, ¶ 50. Gordon then called Haynes to discuss the incident. Pl. 56.1 Resp., Dkt. 310 at 34-35, ¶ 50.

Gordon forwarded Ward's complaint to the Y's legal department. Defs. 56.1 Resp., Dkt. 372 at 14, ¶ 30. Gordon told Associate General Counsel Karyn Boston about her meetings and interactions with Ward, Haynes, and Bland up to that point. Pl. 56.1 Resp., Dkt. 310 at 35, ¶ 51. After she learned about the April 12 staff meeting incident, Boston started an investigation. *Id.* at 35, ¶ 51. Angela Williams, the Y's General Counsel, called Haynes to advise her that Ward had filed a complaint against her, and that the legal department would be investigating. Defs. 56.1 Resp., Dkt. 372 at 14, ¶ 30. Williams and Haynes were friends and both were senior vice presidents who served on the Y's Leadership Team. *Id.*

On April 19, 2010, Boston traveled from Chicago to the Y's D.C. office to conduct her investigation. Pl. 56.1 Resp., Dkt. 310 at 35, ¶ 52. Boston interviewed Ward, Adamson, Bland,

and Haynes, among other Y employees. *Id.* at 35, ¶ 52; Defs. 56.1 Resp., Dkt. 372 at 15, ¶ 31. Bland told Boston that he had worked with Ward to help guide her, but that Ward's tone had been inappropriate from the start and that she had been openly hostile during meetings. Pl. 56.1 Resp., Dkt. 310 at 36, ¶ 53. Bland also stated that he was fearful of Ward's anger toward Haynes and that he did not feel safe with Ward in the office. *Id.*

Adamson told Boston that Ward had yelled at her once, but for reasons that were justified, and that Ward "sighs, disengages, or crosses her arms when she is mad." Defs. 56.1 Resp., Dkt. 372 at 15, ¶ 33. Adamson also told Boston that, on an earlier occasion, Ward had told Adamson that she had beat up one of her high school teachers in the past, and that, Ward wanted to beat up Haynes in the same manner. Pl. 56.1 Resp., Dkt. 310 at 37, ¶ 55. Like Bland, Adamson also stated that she wanted Ward removed from the office. Defs. 56.1 Resp., Dkt. 372 at 15, ¶ 33.

Haynes told Boston that she felt Ward's behavior during the April 12 staff meeting was disrespectful and abusive. Pl. 56.1 Resp., Dkt. 310 at 37, ¶ 54. However, Boston did not ask Haynes about whether she had slammed a book during the staff meeting. Defs. 56.1 Resp., Dkt. 372 at 15, ¶ 32. Montgomery confirmed that Haynes had slammed the book, *id.*, but Bland denied that it happened. *Id.*

Ward later traveled to Chicago to meet with Boston and Gordon about the investigation. Pl. 56.1 Resp., Dkt. 310 at 38, ¶ 57. Some details of the meeting are disputed, but in general Ward contends that both Boston and Gordon told her that Haynes had been found "guilty of unethical behavior." *Id.* Further, despite Gordon previously suggesting that Ward could work from home, Ward was informed that this was no longer an option. *Id.* Instead, arrangements were made for Ward to work four days per week at the local metropolitan D.C. YMCA, and one day

per week in the Government Relations and Policy office, where Haynes, Bland, and Adamson worked. *Id.*

Ward contends that she abided by these arrangements, even though she felt the outcome of the investigation was unfair. Defs. 56.1 Resp., Dkt. 372 at 16, ¶ 36. In particular, Ward was upset that Haynes was never disciplined, or, as Haynes claims, even told the outcome of the investigation. *Id.*

Starting in May 2010, Ward worked from the metropolitan YMCA until the end of her time with the Y. During this period, a final incident occurred which ultimately led to Ward's termination from the organization. While the specifics of the incident are disputed, the parties agree that on June 10, 2010, Adamson attended a Healthy Communities Initiative meeting and provided an update on the Promise Neighborhoods Initiative—a program for which Ward was responsible—without Ward in attendance. *Id.* at 17, ¶ 37; Pl. 56.1 Resp., Dkt. 310 at 41, ¶ 61. After learning that Adamson had "reported out" on an area within her area of responsibility, Ward emailed Adamson to find out if Haynes had asked Adamson to "lead up" the issue. Pl. 56.1 Resp., Dkt. 310 at 42, ¶ 63. The next day, June 11, 2010, Adamson responded to Ward's email and copied Bland, Haynes, and Monica Vinluan, who worked on the Healthy Community Projects. *Id.* at 42, ¶ 63; Defs. 56.1 Resp., Dkt. 372 at 17, ¶ 38. In the email, Adamson wrote that Ward should be clearer about "when and how to reach [her at the metropolitan YMCA] and what kind of thing is important enough to take [her] away from the work [she was] doing at the [metropolitan YMCA]." Defs. 56.1 Resp., Dkt. 372 at 17, ¶ 38.

According to Ward, she called Adamson after receiving the email, but Adamson yelled at her and accused her of being aggressive. *Id.* at 17-18, ¶ 38. Ward then sent Adamson a formal email response stating "we both know why you felt the need" to respond in the way you did. *Id.*

at 18, ¶ 39. Within minutes, Adamson replied, "[a]nd I am sorry you felt the need to call me and scream at me, saying 'Fuck You' to me and the whole team and frankly be so angry that I needed to hang up." *Id.* Ward responded, "[a]nd Katie [Adamson] I'm sorry you feel the need to tell stories, God, you and I all know that didn't come out of my mouth but I'm not surprised you would try to vilify my character and portray me in such a negative light." *Id.* at 18, ¶ 40. As noted above, Bland and Haynes were copied on each of these emails and responses. *Id.* Ward denies telling Adamson "fuck you and fuck the whole team" when they spoke on the phone. Pl. Resp., Dkt. 310 at 43, ¶ 64.

Shortly thereafter, Adamson called Haynes to report that Ward had allegedly said "fuck you and fuck the whole team" on their phone conversation. *Id.* at 43, ¶ 65. Haynes advised Adamson to contact Gordon in HR and Williams in the General Counsel's office. *Id.* Adamson called Williams, reported her allegations, and reiterated her fear of Ward. Defs. Resp., Dkt. 372 at 18, ¶ 41. Bland also participated on that call. *Id.*

Williams had already been receiving updates from Gordon regarding Ward's discrimination and retaliation complaints. *Id.* at 18-19, ¶ 41. Williams instructed Adamson to forward her the email chain she had with Ward, and that Adamson "need[ed] to put in there that [she felt] scared." *Id.* Bland further testified that Adamson felt her "life was threatened." *Id.* The defendants also contend that Adamson spoke with Gordon about her fear of Ward. Pl. 56.1 Resp., Dkt. 310 at 45, ¶ 67. Adamson told Gordon about her earlier conversation with Ward, in which Ward allegedly stated that she beat up one of her teachers and that she wanted to beat up Haynes in the same manner. *Id.*

On June 17, 2010, Gordon and Williams met with Ward to terminate her employment. *Id.* at 46, ¶ 69. Williams testified that Ward was terminated because the Y "has zero tolerance for

workplace violence," citing Ward's "language" to Adamson and Haynes, as well as Bland's "concerns" about Ward's "language and conduct." Defs. 56.1 Resp., Dkt. 372 at 20, ¶ 45. The parties dispute whether Haynes and Bland were involved in the decision to terminate Ward. The defendants contend that only Williams and Gordon were involved in the decision to terminate Ward, with Williams as the ultimate decisionmaker. *Id.* at 20-21. Ward claims that Williams, Gordon, Bland, and Haynes were all involved in the termination decision. *Id.* at 20, ¶ 45.

After Ward was terminated, Montgomery testified that Haynes came out of her office and performed "a cheerleading thing that she does" and "talked about how much the office felt so much lighter." *Id.* at 21, ¶ 46. On January 4, 2011, Haynes hired Ivana Alexander, an African American woman, as a Senior Public Policy Manager with a salary of $98,000 to replace Ward. Pl. 56.1 Resp., Dkt. 310 at 48, ¶ 71. Prior to being hired by the Y, Alexander worked as a Deputy Chief of Staff and Legislative Director for a U.S. Representative for two years and as a legislative assistant in the Office of the Majority Leader for approximately three years. *Id.*

## II.    ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Porter v. City of Chi.,* 700 F.3d 944, 950 (7th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). "To survive summary judgment, the nonmovant must produce sufficient admissible evidence, taken in the light most favorable to it, to return a jury verdict in its favor." *Fleishman v. Cont'l Cas. Co.,* 698 F.3d 598, 603 (7th Cir. 2012) (citing *Berry v. Chi. Transit Auth.,* 618 F.3d 688, 696 (7th Cir. 2010)). Disputed issues of material fact must be resolved in the nonmovant's favor. *See Smith v. Bray,* 681 F.3d 888, 892 (7th Cir. 2012) (citation omitted). However, the Court "will not draw inferences that are supported by only speculation or conjecture," *Collins v. Am. Red Cross,* 715

F.3d 994, 997 (7th Cir. 2013) (citing *Harper v. C.R. England, Inc.,* 687 F.3d 297, 306 (7th Cir. 2012)), and Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Scott v. Trump Ind., Inc.,* 337 F.3d 939, 945 (7th Cir. 2003) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)).

## A. Legal Standards

The plaintiffs have brought their claims of racial discrimination and retaliation under Title VII, § 1981, the IHRA, and the DCHRA. The parties agree that the same legal standards apply under each of these statutes. *See, e.g. Humphries v. CBOCS W., Inc.,* 474 F.3d 387, 403-04 (7th Cir. 2007) (same *prima facie* requirements applied to discrimination and retaliation claims brought under Title VII and § 1981); *Paul v. Theda Med. Ctr., Inc.,* 465 F.3d 790, 794 (7th Cir. 2006) ("The framework governing liability under Title VII also applies to [§] 1981 claims." (citing *Gonzalez v. Ingersoll Milling Mach. Co.,* 133 F.3d 1025, 1035 (7th Cir. 1998))); *Young v. Covington & Burling LLP,* 846 F. Supp. 2d 141, 153 (D.D.C. 2012) ("In addressing employment discrimination claims under [the DCHRA and § 1981], courts look to the jurisprudence surrounding Title VII." (citations omitted)); *Wallace v. Eckert, Seamans, Cherin & Mellott, LLC,* 57 A.3d 943, 956 (D.C. 2012) ("In considering discrimination claims under the [DCHRA], this court uses the three-part, burden-shifting test…for Title VII cases"); *Budzileni v. Dep't of Human Rights,* 392 Ill. App. 3d 422, 443-44 (1st Dist. 2009) (Illinois courts "have adopted the three-part test employed by the federal courts in actions for employment discrimination brought under Title VII." (citing *Zaderaka v. Ill. Human Rights Comm'n,* 131 Ill.2d 172, 178-79 (1989))); *Bd. of Trs. of S. Ill. Univ. v. Knight,* 163 Ill. App. 3d 289, 294 (5th Dist. 1987) ("In analyzing claims of discrimination under the [IHRA], Illinois courts have looked to the standards applicable to federal claims brought under Title VII."). Accordingly, the Court analyzes

plaintiffs' allegations under the legal standards applicable to Title VII discrimination and retaliation claims.

The operative complaint in this case is the plaintiffs' Fourth Amended Complaint (hereinafter, simply "Complaint"). The Complaint sets forth in twelve "counts" a multitude of distinct legal "claims" brought by different combinations of the plaintiffs against different combinations of the defendants. Table 1 attached to this opinion summarizes these "counts" and "claims." The Court has already declined to certify the plaintiffs' putative class claims (Dkt. 454); this opinion addresses only their individual claims. To the extent that the Complaint suggests that each "count" sets forth a separate "claim" as to each plaintiff, it would be in error. A "claim for relief," Fed. R. Civ. P. 54(b), "seeks redress of a distinct wrong." *NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 291 (7th Cir. 1992). Many of what the plaintiffs assert are distinct claims that are more accurately characterized as distinct legal theories supporting a smaller set of legal claims. "Two legal theories sufficiently distinct that they call for proof of substantially different facts may be separate 'claims,'" but "[o]ne set of facts producing one injury creates one claim for relief, no matter how many laws the deeds violate." *Id.* at 292. Thus, there are fewer than the 30-odd "claims" that the Complaint purports to assert.[20]

Two other matters can be addressed before reaching the merits of the plaintiffs' claims against the Y and will simplify that discussion. First, defendant Hite cannot be liable to any of

---

[20] Distinguishing between "claims," "counts," and theories is not a semantic exercise. As the Seventh Circuit explained in *NAACP*, it has significant implications for appellate jurisdiction in the event a party seeks to appeal a judgment on fewer than all the claims asserted pursuant to Rule 54(b). The defendants' motions for summary judgment present the possibility of a Rule 54(b) motion, but more immediately they require an assessment of which of the plaintiffs' claims, or portions of such claims (Rule 56 permits motions for summary judgment on all claims, some claims, or "parts" of claims) are presently at issue. In the event either party seeks to appeal the Court's ruling pursuant to Rule 54(b), it will be required to establish that what is being appealed is, in fact, a "claim" within the meaning of that rule, and that no part of that claim remains to be adjudicated.

the plaintiffs under Title VII (or the IHRA or DCHRA) because Title VII applies only to the conduct of employers, not individuals. *See Passananti v. Cook Cnty.*, 689 F.3d 655, 662 n.4 (7th Cir. 2012); *Smith v. Bray*, 681 F.3d 888, 896 n.2 (7th Cir. 2012). By contrast, individuals may be liable under § 1981. *Bray*, 681 F.3d at 896 n.2. For that reason, the plaintiffs have asserted only their claims under § 1981 against defendant Hite. Further, plaintiffs Toles and Ward purport only to assert a pattern-and-practice claim against defendant Hite; they disavow any intention of asserting any claims that Hite discriminated against them directly. With respect to Ward, however, the defendants point out that Hite's employment with the Y ended just two weeks after Ward's employment began and that Ward makes no allegations against Hite in the Complaint. Ward responds that she is asserting a pattern-and-practice claim against Hite because of "Hite's involvement" in putting into practice the policies that impacted Ward. She cites no authority, however, for the proposition that an individual can be responsible for a company's policies and actions after that individual is no longer an employee, and the Court is aware of none. Accordingly, the Court agrees that summary judgment in favor of defendant Hite on any claim asserted by Ward is appropriate.

Second, the defendants' motions for summary judgment purport to seek dismissal of, and judgment on, the Complaint "in its entirety." As the Y effectively concedes, however, the defendants have not presented any argument for judgment in favor of the Y as to the disparate impact (unintentional discrimination) and pattern-and-practice claims of plaintiffs. *See* Reply, Dkt. 380 at 14 n.10. Accordingly, to the extent that the defendants' motion sought summary judgment on those claims, the motions are denied. Contrary to the implication suggested in the plaintiffs' briefs, however, that does not mean that the defendants have forfeited any subsequent argument that the evidence does not warrant judgment in their favor with respect to those claims.

## B. Standards of Proof for Intentional Discrimination Claims

"Generally speaking, there are two ways of proving [] a claim [of intentional discrimination]: the 'direct' method of proof and the 'indirect' method of proof." *Collins,* 715 F.3d at 999 (citing *Naficy v. Ill. Dep't of Human Servs.,* 697 F.3d 504, 509 (7th Cir. 2012); *but see also Coleman v. Donahoe,* 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J. concurring) (arguing that the direct/indirect distinction is unnecessarily complicated and that "the time has come to collapse all these tests into one"). To prevail on a motion for summary judgment on a disparate treatment claim under the "direct method" of proof, the plaintiffs must show that they suffered a materially adverse employment action, *see Nichols v. S. Ill. University-Edwardsville,* 510 F.3d 772, 779 (7th Cir. 2007) (citations omitted), motivated by the employer's racial discrimination. *See Coleman,* 667 F.3d at 845. The plaintiffs may offer either direct or circumstantial evidence that both "point[s] directly to a discriminatory reason for the employer's action," *Dass v. Chi. Bd. of Educ.,* 675 F.3d 1060, 1071 (7th Cir. 2012) (citing *Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir. 2003)), and is "directly related to the employment decision." *Id.* (citing *Venturelli v. ARC Cmty. Servs., Inc.,* 350 F.3d 592, 602 (7th Cir. 2003)).

Direct evidence typically consists of an "outright admission by the decisionmaker that the challenged action was undertaken because of the [plaintiff's race]." *Id.* (citing *Davis v. Con-Way Transp. Cent. Express, Inc.,* 368 F.3d 776, 783 (7th Cir. 2004) (internal quotations and citations omitted)). That sort of evidence is rare, *see e.g. Coleman,* 667 F.3d at 845 ("'smoking gun' evidence of discriminatory intent is hard to come by"), and when an employer has not openly admitted to discrimination "the plaintiffs must construct a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Brown v.*

*Advocate S. Suburban Hosp.,* 700 F.3d 1101, 1105 (7th Cir. 2012) (internal quotations omitted) (citing *Phelan v. Cook Cnty.,* 463 F.3d 773, 779 (7th Cir. 2006)).

> The Seventh Circuit has recognized three types of circumstantial evidence:
>
> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; [or] (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Good v. Univ. of Chi. Med. Ctr.,* 673 F.3d 670, 675 (7th Cir. 2012) (citing *Darchak v. City of Chi. Bd. of Educ.,* 580 F.3d 622, 631 (7th Cir. 2009)). A plaintiff may rely solely on circumstantial evidence to survive summary judgment, "but only if the circumstantial evidence presented points 'directly to a discriminatory reason for the employer's action.'" *Id.* (citing *Cerutti v. BASF Corp.,* 349 F.3d 1055, 1061 (7th Cir. 2003), quoting *Adams,* 324 F.3d at 939).

The plaintiffs may also proceed under the familiar three-part burden-shifting method of indirect proof established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). To establish a *prima facie* case of intentional discrimination under this "indirect method," the plaintiff has the initial burden of offering evidence that "(1) [they are] member[s] of a protected class, (2) [their] job performance met [the employer's] legitimate expectations, (3) [they] suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff [or plaintiffs]." *Coleman,* 667 F.3d at 845 (citing *Burks v. Wis. Dep't of Trans.,* 464 F.3d 744, 750-51 (7th Cir. 2006)). "Once a *prima facie* case is established, a presumption of discrimination is triggered." *Id.* The burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* (citing *McDonnell Douglas,* 411 U.S. at 802). "When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the

stated reason is a 'pretext,' which in turn permits an inference of unlawful discrimination." *Id.* (citing *McDonnell Douglas,* 411 U.S. at 804; *Burks,* 464 F.3d at 751).

### C. Plaintiffs' Statistical Evidence

The plaintiffs (other than Ward) briefly refer to statistical evidence developed by the plaintiffs' retained expert, Dr. Mark R. Killingsworth, in support of their individual disparate treatment claims. The Court denied the defendants' motion to strike Dr. Killingsworth's reports and testimony as unreliable pursuant to Federal Rule of Evidence 702. *See* Dkt. 454. But although the Court deems Dr. Killingsworth's analysis sufficiently reliable to pass muster under Rule 702, that analysis—by its own terms—does not say anything about whether the Y discriminated against these particular plaintiffs.

Whether statistical evidence can be relevant to the consideration of individual claims of intentional discrimination on summary judgment presents interesting questions. Fourteen years ago, the Seventh Circuit said in *Adams v. Ameritech Servs. Inc.,* 231 F.3d 414, 423 (7th Cir. 2000), that the short answer to that question is "yes." There, the Court of Appeals concluded that "statistical evidence can be very useful to prove discrimination in either [an individual disparate treatment claim or a discriminatory pattern or practice claim]." *Id.* The *Adams* court made clear, however, and a number of subsequent panels have reiterated, that statistical evidence will typically be useful only when offered in conjunction with other evidence of discrimination; standing alone, statistical evidence is generally insufficient to prove individual claims of intentional discrimination. *See id.; see also, e.g., Baylie v. Federal Reserve Bank of Chicago*, 476 F.3d 522, 525 (7th Cir. 2007); *Bennett v. Roberts,* 295 F.3d 687, 697 (7th Cir. 2002); *Cullen v. Ind. Univ. Bd. of Trs.,* 338 F.3d 693, 701 (7th Cir. 2003). Indeed, "it is unlikely that a pure correlation [between a protected classification and some materially adverse employment action,

standing alone] would be enough to establish a *prima facie* case of intentional discrimination." *See Kadas v. MCI Systemhouse Corp.,* 255 F.3d 359, 363 (7th Cir. 2001).[21]

The utility of statistical evidence in proving individual intentional discrimination claims may once again be open to question, however, in the wake of the Supreme Court's opinion in *Wal-Mart v. Dukes,* 131 S. Ct. 2541, 2555 (2011)). In *Wal-Mart*, the Court rejected statistical evidence as an adequate basis to establish commonality in a putative class action asserted on behalf of approximately 1.5 million past and present female employees of Wal-Mart, holding that even statistical evidence showing a disparity in every one of Wal-Mart's 3,400 stores would not suffice to show causation—that is, in the absence of a common policy or procedure, mere statistics could not "produce a common answer to the crucial question *why was I disfavored.*" *Id.* at 2552 (emphasis in original). *Wal-Mart* was a class action, but the commonality inquiry necessarily focuses on whether aggregated statistical evidence of discrimination provides a link (in the words of the Court, whether there is a "glue") between individual claims of discrimination and calls into question the role of statistical evidence in proving such claims. If class-wide

---

[21] That is not to say that statistical evidence can *never* be enough to establish a *prima facie* case of intentional discrimination. *See Kadas,* 255 F.3d at 363. As the Seventh Circuit has explained:

> If 100 employees in a department of 1,000 employees were [terminated] and every one of the 100 was [in the same protected classification]…and every one one of the 900 retained was [not in the protected group], that would…be enough evidence of…discrimination (the probability of its occurring by chance being inconceivably minute) to place on the employer a burden of explaining [the justification for its employment decisions].

*Id.* But evidence that justifies shifting a burden of proof does not necessarily equate to evidence sufficient to create a material issue of fact, as the convoluted *McDonnell Douglas* burden-shifting inquiry illustrates.

statistical evidence does not provide a common answer to the question, then it is difficult to understand how it can be inferred from statistics drawn from the group as a whole that any particular individual actually suffered discrimination.

The impact of *Wal-Mart* in this regard is academic in the present case, however, because the plaintiffs' expert does not purport to address the question of whether the Y discriminated against any specific individual, or even whether any particular supervisor or department discriminated against African American employees. Dr. Killingsworth's own description of his assignment reveals that the question addressed by his analysis is "whether there is a clear pattern under which African-Americans ***as a group*** are systematically disadvantaged relative to others." Report of Dr. Mark Killingsworth, Dkt. 405-1, at 1 (emphasis added).[22] Dr. Killingsworth hazards no opinions about the merits of any of the plaintiffs' *individual* discrimination claims, and confirmed during his deposition that he had not done so. Specifically, Dr. Killingsworth testified:

> "Q: Wouldn't you agree that the—the whole point of a statistical analysis is to draw some generalizations and say on average what is the case, not to say something about an individual person?
>
> A: Oh, that's right. You can't—well, certainly with this kind of analysis, you can't say anything about individuals."

Dkt. 304-5 at 9 (Dep. Tr. at 106:3-14). For their part, the plaintiffs do not rely heavily on Dr. Killingsworth's statistical evidence; in connection with their summary judgment response, they

---

[22] The proffered statistical evidence purports to show, and Dr. Killingsworth opines, that (1) African Americans were assigned to lower pay-grades than Caucasians of the same years of service and education for the years 2005 to 2010, (2) African Americans were statistically significantly less likely to be promoted and that their times for promotion were significantly longer, (3) African Americans received statistically significant less favorable performance evaluations than Caucasians of the same service and education in the years 2007 and 2008, and (4) in every year from 2005 to 2010, and at statistically significant levels between 2005 and 2007, African Americans received less favorable pay. *See* Resp., Dkt. 334 at 13.

cite the statistical evidence only to point out that it buttresses the evidence that the Y discriminated against "other employees" (*see, e.g.* Resp., Dkt. 334 at 13). The question presented here, however, is whether the Y intentionally discriminated against *these* employees.

As *Baylie* explains, consistent with the Court of Appeals' acknowledgement in *Adams* that statistical evidence can be relevant in proving individual discrimination claims, such evidence can be relevant because "all inferences are statistical." 476 F.3d at 523. Statistical evidence—if it is sufficiently reliable and probative of the fact that discrimination accounts for an aggregate disparity—might, despite marginal probative value, tip the balance in a very close individual case in which it is coupled with other evidence "which does most of the work." *Id.* at 524. In this case, however, both the plaintiffs' expert and the plaintiffs effectively acknowledge that it has little, if any, significance.

### D.  James Jones and Nicole Steels

Plaintiffs Jones and Steels assert claims of pay discrimination, discriminatory performance evaluations and merit increases, failure to promote, and retaliation. Jones also asserts a claim of discriminatory termination. Steels, on the other hand, alleges that she was constructively discharged from the Y and that Hite discriminated against her by refusing to allow her to telecommute from home after her maternity leave.

#### 1. Steels' Bankruptcy Proceedings

The defendants contend that Steels is judicially estopped from asserting her claims because she failed to disclose those claims on a bankruptcy petition she filed years prior to the instant suit. Specifically, on August 5, 2004, Steels filed a Chapter 13 bankruptcy petition, Pl. 56.1 Resp., Dkt. 313 at 49, ¶ 72, and was represented by counsel through all stages of the bankruptcy proceedings. *Id.* On Schedule B of her petition, she was directed to identify "all

contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims." *Id.* at 49, ¶ 73. Another form required Steels to "[l]ist all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing of [her] bankruptcy case." *Id.* at 50, ¶ 73. Steels checked "none" on both of those forms. *Id.*

On September 29, 2009, the bankruptcy court granted Steels a discharge of her debts. *Id.* at 50, ¶ 75. On November 25, 2009, the bankruptcy court closed Steels' case and discharged the trustee. *Id.* At no time while her case was open did Steels disclose her charge of discrimination or the existence of the claims she asserts in this case—which were filed on October 13, 2009, while her bankruptcy case remained open—to the bankruptcy court. *Id.* at 50, ¶ 74.

Steels did, however, disclose her claims to the bankruptcy court a year and a half later, after the defendants deposed her on March 7 and 8, 2011. *Id.* at 50, ¶ 76. During that deposition, the defendants provided Steels with her August 5, 2004, bankruptcy petition as an exhibit, specifically noting that Steels had failed to disclose her claims. *Id.* On July 1, 2011, Steels then filed a motion to re-open her bankruptcy case to amend the schedules to her petition. *Id.* at 51, ¶ 77. In that motion, Steels stated that she was "unaware of her obligation to inform counsel of the pending claim" against her former employer, and that she contacted her counsel upon becoming aware of the obligation to disclose her post-petition claim. *Id.*

Steels' motion was granted on August 17, 2011, and her case was converted to Chapter 7. *Id.* at 51, ¶ 78. Thereafter, on August 20, 2011, Steels filed an amended schedule, which disclosed an employment discrimination claim worth $0 to $70,000. *Id.* On July 30, 2012, however, the bankruptcy court issued its decision finding that Steels' claim was not part of her Chapter 7 bankruptcy estate because under the Bankruptcy Code, the estate's assets are

determined at the time of the filing of the petition, when Steels' claims had not accrued, and not at the time of conversion. Bankr. Hr'g Tr. July 30, 2012, Defs. Br., Dkt. 415, Ex. B; *see also Google, Inc. v. Cent. Mfg., Inc.,* 316 Fed. Appx. 491, 495 (7th Cir. 2008) ("[A] cause of action arising after the bankruptcy estate is created belongs to the debtor, and normally the property of a Chapter 7 estate in a case that was converted from a Chapter 13 is determined by the debtor's interest at the time the Chapter 13 case was filed, not when it was converted."). Regardless of the bankruptcy court's ruling, however, the defendants maintain that, because Steels failed to timely disclose her claims to the Bankruptcy Court, she should be judicially estopped from pursuing them now. *See* Mot., Dkt. 265 at 3.

"Judicial estoppel is a doctrine intended to prevent the perversion of the judicial process…[and] applie[s] where intentional self-contradiction is being used as a means of obtaining [an] unfair advantage in a forum designed for suitors seeking justice, to prevent litigants from 'playing fast and loose with the courts.'" *Matter of Cassidy,* 892 F.2d 637, 641 (7th Cir. 1990) (internal citations and quotations omitted). "Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." *Id.* (citing *Davis v. Wakelee,* 156 U.S. 680, 689 (1895)); *see also Cannon-Stokes v. Potter,* 453 F.3d 446, 449 (7th Cir. 2006) (holding that plaintiff was barred from realizing on her claims because she expressly denied having any legal claims when she filed her Chapter 7 bankruptcy petition and failed to amend that petition).

For judicial estoppel "[t]o apply, (1) the latter position must be clearly inconsistent with the earlier position; (2) the facts at issue must be the same in both cases; and (3) the party to be estopped must have prevailed upon the first court to adopt the position." *Urbania v. Cent. States,*

*Se. and Sw. Areas Pension Fund,* 421 F.3d 580, 589 (7th Cir. 2005) (citing *United States v. Hook,* 195 F.3d 299, 306 (7th Cir. 1999)). That said, "judicial estoppel is an equitable doctrine," *Cannon-Stokes,* 453 F.3d at 448; it "should not be used where it would work an injustice, such as where the former position was the product of inadvertence or mistake." *Matter of Cassidy,* 892 F.2d at 642; *see also, e.g., New Hampshire v. Maine,* 532 U.S. 742, 753 (2001) ("[I]t may be appropriate to resist application of judicial estoppel 'when a party's prior position was based on inadvertence or mistake.'"); *Johnson Serv. Co. v. TransAmerica Ins. Co.,* 485 F.2d 164, 175 (5th Cir. 1973) ("[T]he rule looks toward cold manipulation and not an unthinking or confused blunder.").

The defendants initially argued that Steels did not have standing to pursue her claims because they belonged to her bankruptcy estate. However, the bankruptcy court determined that, because her bankruptcy had been converted to Chapter 7, the estate did not own the claims.[23] Bankr. Hr'g Tr. July 30, 2012, Defs. Br., Dkt. 415, Ex. B at 5. Nevertheless, the defendants maintain that the criteria for applying judicial estoppel are met here and, therefore, Steels should be barred from asserting her claims in this case.[24] Mot., Dkt. 265 at 3. Regardless of whether the claims actually belong to Steels' Chapter 7 bankruptcy estate, the defendants point out that (as the bankruptcy court found) Steels' claims were "unquestionably property of [her] Chapter 13"

---

[23] The bankruptcy court held that Steels' cause of action was property of the Chapter 13 estate. *See* Bankr. Hr'g Tr. July 30, 2012, Defs. Br., Dkt. 415, Ex. B at 4. However, when Steels converted her bankruptcy from Chapter 13 to Chapter 7, the court explained that the Bankruptcy Code makes clear that "what property of the Chapter 13 estate becomes property of the Chapter 7 estate on conversion is the property that was property of the 13 estate on the petition date, not after acquired property." *Id.* Steels' cause of action was not property of the Chapter 13 estate on the petition date, and therefore, is not property of the Chapter 7 estate. *Id.* at 5.

[24] Because the Bankruptcy Court determined that Steels' claims did not belong to the Chapter 7 estate, the defendants' claim that Steels lacks standing to assert her claims on the ground that all of her property belongs to the bankruptcy estate is moot. Bankr. Hr'g Tr. July 30, 2012, Defs. Br., Dkt. 415, Ex. B.

bankruptcy estate when those claims accrued. Defs. Br., Dkt. 415 at 2. Steels failed to disclose her discrimination claims until the defendants confronted her with her deficient bankruptcy petition at her deposition, *id,* and only due to "a quirk" in the Bankruptcy Code did those claims cease to be assets of the bankruptcy estate. *Id.* That conclusion, the defendants argue, "end[ed] in a somewhat…inequitable result." *Id.* (citing Bankr. Hr'g Tr. July 30, 2012, Defs. Br., Dkt. 415, Ex. B at 6:14). According to the defendants, therefore, despite the fact that her claims do not belong to the Chapter 7 bankruptcy estate, Steels should be judicially estopped from pursuing those claims in this Court lest she profit from their prior concealment. *Id.* at 3-4.

Steels, on the other hand, maintains that her bankruptcy petition was not "clearly inconsistent" with her claims. Resp., Dkt. 334 at 62. Steels points to the fact that when she filed her bankruptcy petition on August 5, 2004, her discrimination claims had not yet accrued, nor had she filed an EEOC charge. *Id.* Moreover, Steels' bankruptcy plan was confirmed on September 22, 2004—years before her first charge of discrimination. *Id.* Steels avers that she did not intentionally try to convince the bankruptcy court to accept an inconsistent position by failing to amend her petition—she was simply unaware of her obligation to supplement her petition with after-acquired property, and therefore, unintentionally omitted her claims. *Id.* at 63-64. In fact, Steels contends that as soon as she learned about the disclosure requirement, she "promptly sought leave to reopen the bankruptcy for the purpose of updating her disclosures." Pl. Br., Dkt. 414 at 2.

"Debtors have a continuing duty to schedule newly acquired assets while the bankruptcy case is open." *Rainey v. United Parcel Serv., Inc.,* 466 Fed. Appx. 542, 544 (7th Cir. 2012) (citing *In re Waldron,* 536 F.3d 1239, 1244 (11th Cir. 2008)); *see also Jaeger v. Clear Wing Prods., Inc.,* 465 F. Supp. 2d 879, 882 (S.D. Ill. 2006) ("The duty to disclose is a continuing one

that does not end once the forms are submitted to the bankruptcy court; rather, a debtor must amend his financial statements if circumstances change.") (citation omitted). Moreover, "a debtor in bankruptcy is bound by her own representations, no matter why they were made, at least until the debtor moves to amend the disclosures and pay the creditors their due." *Cannon-Stokes,* 453 F.3d at 449 (emphasizing that the plaintiff had not taken the step to amend her disclosures). And as the Seventh Circuit has explained, judicial estoppel "raises the costs of lying" about those disclosures "by making [litigants] choose one position irrevocably," *Cannon-Stokes,* 453 F.3d at 448 (quoting *Chaveriat v. Williams Pipe Line Co.,* 11 F.3d 1420, 1428 (7th Cir. 1993)), and is designed to "prevent the perversion of the judicial process." *Id.* (citing *In re Cassidy,* 892 F.2d at 641). The issue, therefore, is whether Steels intentionally failed to amend her bankruptcy petition (and only did so after the defendants' discovery of the deficiency) to realize on her discrimination claims, or whether her omission was due to inadvertence or mistake.

The court in *Jaeger* decided precisely this issue, on substantially similar facts. 465 F. Supp. 2d 879 (S.D. Ill. 2006). In that case, the plaintiff had filed for bankruptcy in May 2003, *id.* at 881, and then suffered an injury at a concert a few months later, in November. *Id.* As a consequence, the plaintiff could not have disclosed her tort claim in her bankruptcy petition when she first filed it. *Id.* That said, the plaintiff conceded that she failed to disclose her claim *even after* she modified her bankruptcy plans "three times *after* the injury." *Id.* (emphasis in original). The court, noting that "[t]he caselaw plainly holds that a debtor must amend his pleadings whenever circumstances change," *id.* at 882 (citations omitted), nevertheless concluded "genuine issues of material fact…remain[ed] as to *whether* [the plaintiff's] failure to disclose constituted 'cold manipulation' or 'intentional contradiction' as opposed to a 'confused

blunder' or 'simple error or inadvertence.'" *Id.* at 882 (citing *Ajaka v. Brooksamerica Mortg. Corp.,* 453 F.3d 1339, 1345, n. 7 (11th Cir. 2006); *Am. Nat'l Bank of Jacksonville v. FDIC,* 710 F.2d 1528, 1536 (11th Cir. 1983) (explaining that judicial estoppel applies to the "calculated assertion" of divergent positions)).

The *Jaeger* court noted that the plaintiff discovered "that she might need to disclose [her] pending lawsuit to the bankruptcy trustee" during a deposition in August 2006. 465 F. Supp. 2d at 882, n.5. "Within three weeks, [the plaintiff's] bankruptcy counsel informed…the Chapter 13 Trustee's Office about [the] personal injury lawsuit," *id.,* who responded that the plaintiff did not need to amend her bankruptcy schedules, "since the claim accrued after the bankruptcy petition was filed." *Id.* According to the court, viewed in the light most favorable to the nonmoving party, the record "suggest[ed] that [the plaintiff's] failure to disclose was inadvertent oversight, not deliberate manipulation." *Id.* at 882. *But see Barger v. City of Cartersville, Ga.,* 348 F.3d 1289, 1294-97 (11th Cir. 2003) (affirming dismissal of monetary claims where the plaintiff, pursuing her discrimination claim when she filed for bankruptcy, failed to list the claim as an asset on her petition, and only sought to amend her petition after the defendants moved the district court to enter summary judgment on judicial estoppel grounds); *Karraker v. Rent-a-Ctr., Inc.,* No. 02-2026, 2005 WL 2979652, at *2-3 (C.D. Ill. Nov. 7, 2005) (plaintiff judicially estopped from asserting wrongful termination claim where plaintiff was aware of the need to list pending litigation on his bankruptcy schedules, the case was proceeding at the time the plaintiff failed to disclose his claim, and the plaintiff failed to amend his bankruptcy petition prior to its dismissal).

Like the plaintiff in *Jaeger,* Steels failed to amend her bankruptcy disclosures after her discrimination claims accrued. She promptly filed a petition to reopen her bankruptcy proceedings once she learned of the continuing disclosure requirement at her deposition.

Whether Steels' failure to disclose the discrimination claims she has asserted in this case was an intentional attempt to win in two courts, based on two clearly inconsistent positions, as opposed to an inadvertent mistake, is a genuine issue of material fact which precludes summary judgment. *See, e.g., Jaeger,* 465 F. Supp. 2d at 885. Accordingly, the defendants' motion for summary judgment on judicial estoppel grounds is denied.

### 2. Jones' and Steels' Failure-to-Promote Claims

Jones and Steels both allege that Hite and the Y failed to promote them for racially discriminatory reasons. The defendants contend that neither Jones nor Steels has any direct or circumstantial evidence of discrimination to support their failure-to-promote claims, Mot., Dkt. 265 at 5, and that, to survive summary judgment, the plaintiffs must offer evidence that they actually applied for a promotion. Mot., Dkt. 269 at 2. *See also Cardoso v. Robert Bosch Corp.,* 427 F.3d 429, 436 (7th Cir. 2005) (plaintiff failed to make it past the *prima facie* stage on a failure-to-promote claim because he did not apply for the job openings at issue). According to the defendants, because neither plaintiff applied for a promotion, their claims fail as a matter of law. Mot., Dkt. 269 at 2; Mot., Dkt. 265 at 5.

In their combined response, the plaintiffs do not offer direct or circumstantial evidence of intentional discrimination to support their failure-to-promote claims. Resp., Dkt. 334 at 50-52. Instead, the plaintiffs focus solely on the "application" element of their claims, countering the defendants' argument by asserting that they do not need to show that they applied for a job opening or promotion because the Y utilized a "'preferred candidate' system, pursuant to which it would post positions *after* identifying the candidate it wanted…to fill the position." *Id.* at 51 (original emphasis).

A "[f]ailure to promote can be an adverse [employment] action giving rise to liability…, but the plaintiff must first show that she properly applied for the position." *Hill v. Potter,* 625 F.3d 998, 1003 (7th Cir. 2010) (internal citation omitted) (citing *McDonnell Douglas,* 411 U.S. at 802; *Jackson v. Cnty. of Racine,* 474 F.3d 493, 501 (7th Cir. 2007); *Hudson v. Chi. Transit Auth.,* 375 F.3d 552, 558 (7th Cir. 2004)). But, as the plaintiffs contend, it is also true that "[w]hen an employer uses a promotion system in which employees do not apply for promotions but rather are sought out by managers, the application requirement of the *prima facie* case is loosened somewhat." *Box v. A & P Tea Co.,* 772 F.2d 1372, 1377 (7th Cir. 1985) (citing *Reed v. Lockheed Aircraft Corp.,* 613 F.2d 757, 761 (9th Cir. 1980); *Rodgers v. Peninsular Steel Co.,* 542 F. Supp. 1215, 1219-20 (N.D. Ohio 1982)). "In [that] situation, the plaintiff can establish the application element of a *prima facie* case by showing that, had [he or] she known of an… opening, [he or] she would have applied." *Id.* (citing *Rodgers,* 542 F. Supp. at 1220); *Gordan v. City of Harvey,* No. 07 C 5867, 2009 WL 2163233, at *9 (N.D. Ill. July 20, 2009) (plaintiff satisfied *Box* application element by "specifically express[ing] an interest in being promoted to sergeant").

But the "preferred candidate" approach the plaintiffs described is quite different than the recruitment of a specific candidate without affording any opportunity for others to apply for a position. Here, the Y posted the positions and other employees had an opportunity to apply for the position. That the Y had already identified someone who, it believed, met the criteria for the position does not suggest that the application process was a sham (and neither Jones nor Steels argues that it was). The Y's identification of potential candidates, then, does not excuse employees from the requirement that they actually apply for a higher level job opening before claiming that they were discriminated against by the company's decision to hire someone else to

fill that opening. That the Y *could have* reclassified or upgraded Jones' position or considered him for the National Director of Staff Development position in the absence of an application is immaterial; what the Y *could* or *might* have done is insufficient to survive summary judgment on a claim for intentional discrimination. *See Brown,* 700 F.3d at 1104 ("[O]ur favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture."); *Delapaz v. Richardson,* 634 F.3d 895, 901 (7th Cir. 2011) ("conjecture alone cannot defeat a summary judgment motion" (citing *Rockwell Automation, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 544 F.3d 752, 757 (7th Cir. 2008))).

Steels' failure-to-promote claim suffers from the same deficiency. *See* Resp., Dkt. 334 at 52. Like Jones, Steels only argues that the Y *could* have assigned her more responsibilities or considered her for the position of interim director after Hite resigned from the Y. *Id.* However, the record shows that Steels received two promotions during her employment with the Y, Reply, Dkt. 380 at 16, and that she never expressed interest in another promotion—not even after she knew the interim director position would be available after Hite's resignation. *Id.* Accordingly, because neither Jones nor Steels offer proof that they applied for a promotion, their failure-to-promote claims fail as a matter of law.

### 3. Jones' and Steels' Performance Evaluation and Merit Increase Claims

Jones and Steels both allege that they were subject to discriminatory performance evaluations and merit increases during their employment with the Y. The defendants contend that neither plaintiff has direct or circumstantial evidence of discrimination to prove their claims under the direct method, and, therefore, must proceed under the *McDonnell Douglas* indirect method of proof. Mot., Dkt. 269 at 3; Mot., Dkt. 265 at 5. Jones and Steels respond that they can prove their claims under either the direct or indirect method, and rely on a common set of direct

and circumstantial evidence which allegedly demonstrates Hite's bias toward African Americans. *See* Resp., Dkt. 334 at 19-22; 44; 49. The plaintiffs contend that these examples of conduct and comments by Hite suggest that "she held negative racial stereotypes regarding African Americans and treated them differently, [and] frequently undermin[ed] Jones and Steels with their coworkers in the [HR] Department." Resp., Dkt. 334 at 19.

*Material Adverse Employment Actions:*

Although the plaintiffs allege separate claims for performance evaluations and merit increases, these issues are closely linked and rely on almost entirely the same set of evidence and purportedly similarly-situated employees. As the plaintiffs continuously argue throughout their brief, performance ratings were determinative of the annual merit increase that each employee received. Indeed, the Y issued guidelines setting a range of percentages for salary increases that directly corresponded to overall performance ratings. *See* Pl. 56.1 Resp., Dkt. 313 at 11-13, ¶¶ 17-18. For example, in 2005, an employee who received a performance rating of "exceeds expectations" would have been eligible to receive a merit salary increase between 3.1% and 4.9%. Pl. 56.1 Resp., Dkt. 312 at 12-13, ¶ 17. Further, there is no evidence that either plaintiff (or potential comparator) received a merit increase outside the guidelines established by the Y, *i.e.,* received a merit increase lower or higher than the range established under the guidelines for the performance rating they had received. In other words, if either plaintiff received a discriminatory performance evaluation or merit increase, those adverse employment actions would have taken place concurrently.

At the outset, the defendants contend that the plaintiffs' performance evaluation and merit increase claims fail because both Jones and Steels received positive ratings and merit increases during the entire duration of their employment with the Y, and, therefore, neither

plaintiff experienced a "material adverse employment action" necessary to establish a claim. Mot., Dkt. 269 at 3; Mot., Dkt. 265 at 6. According to the defendants, neither plaintiff received a "negative" review, Mot. Dkt. 269 at 3, and even if they had, "negative performance evaluations, standing alone, are not cognizable adverse employment actions." Mot., Dkt. 265 at 8 (citing *De La Rama v. Illinois Dep't of Human Servs.,* 541 F.3d 681, 686 (7th Cir. 2008)). Moreover, both plaintiffs received positive merit increases as a result of their positive performance ratings. Reply, Dkt. 374 at 17. As such, again according to the defendants, the plaintiffs' performance evaluation and merit increase claims cannot constitute adverse employment actions necessary to establish a claim.

The plaintiffs correctly respond, however, that the Y's performance evaluations do not "stand alone" because an employee's performance rating determined the percentage of merit increase that employee received for the year. Resp., Dkt. 334 at 45. To be material, "[t]here must be some tangible job consequence accompanying the" performance evaluation, *Lucas v. Chi. Trans. Auth.,* 367 F.3d 714, 731 (7th Cir. 2004), and "a materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *De La Rama,* 541 F.3d at 685-86 (citation and internal quotations omitted). Here, the performance rating and merit increase guidelines are undisputed. Moreover, the defendants even contest the plaintiffs' claims for discriminatory evaluations by arguing that the plaintiffs received favorable performance evaluations "*which…resulted in*" annual merit increases. Reply, Dkt. 374 at 10. Accordingly, it is clear that the performance evaluations given by the Y were "material" for purposes of a claim of intentional discrimination, because they determined annual salary increases.

The issue for the plaintiffs' performance evaluation and merit increase claims, then, is whether facially *positive* evaluations and merit *increases*, as the plaintiffs received, can constitute "adverse" employment actions sufficient to establish a claim for discrimination. The Seventh Circuit has explained that "receipt of an inadequate pay raise can…amount to an adverse employment action." *Whigum v. Keller Crescent Co.,* 260 Fed. Appx. 910, 914 (7th Cir. 2008) (citing *Griffin v. Potter,* 356 F.3d 824, 830 (7th Cir. 2004)). More importantly, "context matters to the determination of what constitutes a materially adverse action." *Silverman v. Bd. of Educ. of City of Chi.,* 637 F.3d 729, 741 (7th Cir. 2011). "In some circumstances, even faintly positive evaluations could [amount to adverse actions]…at least if the expectation in the organization or based on the employee's track record is that fair evaluations will be very positive." *Palermo v. Clinton,* 437 Fed. Appx. 508, 511 (7th Cir. 2011) (explaining that "faintly positive" evaluations could constitute adverse actions sufficient to support a retaliation claim). In other words, the issue of whether a positive performance evaluation and merit increase is adverse is relative to the context in which that evaluation and increase was given.

If, as the defendants aver, a facially positive performance evaluation and annual merit increase could *never* constitute a "materially adverse action," the Y could potentially assign every single African American employee a rating of "meets expectations" and corresponding merit increase, while awarding all Caucasian employees a rating of "exceeds expectations" and equivalent raise, and not run afoul of federal law—a proposition that is clearly incorrect. *See, e.g., King v. Acosta Sales and Mktg., Inc.,* 678 F.3d 470, 473 (7th Cir. 2012) (plaintiff established a pay discrimination claim where male employees had received substantially greater increases in pay than women; "Even a dollar's difference based on sex violates…Title VII."); *Russell v. Principi,* 257 F.3d 815, 819 (D.C. Cir. 2001) (under defendant's perverse logic, "an

employer could award $500 bonuses to all white employees and $1 bonuses to all similarly situated black employees without running afoul of [federal law]*,* because under such a discriminatory scheme no employee would be worse off in an absolute sense."). Accordingly, whether the performance ratings and merit increases given to these plaintiffs were "materially adverse" is a disputed question of fact that is not appropriately determined at the summary judgment stage. *See, e.g., Thompson v. Mem'l Hosp. of Carbondale,* 625 F.3d 394, 407 (7th Cir. 2010) ("Sometimes whether an action is an adverse employment question is clear as a matter of law, but 'there are times when the question is not so obvious' such that it is a question of fact.") (citing *Lewis v. City of Chi. Police Dep't,* 590 F.3d 427, 436 (7th Cir. 2009)) (citing SEVENTH CIRCUIT PATTERN JURY INSTRUCTION § 3.01, Comment E, which notes that if a fact issue arises as to whether the plaintiff suffered a materially adverse employment action, "a court should modify the instructions to provide the jury with guidance as to what this term means"); *O'Neal v. City of Chi.,* 588 F.3d 406, 409-10 (7th Cir. 2009) (issue of fact regarding adverse employment action where repetitive reassignments would negatively affect opportunity for promotion)).

*Direct Method:*

Even assuming that the performance ratings and merit increases Jones and Steels received constitute adverse employment actions, however, the plaintiffs' list of direct and circumstantial evidence, with a few exceptions, falls short of what is required under the direct method of proof because their examples of bias either do not relate to an employment decision made by Hite, the putative decisionmaker in connection with the claims,[25] fail to "point directly to a discriminatory reason" for an employment action taken by Hite, *see, e.g., Abuelyaman v. Ill. State Univ.,* 667

---

[25] Jones and Steels maintain that Hite decided their performance rating and merit increases. Accordingly, to prevail, they must adduce evidence sufficient to create a fact issue as to whether Hite, not some other manager, intended to discriminate against them.

F.3d 800, 809 (7th Cir. 2011), or are not supported by admissible evidence. For example, the plaintiffs state that (1) Hite told Jones that the Y's CEO, Neil Nicoll, did not want the Y to get involved with "Heritage Y's" (which, according to the plaintiff, are "Y's [that were] created when African Americans were not allowed to join local Y['s]," Pl. 561. Resp., Dkt. 312 at 80, ¶ 57) because "they were like Historically Black Colleges and needed to come into the mainstream," Resp., Dkt. 334 at 19, (2) Hite told Jones that Nicoll thought that Maurice Horsey, an African American employee, was lazy during an investigation of Horsey's complaint of harassment and discrimination, *id.* at 20, and that (3) sometime in 2004 or 2005, HR Director Sharon Rakowski stated that she thought all of the call center employees at the Y were "from the ghetto." *Id.* at 50. These examples fall short because they do not point directly (indeed, do not point at all) to a discriminatory purpose or bias by Hite in connection with assigning annual performance ratings and merit increases, as required in establishing a claim under the direct method of proof. *See Naficy,* 697 F.3d at 510 ("The relevant question under the direct method is whether the evidence 'points directly' to a discriminatory motive for the employer's decision." (citing *Kodish v. Oakbrook Terrace Fire Prot. Dist.,* 604 F.3d 490, 501 (7th Cir. 2010))). None of the pieces of evidence even purports to relate to *Hite*'s views or to a decision by any supervisor with input into the assignment of performance ratings or award of merit increases to Jones and Steels. Even if these comments reflect racial bias (a debatable proposition), there is no connection between these comments and the performance evaluations Jones and Steels received.

Steels also offers numerous examples of occasions when Hite acted toward her in an aggressive, or even rude and disrespectful, manner. For instance, Hite leaned over Steels' desk and told her that she "need[ed] to understand who is in charge." Resp., Dkt. 334 at 20. Steels complains as well that on one occasion, Hite stood outside of Steels' office door while she was

using a breast pump to express milk for her infant, listened, and then instructed Steels not to lock the door to her office. *Id.* Steels complains as well that Hite corrected Steels' grammar in front of other employees and interrupted her during a presentation. *Id.* These incidents may suggest that Hite was overbearing or difficult to work for, but they do not point directly to an unlawful racial animus underlying Hite's performance rating and merit increase decisions. *See, e.g., Brown,* 700 F.3d at 1105 ("Title VII protects against discrimination, not 'personal animosity or juvenile behavior.'" (citing *Shafer v. Kal Kan Foods, Inc.,* 417 F.3d 663, 666 (7th Cir. 2005))). Jerk is not a synonym for bigot.

The plaintiffs also offer a list of African American employees who allegedly received "stereotyped evaluations," as circumstantial evidence of discriminatory intent and pretext. *See* Resp., Dkt. 334 at 49. But like the evidence above, the plaintiffs have failed to sufficiently tie this evidence to a discriminatory reason for the performance ratings and merit increases that Hite assigned to *them.* For example, Ursala Tatum was allegedly paid to leave the Y after complaining about her work environment in the marketing department. *Id.* According to the plaintiffs, Tatum's supervisor (who was not Hite) cited performance reasons for Tatum's problems within the marketing department. *See* Defs. 56.1 Resp., Dkt. 375 at 25, ¶ 46. However, Nussbaum, who was the Director of Y University, purportedly disagreed with the supervisor's assessment, but instructed Jones to offer Tatum money to resign in order to protect the Y from discrimination charges. *Id.* Even if true, this example does not point to discrimination *by Hite.* Indeed, only one of the examples (that of Phyllis Lee) even refers to Hite; that example merely says that Hite denied a merit increase that an African American manager had recommended, but does not allege, much less cite evidence, that Hite's decision was motivated by race. *See* Pl. Resp., Dkt. 334 at 49.

As noted above, evidence of a defendant's "behavior toward or comments directed at other employees in the [same] protected group" as the plaintiffs is relevant circumstantial evidence. *Hasan v. Foley & Lardner LLP,* 552 F.3d 520, 527 (7th Cir. 2008). But as the Seventh Circuit has explained, the relevance of "me too" evidence, as it is sometimes referred, depends on "a variety of factors, including 'how closely related the evidence is to the plaintiff's circumstances and theory of the case.'" *Hasan,* 552 F.3d at 529 (citing *Sprint/United Mgmt. Co. v. Mendelsohn,* 552 U.S. 379 (2008); Fed. R. Evid. 401, 403); *see also Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 737 (7th Cir. 1994). The plaintiffs argue that they "could not possibly provide details regarding each of these employees' situations." Resp., Dkt. 334 at 50. However, in order to survive summary judgment, that is exactly what the plaintiffs must do to create the "convincing mosaic" of circumstantial evidence that would allow a reasonable factfinder to infer a discriminatory reason for Hite's evaluation and merit increase decisions. Without additional context, it is impossible to distinguish any of these examples from a nondiscriminatory employment action and a potentially discriminatory action based on race by the specific decisionmaker who allegedly discriminated against Jones and Steels—Elinor Hite. *See, e.g., Leitgen v. Franciscan Skemp Healthcare, Inc.,* 630 F.3d 668, 677 (7th Cir. 2011) (evidence that another employee raised complaints of sex discrimination was unavailing because the record contained "no evidence that the [defendant] did in fact discriminate"); *Harris v. Warrick Cnty. Sheriff's Dep't,* 666 F.3d 444, 448 (7th Cir. 2012) (to prove discrimination, evidence must establish "that the *decisionmaker* has acted for a prohibited reason" (citing *Rogers v. City of Chi.,* 320 F.3d 748, 754 (7th Cir. 2003))). Was Hite involved in each, or any, of the performance evaluation decisions offered as evidence? Were each, or any, of the decisions motivated by

unlawful racial discrimination or were they based on performance or any number of factors unrelated to race?

The plaintiffs' most substantial evidence of Hite's bias is inadmissible. According to the plaintiffs, Hite allegedly told Donna Russell, a Caucasian temporary employee in HR, that "black fat women are not good in clerical positions," in connection with the termination of an African American administrative employee. Pl. Resp., Dkt. 334 at 19. This potentially significant piece of evidence, however, comes from an investigative report prepared by Ogletree, the law firm hired to investigate Steels' 2007 discrimination complaint. *Id.* As the defendants correctly point out, this report is inadmissible hearsay because it is an out-of-court statement being offered for the truth of the matter asserted. Fed. R. Evid. 801(c). In fact, the evidence offered to prove that Hite made the discriminatory statement potentially contains at least three levels of hearsay: (1) Hite's statement to Russell; (2) Russell's statement to the investigating attorney; and (3) the attorney's report. Hite's statement to Russell would qualify as a party admission, Fed. R. Evid. 801(d)(2) (technically non-hearsay), and would not in any event be offered by plaintiffs for its truth, but the plaintiffs have failed to identify any exception that would permit admission of Russell's statement to the attorney ("Hite said this to me") or for the report itself ("Russell said that Hite said this"). Those statements would be offered for their truth—*i.e.,* to prove that Hite's statements were made—and would therefore constitute hearsay.

The plaintiffs have failed to offer either sufficient direct evidence or circumstantial evidence to create a "'convincing mosaic' … that would allow a reasonable [jury] to infer that" Hite issued performance ratings and merit increases based on racial discrimination. *See, e.g., Abuelyaman,* 667 F.3d at 809 (citing *Troupe,* 20 F.3d at 737). They have therefore failed to satisfy their burden under the direct method of proof with respect to those claims.

*Indirect Method:*

Therefore, to survive summary judgment on these claims, Jones and Steels would need to establish *prima facie* cases of intentional discrimination under the indirect method of proof. Both plaintiffs are African American and have, therefore, established the first element of a *prima facie* case: membership in a protected group. *See, e.g., Watson v. Pace W. Div., Subdivision of Reg'l Transp. Auth.,* 129 F.3d 1268, at *2 (7th Cir. 1997) (explaining that the plaintiff "is African American and therefore a member of a protected group"). Moreover, the record indicates that both plaintiffs were generally meeting the Y's legitimate expectations, and the defendants have not challenged the plaintiffs on this issue. Accordingly, the plaintiffs' ability to prove their claims under the indirect method turns on whether they have sufficiently identified similarly situated employees not in their protected group who were treated more favorably.

On this issue, Jones' claims fall short because he fails to identify a similarly-situated, non-African American employee who received a more favorable performance rating or merit increase. The defendants argue that Jones cannot identify *any* similarly-situated employee because Jones was the only director-level employee reporting to Hite. Mot., Dkt. 269 at 5. But this argument is too narrow and demands a "precise equivalence" not required by the law. *See Coleman v. Donahoe,* 667 F.3d 835, 846 (7th Cir. 2012) (citing *Santa Fe Trail Transp. Co.,* 427 U.S. 273, 283 n.11 (1976)). The similarly-situated-employee analysis requires only that the comparator be comparable to the plaintiff "in all material respects." *Bio v. Fed. Express Corp.,* 424 F.3d 593, 597 (7th Cir. 2005) (internal quotations omitted) (citing *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir. 2002)). In evaluating whether two employees are comparable, courts look at all relevant factors, including whether the employees "(i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same

supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors." *Id.* (citing *Ajayi v. Aramark Bus. Servs., Inc.,* 336 F.3d 520, 532 (7th Cir. 2003)).

But Jones errs in the other direction, arguing that he was similarly situated to every single employee at the Y because Hite and/or Nicoll reviewed all performance evaluations and merit increases.[26] Resp., Dkt. 334 at 35 (arguing that he is similarly situated to all Y employees with respect to merit increases); *id.* at 46 (arguing that he is similarly situated to all Y employees with respect to performance evaluations). The fact that Hite or Nicoll reviewed performance evaluations made by other supervisors does not establish the existence of a common supervisor. And blanket arguments that Jones is similarly situated to every employee, either in HR or at the Y as a whole, will not suffice. *See, e.g., Dority v. City of Chi.,* No. 98 C 4893, 2001 WL 1155286, at *14 (N.D. Ill. Sept. 28, 2001) ("a plaintiff must provide specific evidence and specific examples of employees who have been treated more favorably" (citing *Harris v. SSM Healthcare,* No. 97 C 2121, 1998 WL 704056, at *3 (N.D. Ill. Sept. 13, 1998))). Without offering evidence that Jones is similarly situated to another employee in "all material respects," this Court cannot conduct a meaningful comparison to determine whether a reasonable inference of racial discrimination can be made.

It bears noting in this regard that Jones' failure to identify a comparator is not solely the product of his high-ranking position. Regardless of rank, no other employee in HR received a higher rating than Jones in 2006, who received an "exceeds expectations" rating and 5.5% merit

---

[26] To the extent that Jones argues that he was similarly situated with Laura Fortson or Kurt Kramer, it is undisputed that these employees were in different departments and had different supervisors. *See* Pl. 56.1 Resp., Dkt. 312 at 35, ¶ 46. Moreover, Jones does not dispute that Fortson had more years of experience than he did. *Id.* Further, in 2006, Jones received a 5.5% increase, while Fortson's increase was only 4.7% and Kramer's was only 4.25%. *Id.* at 35-36, ¶¶ 47, 49.

increase. So even if Jones had identified similarly-situated employees in HR for that year, he could not have shown that any of those employees were treated more favorably. Mot., Dkt. 269 at 4.[27]

Based on the foregoing, a jury could not reasonably infer that Hite's performance rating and merit increase decisions were based on racial discrimination. "Whether a comparator is similarly situated is 'usually a question for the fact-finder,' and summary judgment is appropriate only when 'no reasonable fact-finder could find that plaintiffs have met their burden on the issue.'" *Coleman,* 667 F.3d at 846-47 (citing *Srail v. Vill. of Lisle,* 588 F.3d 940, 945 (7th Cir. 2009)). Where the plaintiff has not even attempted to identify a single employee with enough common factors to allow for a meaningful comparison, however, no reasonable factfinder could conclude that the plaintiff has met his burden for that element of a *prima facie* case. And because Jones has failed to establish a *prima facie* case, the Court need not address his arguments regarding pretext. Accordingly, the defendants' motions for summary judgment on those claims are granted, and Jones' claims for discriminatory performance evaluations and merit increases are dismissed.

Steels similarly argues that she is comparable to all employees at the Y. Resp., Dkt. 334 at 35. As explained above, this argument fails as a matter of law. However, Steels also argues that Gondek and VanDeventer were comparable for purposes of her discriminatory performance evaluation and merit increase claims. *Id.* at 38. VanDeventer, however, is not a proper comparator. Steels argues that VanDeventer is similarly situated solely on the grounds that they were both supervised by Hite and were subject to the same performance review process. Resp.,

_____

[27] The fact that Jones received a higher evaluation than any other employee in HR, moreover, would be probative evidence to rebut his claims that his evaluations were racially discriminatory in other years (in the absence of a change in the personnel responsible for his evaluations).

71

Dkt. 334 at 38. But VanDeventer held a different position than Steels, Project Coordinator, *see* Pl. 56.1 Resp., Dkt. 313 at 23, ¶ 32, a position that earned less than Steels throughout the relevant time period. *See, e.g., id.* at 28, ¶ 41. Steels, on the other hand, was a Senior HR Generalist, with different job responsibilities and duties. *Id.* at 24, ¶ 35.

That said, at least in 2006 and part of 2007, Steels was similarly situated to Gondek, a Caucasian woman. During that time period, both Steels and Gondek were supervised directly by Hite and held the same position, Senior HR Generalist. *Id.* at 26, ¶ 40. In September 2006, Gondek received a 4% merit increase and a rating of "exceeds expectations" on her performance review. *Id.;* Defs. 56.1 Resp., Dkt. 381 at 22, ¶ 39. For that same year, Steels received a rating of "meets expectations" and an increase of 2.9%. Pl. 56.1 Resp., Dkt. 313 at 20, ¶ 30; *id.* at 25, ¶ 36. After April 2007, however, Gondek was no longer similarly situated to Steels. At that time, Gondek began working part-time and earning 20% of her salary. She then moved to Philadelphia and only worked on discrete projects later that year. Pl. 56.1 Resp., Dkt. 313 at 21, ¶ 31; 34, ¶ 52. Moreover, in 2007, Steels received a "meets expectations" rating and a 3.8% increase. *Id.* at 21, ¶ 31; *id.* at 25, ¶ 37. Gondek also received a "meets expectations" rating for that year, but only a 3.3% merit increase. *Id.* at 23, ¶ 33.

Having established that Gondek was similarly situated, the burden of proof shifts to the Y to offer a legitimate, nondiscriminatory reason for the difference in ratings and pay increases between Steels and Gondek for 2006. The defendants must therefore proffer a legitimate justification, *i.e.,* some other basis for Hite's decision other than race. In deciding whether the defendants' justification is pretextual, "[t]he question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain" the difference in evaluations. *See Harper,* 687 F.3d at 311 (citing *O'Leary v. Accretive*

*Health, Inc.,* 657 F.3d 625, 635 (7th Cir. 2011)). In other words, the question is whether the Y's justification is "a lie." *Id.* (citing *Ineichen v. Ameritech,* 410 F.3d 956, 961 (7th Cir. 2005)). To meet this burden the plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions' in [the defendants'] stated reason 'that a reasonable person could find [it] unworthy of credence.'" *Id.* (citing *Boumehdi,* 489 F.3d at 792).

In this case, the Y proffers a particularly weak justification—that Hite based each performance score and merit increase on her "honest assessment" of both employees. Indeed, that is not a justification at all, but merely a conclusion that Hite did not discriminate. As the plaintiff points out, neither the written performance reviews nor the defendants' briefs provide any objective basis for Hite's determination. *See* Resp., Dkt. 334 at 40. Essentially, the defendants' argument is circular: the proof that Hite did not discriminate is that Hite's assessment of each employee was not discriminatory. But without more, the defendants' justification begs the question of whether her subjective determination, or "honest assessment," was, at least in part, motivated by racial discrimination. *See, e.g., Williams v. City of Montgomery,* 742 F.2d 586, 588 (11th Cir. 1984) (defendants' justification for firing African American insufficient because it was purely subjective and irrelevant to the defendants' termination policies).

The Y's argument, however, is buttressed by the fact that Hite's pay increase was *higher* than Gondek's the following year. It is difficult to sustain an inference that Hite discriminated against Steels on the basis of her race in 2006 from the fact that she approved a higher increase for Gondek in 2006 when she did precisely the opposite the following year. But Steels also cites additional evidence to support an inference of pretext, such as Hite's admission that she considers race when making personnel decisions and Hite's failure to follow internal procedures

by not completing formal performance reviews for either Steels or Jones. Resp. Dkt. 334 at 40. This additional evidence strengthens the inference of pretext. *See, e.g., Rudin v. Lincoln Land Cmty. Coll.,* 420 F.3d 712, 727 (7th Cir. 2005) ("[A]n employer's failure to follow its own internal employment procedures can constitute evidence of pretext."); *Giacoletto v. Amax Zinc Co., Inc.,* 954 F.2d 424, 428 (7th Cir. 1992) (plaintiff offered sufficient evidence of pretext where the defendant "improperly implement[ed] a subjective employment decision which contradicted objective evidence regarding [the plaintiff's] capabilities"). By failing to complete the performance evaluations or provide an objective basis for Hite's employment decisions, the defendants effectively caused the absence of objective evidence by which to judge whether Hite's "honest assessment" was truly nondiscriminatory. Accordingly, at least for 2006, the Court concludes that there is a triable issue of fact as to whether the difference in Steels' and Gondek's performance evaluations and pay increases was based on racial discrimination. Therefore, the defendants' motion on this claim is denied as to 2006; the motion is granted, however, with respect to 2007.

*4. Jones' and Steels' Discriminatory Compensation Claims*

Jones and Steels also allege that their annual base compensation was discriminatorily low. In particular, Jones claims that his starting salary, annual compensation, compensation for serving as the HR department's interim director, and equity increases he received were all discriminatory. Similarly, Steels alleges that her annual compensation and equity increases were discriminatorily low during her time as a Senior HR Generalist. The defendants contend that neither Jones nor Steels can prevail on their compensation claims under either the direct or indirect methods of proof.

At the outset, the Court can quickly dispose of Jones' claim that he was paid a discriminatorily low interim increase for his service as the interim director of HR, during the period after Timmons' resignation and before Hite's arrival. As the defendants note, Jones admitted that neither Nussbaum nor Ken Gladish, the individuals from whom he requested an increase, had discriminated against him. Mot., Dkt. 269 at 7; Reply, Dkt. 374 at 17. Moreover, although he did not receive it immediately, the interim increase that Jones did receive was 37.5% of his salary, while the Y's general practice was to grant employees only a 30% increase for interim work.[28] *Id.* Jones never responded to these arguments in his response brief. *See, e.g., Milligan v. Bd. of Trs. of S. Ill. Univ.,* 686 F.3d 378, 389 (7th Cir. 2012) (plaintiff forfeited reliance on evidence not raised in opposition brief to summary judgment) (citing *Liberles v. Cook Cnty.,* 709 F.2d 1122, 1126 (7th Cir. 1983) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal")). Accordingly, the defendants' motion for summary judgment on Jones' claim for discriminatorily low interim pay is granted.

The defendants similarly contend that Jones cannot prove that his starting salary was discriminatorily low because he has not offered sufficient direct or circumstantial evidence and cannot establish a *prima facie* case under the indirect method. Jones attempts to offer evidence under both methods of proof; however, his evidence falls short of creating a "convincing mosaic" from which discrimination can be inferred under the direct method and fails to identify a similarly-situated employee under the indirect method.

---

[28] As explained above, while it is unclear how the parties arrived at the 37.5% bonus figure, it is undisputed that Jones received a bonus for his service as the interim director. *See* infra at 5, n.5.

A review of the record evidence could support the inference that Jones' starting salary was lower than the starting salary of other senior personnel. For instance, Jones received several equity salary increases shortly after being hired. On May 1, 2005, Jones' salary was increased to $100,008. Pl. 56.1 Resp., Dkt. 312 at 32, ¶ 41. Further, Jones received another equity increase in 2006, bringing his salary to $115,008. *Id.* at 33, ¶ 43. Jones argues that these pay raises show that his starting pay was too low, but that argument puts an employer into an impossible box: give good pay raises and be susceptible to a claim that starting salary was discriminatory; give low pay raises and face claims of discriminatory pay raises. And here, Jones advances both.

In this case, Jones presents evidence that Timmons, who was the director of HR when Jones was hired, agreed that Jones' starting salary was too low. But evidence tending to show that his starting salary was low, by itself, is not enough to raise a reasonable inference that the cause of the discrepancy was due to *intentional* discrimination, either by Timmons, who was the director of HR at the time, or as the plaintiff alleges, some other, unidentified, decisionmaker higher in the Y's chain of command. Employers have economic incentives to offer a starting salary that is the lowest salary that will attract a candidate they wish to hire;[29] that they were able to recruit Jones for less than some other employee does not, standing alone, support an inference of discrimination.

The differences between Jones' resumé and experience and those of the employees he points out as comparators show that there were non-racial factors that could have justified the differences in their starting salaries. Jones alleges that he and Steven Kramer, the Y's Director of Program Leadership and Training, were hired at approximately the same time, but Kramer

---

[29] This is not to say that employers never have incentives to pay above-market rates; the point is that it cannot be inferred solely from the fact that a salary offered to one candidate is lower than that offered to another, or that is below-market generally, that the lower salary is the product of discriminatory bias.

received a starting salary of $130,008. Resp., Dkt. 334 at 41. Timmons identified Kramer's position as the closet match in skill level, Resp., Dkt. 334 at 41, but despite that finding (which is not conclusive), Timmons recommended that Jones' salary only be increased to grade 9 (and not grade 11, the corresponding grade for Kramer's position as Director of Program Leadership and Training), and specifically noted that his recommendations were "based on *external* data due to the competitive market of the position in question." *See* Pl. 56.1 App., Dkt. 326, Tab 85(a) at 33 (emphasis added). Further, and as explained above, Kramer was in a different department, with a different job title, different responsibilities, and different supervisors. Pl. 56.1 Resp., Dkt. 312 at 36, ¶ 48. As such, there are simply too many differing material factors, both internal and external to the Y, between Jones and Kramer to allow for a meaningful comparison, which would give rise to an inference of racial discrimination as an explanation for the differences in their starting salaries. *See, e.g., Hanners,* 674 F.3d at 692 (plaintiff failed to "demonstrate that the individuals [he] listed were 'directly comparable to [him] in all material respects'"). Jones also points to the salary of Sharon Rakowski, a director in HR who was earning $93,672 when Jones was hired at a starting salary of $80,016 by Timmons. Resp., Dkt. 334 at 41. However, it is undisputed that Rakowski had been working for the Y for three years before Jones was hired. Defs. 56.1 Resp., Dkt. 375 at 4-5. Moreover, Rakowski had been working as the HR Department's highest ranking employee during that time. *Id.*

Accordingly, Jones has failed to offer sufficient evidence to support his claim for a discriminatorily low starting salary, and has failed to identify similarly-situated employees to

establish a *prima facie* case for that claim under the indirect method.[30] Therefore, the defendants' motion for summary judgment on that claim is granted.

Steels, on the other hand, offers two similarly-situated employees who were paid more than her during her time at the Y. First, Hite hired Lourdes Durren, a Hispanic woman, as a Senior HR Generalist at a salary higher than that of Steels. Dkt. 334 at 36. Durren was hired on January 1, 2008, at a salary of $78,000. Pl. 56.1 Resp., Dkt. 313 at 28, ¶ 42. At the time, however, Steels was earning $73,080 for the same position. *Id.* at 21, ¶ 31; *id.* at 25, ¶ 37. To justify the difference in salaries, the defendants argue that Durren had a master's degree and more experience as an HR consultant, director, and senior generalist. *Id.* at 29, ¶ 43. However, there is no evidence that Hite actually considered these factors when setting Durren's salary. *See Bio,* 424 F.3d at 597 ("[Courts may consider] experience, education, and other qualifications [when determining whether employees are comparable]—provided the employer considered these…factors."). In fact, Hite posted a job opening for a Senior HR Generalist with a potential salary range, the low end of which was higher than Steels' then-current salary, Resp., Dkt. 334 at 35, suggesting, as the plaintiff argues, that Hite was willing to pay "anybody," regardless of education or experience, a higher salary than Steels.

In their reply brief, the defendants attempt to offer evidence, in the form of a declaration, that Hite relied on Durren's education and experience in setting her salary. *See* Defs. 56.1 App.,

---

[30] The plaintiff argues that it is improper to draw an inference that Timmons could not or would not discriminate against Jones in setting his starting salary simply because Timmons hired Jones or because Timmons is also African American. *See* Resp., Dkt. 334 at 42. In the abstract, the plaintiff are correct, but the issue is beside the point. The plaintiff has not offered evidence to support an inference that either Timmons or some other decisionmaker set Jones' starting salary lower than it otherwise would have been because, or partly because, Jones is African American. Jones argues that Timmons may have been pressured to set his salary lower than Rakowski's. *Id.* at 43. But this argument fails to account for the differences in Rakowski's time and experience at the Y, and amounts to no more than speculation and conjecture which, as already noted, is insufficient to survive summary judgment.

Dkt. 382-2, Tab 2 at ¶ 7 ("I set Durren's salary based on her credentials and experience."). But the defendants' proffered declaration falls short of satisfying their burden of offering a legitimate, nondiscriminatory justification for the discrepancy in Steels' and Durren's salaries. While there is no "blanket prohibition from filing additional affidavits when a movant for summary judgment files a reply brief following a nonmovant's response," *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.,* 328 F.3d 309, 318 (7th Cir. 2003), the timing of the defendants' offer of proof leaves the plaintiff without an opportunity to respond to or rebut the justification as pretext. *See, e.g., Nelson v. United Parcel Serv.,* Nos. 06 C 1428, 06 C 1898, 2008 WL 4449885, at *8 (N.D. Ill. Sept. 30, 2008) (explaining that the defendant did not offer its justification in its motion for summary judgment, and, therefore, did not give the plaintiff an opportunity to respond to it). Moreover, Steels earned a master's degree in HR in 2002, eliminating that qualification as a possible justification. Resp., Dkt. 334 at 36. Without evidence to support their explanation as to why Durren was paid more, Steels correctly argues that the defendants have failed to satisfy their burden of providing a nondiscriminatory justification for the disparity, and, therefore, she does not have to offer evidence to prove pretext. *Id.* at 37.

As a second comparator, Steels points out that Hite hired Gondek in November 2005 at a starting salary of $70,008 when Steels was earning only $59,760. *Id.* at 37; Pl. 56.1 Resp., Dkt. 313 at 26, ¶ 40. And Steels continued to earn less than Gondek up until the point in 2007 in which Gondek began telecommuting permanently. Pl. Resp., Dkt. 334 at 37. As with Durren, Hite failed to provide an explanation for the difference in Gondek's and Steels' compensation. *Id.* at 37-38. Therefore, Steels has made out a *prima facie* case for her compensation claims under the indirect method of proof. Without a legitimate justification for the discrepancy

between Steels' salary and those of Gondek and Durren, there is nothing for the plaintiff to rebut as pretext. Accordingly, summary judgment on those claims is denied.

### 5. Steels' Telecommuting Claim

Steels alleges that Hite denied her the opportunity to telecommute, one day per week after the conclusion of her maternity leave, because she is African American. Resp., Dkt. 334 at 52-53.[31] The defendants contend that a refusal to permit an employee to work from home is not an adverse employment action, and therefore not actionable. Mot., Dkt. 265 at 10. The defendants further argue that, even if actionable, Steels has failed to identify a similarly-situated employee not in Steels' protected group that received more favorable treatment. *Id.*

Steels responds that whether Hite's denial of Steels' request to work from home is actionable is "a fact-specific determination." Resp., Dkt. 334 at 53. Moreover, Steels argues that Gondek, who was allowed to telecommute after transitioning to part-time status, is an employee who was similarly-situated and treated more favorably. *Id.* Steels' claim fails on both points, however, as she has not offered sufficient evidence to demonstrate that Hite's refusal to allow her to telecommute was a "materially adverse action," and she has not established that Gondek, or any other employee, was similarly-situated yet treated more favorably.

"[N]ot everything that makes an employee unhappy is an actionable adverse action," *Porter v. City of Chi.,* 700 F.3d 944, 954 (7th Cir. 2012) (citing *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir. 1996)). Rather, "an adverse action must materially alter the terms or conditions of employment to be actionable under the antidiscrimination provision of Title VII." *Id.* (citing *Burlington N. and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 62 (2006)). A "materially

---

[31] Steels was permitted to work from home in 2005, and one day per week in March and April 2007, after Steels returned from maternity leave. Reply at 31. Hite required Steels to return to working full time in the office on April 30, 2007.

adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* (citing *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir. 1993)).

Steels has failed to offer any evidence that Hite's refusal to allow her to work from home resulted in a "materially adverse change." *See, e.g., Haas v. Zurich N. Am.,* No. 05 C 1421, 2006 WL 2849699, at *4 (N.D. Ill. Sept. 29, 2006) ("The fact that [the defendant] did not permit [the plaintiff] to work from home every time she requested is…not an adverse employment action…[because it] is not an adverse employment action to refuse to grant an employee a discretionary benefit to which that employee is not necessarily entitled." (citing *Rabinovitz v. Pena,* 89 F.3d 482, 488-89 (7th Cir. 1996))). Furthermore, Steels has not offered evidence of any other "indices that might be unique" to her situation, that would indicate that Hite's requirement that she work in the office was adverse.

For instance, Steels relies on *Washington v. Ill. Dep't of Revenue,* for the proposition that whether her claim is actionable is a "fact-specific determination." 420 F.3d 658, 662 (7th Cir. 2005) (change in schedule actionable where plaintiff had "a vulnerability…[based on] her son's medical condition…[and] [w]orking 9-to-5 was a materially adverse change *for her*"). *Washington* dealt with a retaliation claim, under which the "category of materially adverse actions…sweeps more broadly than the 'adverse employment actions' required to sustain a discrimination claim." *Porter,* 700 F.3d at 957 (internal quotations omitted) (citing *Benuzzi v. Bd. of Educ. of City of Chi.,* 647 F.3d 652, 665 (7th Cir. 2011)). But even in that context, the Seventh Circuit explained that changes in schedule that do not affect pay or opportunities for

promotion will "by and large" not be actionable. *Washington*, 420 F.3d at 662; *see also Vance v. Ball State Univ.,* 646 F.3d 461, 474 (7th Cir. 2011).

That said, there is an exception when an "employer exploits a known vulnerability of an employee…[such that] a change in assignments, like an altered work schedule, conceivably might amount to an adverse employment action." *Id.* For instance, in *Washington,* "the plaintiff…relied on her previously established flex-time schedule so she could care for her son, who had Down syndrome." *Id.* Steels, however, has not alleged similar or other facts to demonstrate that she relied on the ability to work from home one day per week, such that the refusal to allow her to do so materially altered the terms and conditions of her employment. *See id.* (plaintiff "must allege more than a dislike…for her case to go forward"). Here, Steels argues only that she had to resume her previous duties of working in the office after the conclusion of her maternity leave, which is insufficient to raise even an inference of material adversity. *See also Stephens v. Erickson,* 569 F.3d 779, 791 (7th Cir. 2009) ("[A] transfer or reassignment of job responsibilities…is not materially adverse unless it represents a *significant* alteration to the employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects." (citing *Nagle v. Vill. of Calumet Park,* 554 F.3d 1106, 1119-20 (7th Cir. 2009); *Lapka v. Chertoff,* 517 F.3d 974, 986 (7th Cir. 2008); *Grube v. Lau Indus. Inc.,* 257 F.3d 723, 728 (7th Cir. 2001); *cf. Nichols v. S. Ill. Univ.-Edwardsville,* 510 F.3d 772, 780-81 (7th Cir. 2007); *Washington,* 420 F.3d at 662)).

Furthermore, even if actionable, Steels has failed to demonstrate that she was treated less favorably than a similarly-situated employee. As the defendants note, Gondek switched to a part-time schedule in April 2007, and thereafter moved to Philadelphia and began working on discrete projects only. Pl. 56.1 Resp., Dkt. 313 at 34, ¶ 52. Part-time employees are generally not

similarly situated to full-time employees. *See Ilhardt v. Sara Lee Corp.,* 118 F.3d 1151, 1155 (7th Cir. 1997) ("[F]ull-time employees are simply not similarly situated to part-time employees. There are too many differences between them."); *Johnson v. Univ. of Iowa,* 431 F.3d 325, 330 (8th Cir. 2005) ("Generally, part-time employees are not similarly situated to full-time employees."). Moreover, while the plaintiff argues that whether Gondek is similarly situated is "immersed in fact disputes," she fails to offer any evidence or citations to the record to demonstrate those fact disputes. Such conclusory allegations are insufficient to raise a genuine issue of material fact. *See Anderson v. Donahoe,* 699 F.3d 989, 996 (7th Cir. 2012); *Abuelyaman,* 667 F.3d at 812 ("It is well settled that conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact." (citing *Hall v. Bodine Elec. Co.,* 276 F.3d 345, 354 (7th Cir. 2002))). Accordingly, Steels has failed to support her claim for discrimination based on Hite's refusal to let her work from home under either the direct or indirect methods of proof, and the defendants' motion for summary judgment is granted.

### 6. Jones' Discriminatory Termination Claim

Jones' position was eliminated on October 15, 2007. *See* Pl. 56.1 Resp., Dkt. 312 at 47, ¶ 62. Jones argues that Hite chose his position for elimination because he is African American. Like the plaintiff's other discrimination claims, he may proceed on his termination claim under either the direct or indirect methods of proof. The direct method requires offering the same type of direct evidence, previously explained, creating a "convincing mosaic" of circumstantial evidence that supports an inference of discrimination. Under the indirect method, however, a plaintiff in a "single discharge" or "mini-reduction-in-force" ("mini-RIF") case "does not need to make a showing that 'similarly situated' employees were treated better because the inference of discrimination arises from the fact that they were constructively 'replaced' by workers outside of

the protected class." *Bellaver v. Quanex Corp.,* 200 F.3d 485, 495 (7th Cir. 2000). Put simply, "the inference of discrimination arises in [these] cases…where the terminated employee's duties are absorbed by the other employees not in the protected class." *Id.*[32]

To establish that his duties were absorbed by employees not in his protected group, Jones claims that Hite planned to assume his duties after his termination, along with either Radcliff, the Director of Y-University, or VanDeventer, an HR/OD System Supervisor. Resp., Dkt. 334 at 25 (citing Pl. 56.1 App., Dkt. 326, Tab 120 at YUSA079561 ("Ogletree Report"); *id.,* Tab 118 ("Defendants' Second Supplemental Objections and Response to Plaintiffs' Discovery Requests Issued April 6, 2011")). The evidence he relies on, however, is based on inadmissible hearsay and portions of the record that do not support the plaintiff's contention. As discussed above, the plaintiff has failed to provide a foundation for the Ogletree Report, cited here, which constitutes hearsay and hearsay-within-hearsay. Moreover, the plaintiff's citation to the defendants' purported response to an interrogatory contains only the defendants' objections to that request, and not, as the plaintiff contends, the response that Jones' duties "would have been absorbed by Michelle VanDeventer…and/or Elinor Hite." *See* Defs. 56.1 Resp., Dkt. 375 at 21, ¶ 38. In fact, the only evidence offered on this point is by the defendants, albeit in a declaration by Hite, that Jones' duties were absorbed by HR. *See* Pl. 56.1 Resp., Dkt. 312 at 47, ¶ 62. Jones has failed to offer admissible evidence to prove that his duties were absorbed by employees outside of his

---

[32] Jones argues that he was similarly situated to all other HR employees because all of those employees were eligible for termination. Resp., Dkt. 334 at 27-28. But the Seventh Circuit has explained that "where the plaintiff's duties were reabsorbed by [another employee(s)] after [the plaintiff's] termination," *Petts v. Rockledge Furniture LLC,* 534 F.3d 715, 725 (7th Cir. 2008) (internal quotation marks omitted) (citing *Hemsworth v. Quotesmith.Com, Inc.,* 476 F.3d 487, 492 (7th Cir. 2007)), as is undisputed in this case, the court "*must* apply the indirect burden shifting method for a [mini-RIF] situation." *Id.* at 725. Therefore, Jones' argument regarding similarly-situated employees is unnecessary. *See id.* (explaining that district court properly utilized the mini-RIF variation of a *prima facie* case under the indirect method where the plaintiff's duties were absorbed by other employees after her position was eliminated).

protected classification. Accordingly, he cannot proceed with his claim under the indirect method of proof. *See, e.g., Petts,* 534 F.3d at 726 (plaintiff failed to establish the fourth prong of a mini-RIF gender discrimination case because even though "some of her duties were absorbed by male employees…some of them were [also] absorbed by women").

That said, Jones has offered sufficient direct evidence to survive summary judgment on his claim for discriminatory termination. As he points out, Hite drafted a reorganization chart for the HR department on May 12, 2007, which depicted the department as she "desired" it to appear by November 2007. Resp., Dkt. 334 at 18. On that chart, Hite wrote several "issues" that she was presumably considering while contemplating the reorganization. The first of those issues was "race." *Id.* When asked about this chart in her deposition, Hite testified that she "always looks at multiple factors whenever [she's] reorganizing…including things like…race and gender." *Id.* According to Jones, this evidence is sufficient to demonstrate that Hite considered race while she was reorganizing the HR department, and, therefore, while deciding which position(s) to eliminate.

The defendants argue that Jones' argument requires the Court to make an inference to which Jones is not entitled, because he only supports the inference with speculation. Reply, Dkt. 374 at 24. According to the defendants, Hite's testimony "that she wrote 'race' because she did not want an all-white department, but instead a mix of minorities and Caucasians, to get better teamwork, different ideas, and better reflect the Y as a whole…remains unrefuted." *Id.* at 24. But "[e]vidence which in and of itself suggests that the person or persons with the power to hire, fire, promote and demote the plaintiff were animated by an illegal employment criterion amounts to direct proof of discrimination." *Venters v. City of Delphi,* 123 F.3d 956, 972 (7th Cir. 1997).

The Seventh Circuit has explained that while "evidence of discriminatory motives must…have some relationship with the employment decision in question," *id.* at 973, "remarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination *even if* the evidence stops short of a virtual admission of illegality." *Id.* (citing *Shager v. Upjohn Co.,* 913 F.2d 398, 402 (7th Cir. 1990) (emphasis added); *Robinson v. PPG Indus., Inc.,* 23 F.3d 1159, 1164-65 & nn.2-3 (7th Cir. 1993)). "Proof of this nature supports the inference that a statutorily proscribed factor…[such as] race…was at least a motivating factor in the adverse employment action at issue." *Id.* (citing *Terbovitz v. Fiscal Court of Adair Cnty., Ky.,* 825 F.2d 111, 115 (6th Cir. 1987); 42 U.S.C. § 2000e-2(m)). "This in turn activates a burden on the part of the employer to demonstrate that it would have taken the same action against the plaintiff even if the proscribed criterion had played no role in its decision," *id.* (citations omitted), and the "persuasiveness of that showing will normally be for the finder of fact to assess." *Id.*

Here, the evidence and Hite's testimony reveal a disputed question of fact regarding what role race played in her decision to terminate Jones.[33] The defendants argue that Hite's consideration of race was only to promote and achieve the benefits of diversity and that the elimination of Jones' position was to "reduce headcount in the HR Department, cut costs and eliminate redundancies." Mot., Dkt. 269 at 9. But Hite's reference to "race" on her reorganization chart is ambiguous; perhaps that is what she meant, but it is also a reasonable inference, even from her own testimony, that she might have considered race in concluding that a minority group was overrepresented within the HR department and that members of that group

---

[33] Jones also relies on the list of circumstantial evidence previously addressed. *See* infra 65-66; Resp., Dkt. 334 at 19-22. As already discussed in relation to Jones' other claims, this evidence is either inadmissible, does not point directly to a discriminatory reason for an employment decision made by Hite, or does not relate to Hite.

should be terminated on that basis. Whether these or other explanations are sufficient to demonstrate that Hite would have chosen Jones' position for elimination, even if race played no role in the decision, is ultimately for the finder of fact. *See, e.g., Whitfield v. Int'l Truck and Engine Corp.,* --- F.3d ---, 2014 WL 2547772, *4 (7th Cir. June 6, 2014) (district court clearly erred in concluding that the term "Black" written on front of personnel file was evidence of company's intention to promote diversity in the workforce); *Venters,* 123 F.3d at 973 (persuasiveness of the defendants' showing is for the factfinder "unless the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case"). Accordingly, Jones' claim survives summary judgment under the direct method of proof.

### 7. Steels' Constructive Discharge Claim

Steels claims that she was constructively discharged from the Y when she submitted a resignation letter on or about October 9, 2008. *See* Pl. 56.1 Resp., Dkt. 313 at 47, ¶ 67. "A constructive discharge constitutes an adverse employment action." *Chapin v. Fort-Rohr Motors, Inc.,* 621 F.3d 673, 679 (7th Cir. 2010) (citing *Pa. State Police v. Suders,* 542 U.S. 129, 147 (2004)). A constructive discharge "occurs when the plaintiff shows that [s]he was forced to resign because [her] working conditions, from the standpoint of the reasonable employee, had become unbearable." *Id.* (citing *Suders,* 542 U.S. at 147).

The Seventh Circuit has recognized two forms of constructive discharge. *Id.* The first occurs when "an employee resigns due to alleged discriminatory harassment." *Id.* But those cases "require a plaintiff to show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress…thereby allowing an employer to address a situation before it causes the employee to quit." *Id.* (citing *Roby v. CWI, Inc.,* 579 F.3d 779, 785 (7th Cir. 2009); *Boumehdi v.*

*Plastag Holdings, LLC,* 489 F.3d 781, 789-90 (7th Cir. 2007)); *see also Smith,* 681 F.3d at 908 ("A constructive discharge occurs when working conditions become so unbearable that an employee is forced to resign."); *Ellis v. CCA Of Tenn. LLC,* 650 F.3d 640, 650 (7th Cir. 2011) ("Establishing constructive discharge is more difficult than establishing a hostile work environment." (citation omitted)). And to show a "hostile work environment," the plaintiff must demonstrate "that the [employer's] conduct was 'sufficiently severe or pervasive to alter the conditions of [her] employment.'" *Ekstrand v. Sch. Dist. of Somerset,* 583 F.3d 972, 978 (7th Cir. 2009) (citing *Suders,* 542 U.S. at 133)). Examples of "egregious" working conditions that go beyond a hostile working environment generally include threats to personal safety. *Chapin,* 621 F.3d at 679 (citing *Porter v. Erie Foods, Int'l, Inc.,* 576 F.3d 629, 640 (7th Cir. 2009) (claim for constructive discharge possible where harassment included repeated use of noose and implied threats of physical violence); *Taylor v. W&S Life Ins. Co.,* 966 F.2d 1188, 1198-99 (7th Cir. 1992) (constructive discharge where supervisor made racial jokes and brandished a firearm, held it to the plaintiff's head, then took a photo and made racial jokes about it at a staff meeting)); *see also Brooms v. Regal Tube Co.,* 881 F.2d 412, 417 (7th Cir. 1989) (finding constructive discharge where the employee's human resource manager repeatedly showed her racist pornographic photos and made threatening comments to her, including a threat to kill her).

The second form of constructive discharge occurs "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *Chapin,* 621 F.3d at 679 (citing *E.E.O.C. v. Univ. of Chi. Hosps.,* 276 F.3d 326, 332 (7th Cir. 2002)). In this situation, the employer's conduct may amount to a constructive discharge if the employee resigns. *Id.* But the employee must still demonstrate that her working conditions were "intolerable," *id.*, and working conditions do not become intolerable merely because a "prospect

of discharge lurks in the background." *Id.* (citing *Cigan v. Chippewa Falls Sch. Dist.,* 388 F.3d 331, 333 (7th Cir. 2004)); *see also Swearnigen-El v. Cook Cnty. Sheriff's Dep't,* 602 F.3d 852, 859 (7th Cir. 2010) ("[The Seventh Circuit has] clarified that 'the prospect of being fired at the conclusion of an extended process' without more, does not meet [the] standard [for constructive discharge]." (quoting *Cigan,* 388 F.3d at 333-34)). Rather, the employee must reasonably believe that "had [s]he not resigned, [s]he would have been immediately fired." *Chapin*, 621 F.3d at 680. In other words, the plaintiff must offer evidence that a "firing" was "an imminent and inevitable event." *Id.*

The defendants contend that Steels cannot establish a constructive discharge claim because her working conditions were not intolerable, and because she secured alternative employment before she resigned from the Y. Mot., Dkt. 265 at 11. However, Steels responds that the defendants erred by stating that a constructive discharge can *only* be established "if abusive working conditions are 'even more egregious than the higher standard for hostile work environment,'" *i.e.,* the "discriminatory harassment" standard. Resp., Dkt. 334 at 55. But while Steels suggests that the "discriminatory harassment" standard is not applicable to her claim, *see id.* at 59, or perhaps, that she can prove her claim under some other legal framework, she only cites to older cases that articulate the same standard cited by the defendants. *See id.* at 56 (citing *Hunt v. City of Markham,* 219 F.3d 649, 655 (7th Cir. 2000); *EEOC v. Miller Brewing Co.,* 650 F. Supp. 739, 747 (7th Cir. 1986)). As such, it is not entirely clear under which standard of constructive discharge Steels asserts her claim. She argues that the "discriminatory harassment" standard is not the only possible legal framework for her claim, but then fails to argue that her claim was "imminent" under the second, and only other recognized, form of constructive discharge discussed above.

Instead, Steels argues that she was forced to quit because it became clear to her that, if she was going to advance her career, she would have to leave the Y. To support this argument, she offers numerous bits of evidence, such as (1) a PowerPoint presentation addressed to the Board of Directors which concluded that the Y's "performance management system negatively impacted minorities," Pl. 56.1 App., Dkt. 326, Tab 24 at ¶ 5-6 ("Declaration of Nicole Steels— April 29, 2012"), (2) "the long pattern of discriminatory conduct to which [she] was subjected," Resp., Dkt. 334 at 58, (3) the contention that the Y paid [her] less than her counterparts, *id.,* and (4) the allegations that Hite "regularly belittled, marginalized and harassed [her]." *Id.* Moreover, the plaintiff places great weight on handwritten notes (which she did not see contemporaneously) in which Hite apparently wrote "runs to JNJ [James Jones]…anybody else, take the hint + leave." *Id.* at 16; Pl. Stmt. of Add'l Facts, Dkt. 313 at 62, ¶ 27. According to Steels, this evidence is sufficient to show that Hite was attempting to force Steels out of the organization.

But this and Steels' other circumstantial evidence fails to rise to the level of "egregious" work conditions, above and beyond those of a hostile work environment which itself requires "severe and pervasive harassment," sufficient to demonstrate that she was essentially forced to resign. *See, e.g., Chapin,* 621 F.3d at 679 (one threat and raised voices insufficient to state a hostile work environment claim, and therefore insufficient as a basis for a constructive discharge claim); *Patton v. Indianapolis Pub. Sch. Bd.,* 276 F.3d 334, 339 (7th Cir. 2002) (holding that plaintiff failed to show a hostile work environment where supervisor "treated her in a rude, abrupt, and arrogant manner, ignored her work-related suggestions and failed to keep her informed about changes at work" and explaining that "[m]any employees have to put up with some amount of rude, arrogant, or boorish behavior at work"); *cf. Parrett v. City of Connersville, Ind.,* 737 F.2d 690, 694 (7th Cir. 1984) (constructive discharge where plaintiff was forced to sit

in a windowless room that was formerly a broom closet and spend his entire shift doing nothing); *Fitzpatrick v. Raymond Mgmt. Co.,* No. 10 C 252, 2011 WL 5403497, at *3 (N.D. Ill. Nov. 08, 2011) ("The rare cases in which harassment is so extreme that the employee is excused from remaining on the job usually involve threats of physical violence." (citations omitted)). And as explained above, Steels has failed to show Hite's allegedly rude or overbearing behavior was based on racial animus or discrimination with admissible evidence.

While the Seventh Circuit has held that a "person who is told repeatedly that [s]he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if [s]he decided that to remain with [her] employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable," *Hunt,* 219 F.3d at 655, Steels has not offered this type of evidence. Indeed, the record indicates that the Y hired an outside law firm to investigate her complaint and hired a coach to assist with her professional relationship with Hite. More importantly, her claim that her working conditions were so unpleasant that she was compelled to resign is undercut by the fact that she delayed her start at her new employer, Wrightwood Capital, to assist her co-workers and the incoming interim director, *after* Hite had left. *See* Pl. 56.1 App., Dkt. 326, Tab 24 at ¶ 10-11. Had Steels truly felt compelled to resign based on Hite's conduct, viewed in the aggregate with her other claims of discrimination, she would have done so prior to Hite leaving the organization. Accordingly, a reasonable factfinder could not conclude that, at the time Steels resigned, she did so because Hite's criticisms and conduct had made the working environment intolerable. *See, e.g., Lifton v. Bd. of Educ. of the City of Chi.,* 416 F.3d 571, 578 (7th Cir. 2005) ("The doctrine of constructive discharge is limited to egregious cases, such as, for example, where an employee is subjected to

threats or repeated racist taunting." (citing *Tutman v. WBBM-TV, Inc.,* 209 F.3d 1044, 1050 (7th Cir. 2000))).

Moreover, while Steels has offered sufficient evidence to survive summary judgment on her base and 2006 compensation claims, unequal pay, standing alone, is not enough to constitute a constructive discharge. *See Fitz v. Pugmire Lincoln-Mercury, Inc.,* 348 F.3d 974, 978 (11th Cir. 2003) (citing *Pittman v. Hattiesburg Mun. Separate Sch. Dist.,* 644 F.2d 1071, 1077 (5th Cir. 1981)); *White v. Dial Corp.,* 52 F.3d 329 (7th Cir. 1995) (unpublished opinion) (citing *Bourque v. Powell Elec. Mfg. Co.,* 617 F.2d 61, 65-66 (5th Cir. 1980) (unequal pay and disappointment at failure to receive expected pay raise not sufficient to establish constructive discharge)); *Fisher v. Conrad,* 985 F.2d 559 (6th Cir. 1993) (unpublished opinion) ("a failure to promote, an unlawful transfer, or unequal pay, standing alone, does not amount to a constructive discharge.") (citing *Irving v. Dubuque Packing Co.,* 689 F.2d 170, 172 (10th Cir. 1987)); *Jurgens v. E.E.O.C.,* 903 F.2d 386, 391 (5th Cir. 1990) (unequal pay may be relevant, but alone insufficient, to constitute constructive discharge (citing *Jett v. Dallas Indep. Sch. Dist.,* 798 F.2d 748, 755 (5th Cir. 1986))). Furthermore, courts have held that an "employer has not effected a constructive discharge because an employee believes that she has lost respect or credibility within the company or that she has limited opportunity for advancement." *See Chaddah v. Harris Bank Glencoe-Northbrook,* No. 93 C 397, 1994 WL 75515, at *3 (N.D. Ill. Mar. 08, 1994) (citing *Schaulis v. CTB/McGraw-Hill, Inc.,* 496 F. Supp. 666, 676 (N.D. Cal. 1980)). But that does not even appear to be the case here. Rather, what the evidence offered by both parties indicates is that Steels began considering leaving the Y sometime after Hite assumed the position of director, Reply, Dkt. 380 at 10 n.6, and then she remained on the job until she could secure a higher paying position with another employer; and not that her claims of unequal pay created

"such an aggravated situation that…[she reasonably felt] forced to resign." *See, e.g., Jett,* 798 F.2d at 755.

Furthermore, although it does not appear that Steels is pursuing her claim under the "inevitable termination" form of constructive discharge, Hite's handwritten note, alone, is insufficient to show that Steels reasonably believed that her termination was "imminent." There is no evidence that Steels was aware of the note, nor is there evidence that Hite or anyone else at the Y had communicated to Steels that her termination was imminent or inevitable. *See, e.g, E.E.O.C. v. Univ. of Chi. Hosps.* 267 F.3d at 332 (holding that a constructive discharge claim could move forward where the employee returned to work to find her belongings packed and her office being used as storage, her supervisor was fired for refusing to fire her, she received sudden negative performance evaluations, and was told that a minor mistake was "the last straw"); *Kodish v. Oakbrook Terrace Fire Prot. Dist.,* 604 F.3d 490, 502 (7th Cir. 2010) (constructive discharge where it was undisputed by both parties that if the employee had not resigned, he would have been terminated immediately). And even if Hite was planning to immediately fire Steels, Steels resigned after Hite had left the Y, and therefore, after the threat of an immediate termination was eliminated. *See* Pl. 56.1 App., Dkt. 326, Tab 24 at ¶ 10. In other words, a reasonable finder of fact could not conclude that the "handwriting was on the wall" or that "the axe was about to fall," with respect to Steels employment at the Y. *See Chapin,* 621 F.3d at 680 (no constructive discharge where the plaintiff had "quit after the axe had been put away" (citing *Lindale v. Tokheim Corp.,* 145 F.3d 953, 956 (7th Cir. 1998)). Accordingly, Steels has failed to offer sufficient evidence to demonstrate that she was constructively discharged, and the defendants' motion for summary judgment on this claim is granted.

*8. Jones' and Steels' Retaliation Claims*

In addition to alleging that the employment actions in this case were based on discrimination, the plaintiffs also allege that many of them were retaliatory. To prevail on a claim for retaliation, the plaintiffs may proceed under either the direct or indirect method. Under the direct method, the plaintiffs must show that they (1) "engaged in protected activity," (2) "that they suffered an adverse employment action," and (3) "that there is a causal link between their protected activity and the adverse action." *Brown,* 700 F.3d at 1106 (citing *Coleman,* 667 F.3d at 859). While "the category of 'materially adverse actions'…sweeps more broadly than the 'adverse employment actions' required to sustain a discrimination claim," *Porter,* 700 F.3d at 957 (citing *Benuzzi,* 647 at 665), an employment action in the retaliation context "is only adverse if it might dissuade a reasonable worker from making or supporting a charge of discrimination." *Brown,* 700 F.3d at 1106-07 (citing *Burlington N.,* 548 U.S. at 68). Causation may be shown with evidence that the plaintiffs' protected activities were a "substantial or motivating factor" in the employer's action. *See Naficy,* 697 F.3d at 512 (citing *Coleman,* 667 F.3d at 860). And "[l]ike a discrimination claim, proving a retaliation claim under the indirect method requires evidence that a similarly situated employee who did not engage in the statutorily protected activity received better treatment." *Brown,* 700 F.3d at 1106 (citing *Harper,* 687 F.3d at 309-10).

The Court can quickly dispose of Jones' retaliation claim under the indirect method. The defendants moved for summary judgment on this claim, arguing that Jones could not identify any similarly-situated employees who were treated more favorably. Mot., Dkt. 269 at 14. While the defendants' argument that *no* employee could be similarly situated to Jones, because Jones was the only director-level employee under Hite, is incorrect, Jones has failed to identify, or even attempt to identify, any similarly-situated employees who were treated more favorably in his

response. *See* Resp., Dkt. 334 at 32. Specifically, Jones responds only that "Defendants rely exclusively on their arguments made in connection with Jones' discrimination claims." *Id.* That may be true, but the plaintiff must still satisfy his burden of establishing a *prima facie* case, and to the extent that Jones contends that he was similarly situated to *all* employees in HR or at the Y as a whole, he has not met his burden of production, as explained above. *See* infra 70-71. Accordingly, because Jones has not offered evidence to establish a requisite element of a *prima facie* case, he cannot prevail on his retaliation claim under the indirect method.

Jones' retaliation claim also fails under the direct method. Jones alleges that he engaged in protected activity when he (1) "oppos[ed] conduct he believed to be racially discriminatory" by discussing that conduct with Hite, which involved Hite's treatment of Steels and Yvonne Bibbs,[34] Resp., Dkt. 334 at 31, (2) sent an email to Hite on September 8, 2007 expressing concern over racial discrimination, *id.* at 30, and (3) participated in an interview with lawyers from Ogletree on October 10, 2007 concerning Steels' complaint.[35] *Id.* In retaliation for engaging

---

[34] The defendants argue that Jones contradicted his deposition testimony regarding this conversation, and that, based on his deposition, his conversation with Hite only involved Jones expressing the concern that "there was a perception being put out that the issues in the [HR] department were based on race." Reply, Dkt. 374 at 31. According to the defendants, this statement is "far too vague to constitute protected activity." *Id.* The Court does not need to decide whether Jones has offered sufficient evidence to establish that his conversation with Hite was protected activity because, as explained below, Jones has failed to offer sufficient facts or argument to connect this activity with retaliation—*i.e.,* establish causation.

[35] As the defendants argue, Jones failed to respond to the defendants' motion for summary judgment or otherwise argue that the following conduct constituted protected activity: (1) opposing findings of Hite's investigation of Horsey's review; (2) seeking to change merit increases for some employees in 2006 and 2007; (3) questioning or calling for adverse impact review of the merit system; (4) opposing a referral program; and (5) following up on a department's concerns about promotion and compensation issues impacting minorities. *See* Reply, Dkt. 374 at 30. By failing to respond, present facts, and argue that these activities constituted protected activities, Jones has waived his claims of retaliation based on these acts. *See, e.g., Milligan,* 686 F.3d at 389 (plaintiff forfeited reliance on evidence not raised in opposition brief to summary judgment) (citing *Liberles,* 709 F.2d at 1126 ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the

95

in these protected activities, Jones alleges that Hite assigned him the lowest pay increase in the department and that his position was eliminated in October 2007. *Id.* at 32.

As an initial matter, and as explained above, Jones has failed to offer sufficient evidence to demonstrate that his performance evaluations and merit increases were materially adverse. *See infra* 71. For example, in 2005, Jones received a 3% merit increase and a rating of "meets expectations." Pl. 56.1 Resp., Dkt. 312 at 32, ¶ 42. In 2006, Jones received a 5.5% merit increase, plus an additional $2,500, which he admits was granted in part to satisfy his request for an equity salary increase that year. *Id.* at 37, ¶ 51. Then in 2007, Jones received a 3% increase and rating of "meets expectations." *Id.* at 37, ¶ 52. But Jones offers no evidence or objective criteria upon which to base an inference that he should have received or would have received a higher rating and merit increase but for his alleged protected activity. Moreover, Jones failed to identify any similarly-situated employees who were treated more favorably or offer evidence that, for instance, highly favorable evaluations and merit increases were considered the norm. In this context, without more, it is difficult to imagine a scenario in which receiving a positive performance evaluation and 3% merit increase would deter a reasonable employee from engaging in future protected activity. Therefore, if Jones' retaliation claim is to proceed, it must be based on his termination, which clearly was an adverse employment action. *See Tomanovich v. City of Indianapolis,* 457 F.3d 656, 664 (7th Cir. 2006).

Relying on "suspicious timing," Jones argues that "[d]rawing all inferences in [his] favor, a jury could determine Hite decided to eliminate [his] position in short period [sic] after his

reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal."); *Chi. Reg. Council of Carpenters v. Village of Schaumberg,* 644 F.3d 353, 356 (7th Cir. 2011) (same); *India Breweries, Inc v. Miller Brewing Co.,* 612 F.3d 651, 659 n.2 (7th Cir. 2010) (same); *Amrhein v. Health Care Service Corp.,* 546 F.3d 854, 859 (7th Cir. 2008) (same); *Domka v. Portage Cnty., Wis.*, 523 F.3d 776, 783 (7th Cir. 2008) (same).

September 8, 2007 e-mail and follow-up conversations with Hite," regarding Jones' concerns about racial discrimination at the Y. Resp., Dkt. 334 at 33. "[S]uspicious timing alone[,] [however,] rarely is sufficient to create a triable issue," *Tomanovich,* 457 F.3d at 665 (citing *Moser v. Ind. Dep't of Corr.,* 406 F.3d 895, 905 (7th Cir. 2005)), and "mere temporal proximity is not enough." *Id.* (citing *Wyninger v. New Venture Gear, Inc.,* 361 F.3d 965, 981 (7th Cir. 2004)). Therefore, as further evidence, Jones also argues that prior to his August review, Hite had described him as having "very solid OD skills and HR generalist skills," but after he expressed his concern with the "disparate results he found in the merit increases," he was suddenly described as "divisive," "insubordinate," and "argumentative." Dkt. 334 at 33. According to Jones, his conduct also led "Hite to question what he was doing…behind her back and accuse [him] of encouraging people to sue the Y." *Id.*

The problem with the plaintiff's contention, however, is that Jones' declaration belies his argument that he was terminated after he voiced concerns about racial discrimination. In his declaration, Jones admits that "[w]hen [he] met with Ms. Hite in late August 2007 to discuss [his] review, she did mention my position would be eliminated." Dkt. 325, Tab 30 at ¶ 16. By Jones' own admission, then, that decision must have been made, or at least was under active consideration, prior to the protected activity that he relies upon to make out his claim for retaliation (which began the following month) and there is no way the protected activity could have been a "substantial or motivating factor" in the elimination of Jones' position. *See, e.g., Tomanovich,* 457 F.3d at 664 (defendants' decision to place the plaintiff on a performance plan could not have been retaliation for the plaintiff's later EEOC filings). Accordingly, Jones has failed to establish a claim for retaliation, and the defendants' motion for summary judgment on this claim is granted.

Steels, on the other hand, argues that she can prevail on a claim for retaliation based on "events occurring after her September 2007 complaint to Nicoll regarding race discrimination and her December 2007 EEOC charge." Resp., Dkt. 334 at 53. In retaliation for engaging in these protected activities, Steels alleges that she suffered materially adverse actions in the form of (1) not being paid as much as Durren, who Hite hired as a Senior HR Generalist, (2) Hite's posting of a Senior HR Generalist position with a starting salary higher than Steels' salary, (3) not being selected for supervisory opportunities or the interim director position, and (4) her constructive discharge.

On this claim, Steels proceeds only under the direct method, as she has not attempted to satisfy the elements of a *prima facie* case under the indirect method in her response. *See* Resp., Dkt. 334 at 53-55. Under the direct method, the defendants apparently concede that Steels' letter to Nicoll and the EEOC complaint constituted protected activities because they do not reply to those arguments. *See also Henson v. T-Mobile USA,* No. 12 C 3845, 2013 WL 1154434, at *7 (N.D. Ill. Mar. 18, 2013) ("Complaining to an employer about impermissible discrimination and filing a charge of discrimination with the EEOC are statutorily protected activities." (citing *Tomanovich,* 457 F.3d at 663)). That said, Steels has not offered evidence that she was qualified for the position of interim director (or even that she applied for the position); and even if she had, that vacancy occurred in September 2008, nine months after Steels filed her EEOC charge. *See, e.g., Milligan,* 686 F.3d at 390 (no causation where alleged retaliation occurred six months after the plaintiff's last sexual harassment complaint). Moreover, as explained above, she has not established a claim for constructive discharge. Therefore, to prevail on her retaliation claim, she must demonstrate that posting an opening for a Senior HR Generalist at a higher salary range

than she was earning at the time and hiring Durren at a salary higher than Steels was earning were materially adverse actions.

Hite hired Durren on January 1, 2008, shortly after Steels had filed her EEOC charge and weeks after Ogletree had concluded its investigation of Steels' complaint. As explained above, whether this hiring decision can be considered materially adverse depends on the context of the situation. Here, Steels had complained to Nicoll that she was experiencing a hostile and intimidating work environment because of Hite's management. Steels and Hite had been working with a coach to resolve their issues and improve their communication when Steels filed an EEOC charge complaining of inequities in the terms and conditions of her employment based on race. Shortly afterward, Ogletree concluded its investigation of Steels' complaint.

As evidence of retaliatory motive, Steels also points to handwritten notes made by Hite, which Steels contends were made shortly after Hite learned about Steels' complaint. Specifically, Hite wrote that it was "intrig[uing] [Steels] felt this way since 8/05" and described Steels as "insubordinate, subversive, [and] distrustful." *See* Defs. 56.1 Resp., Dkt. 381 at 15, ¶ 27. The defendants dispute that these notes were written after Hite learned about Steels' complaint. *See id.* at 16. However, based on the wording of the notes themselves, and the fact that Hite testified that she could not remember when she wrote them, there is at least a fact issue concerning the timing of when the notes were written.

Within this context, though marginal, hiring a new employee into the same position as Steels at a higher salary shortly after she had complained about inequities, could potentially dissuade a reasonable employee from filing a future charge of discrimination, by sending the message that Steels would never achieve pay equity. *See Pubentz v. Holder,* No. 10 C 7722, 2013 WL 812377, at *14 (N.D. Ill. Mar. 5, 2013) ("The standard for what constitutes an adverse

employment action is more flexible in a retaliation claim than in a discrimination claim." (citing *Burlington,* 548 U.S. at 69)). This is supported by the fact that, as explained above, the defendants have failed to offer a legitimate nondiscriminatory reason for the discrepancy between Steels' and Durren's salaries at the time. *See* infra 78-79.

Given the general nature of Steels' complaint and EEOC charge—that she was experiencing inequities in the terms and conditions of her employment—and the temporal proximity of Hite's hiring decisions, a reasonable jury could find that Steels' protected activities were a motivating factor in Hite's decisions. Accordingly, Steels may proceed on her claim of retaliation in connection with Hite's hiring of Durren, and the defendants' motion for summary judgment on this claim is denied.

### E. Iona Toles

The defendants argue that Toles cannot prevail on her discriminatory pay or failure-to-promote claims because she has failed to adduce sufficient admissible evidence to support her claims under either the direct or indirect method of proof. The defendants have also moved for summary judgment on several other purported claims, arguing that: (1) Toles' claim that she was not promoted to a Contact Center leadership position in 2001 is time-barred, Defs. Mot., Dkt. 273 at 3; (2) there is no evidence that Toles' move from the fourteenth to the fifteenth floor was racially discriminatory, *id.* at 6; (3) Toles cannot show that she received racially discriminatory performance evaluations, *id.* at 7; and (4) that Toles' failure-to-train claims are meritless. *Id.* at 13. In her response, however, Toles states that the Y discriminated against her in five ways relating to pay and promotions: "(1) intentionally paying her less than white employees; (2) paying her less than white employees regardless of intent (disparate impact claim); (3) failing to 'promote' her in 2008 into a job she already held; (4) failing to promote her to one of the 2010

conference center coordinator positions; and (5) failing to promote her to the [Contact Center] team lead position [in 2010]." Pl. Resp., Dkt. 318 at 1.

As the plaintiff argues, the defendants did not move for summary judgment on the plaintiffs' disparate impact claim or the third failure-to-promote claim regarding the 2010 Contact Center team lead position.[36] As such, summary judgment on those claims is denied. On the flip side, to the extent that Toles concedes she is not pursuing, or that Toles has failed to respond to, the 2001 failure-to-promote claim, failure-to-train claim, performance evaluation claim, and the separate claim concerning her move to the fifteenth floor (apart from the 2008 failure-to-promote claim to which those facts are related), summary judgment is granted.

For the reasons set forth below, the defendants' motion for summary judgment on Toles' remaining claims is granted in part and denied in part.

### 1. Compensation Claims

Toles argues that she has enough circumstantial evidence under the direct method of proof to show that she was paid discriminatorily low compensation and merit increases throughout her tenure at the Y. Generally, she contends that the Y failed to pay her commensurately with other Caucasian administrative employees and failed to place her in Pay

---

[36] The defendants did not address the claim concerning the Contact Center team lead position in their brief in support of their summary judgment motion. They contend, however, that because they included in their Statement of Facts (No. 55) a statement and evidence rebutting this claim, that they adequately raised the issue. The Court disagrees; the defendants offered no argument in support of granting judgment on this claim and that failure constitutes a forfeiture of the argument. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) (failure to raise argument in opening brief forfeits that argument). The Court notes as well that the defendants' argument that this alleged failure to hire cannot constitute an adverse employment action, Reply at 8, is simply wrong; the plaintiff's burden under the indirect method can be established either by showing that the position was filled by someone outside of the plaintiff's protected class or if the position remained vacant. *See, e.g., Koszola v. Bd. of Ed. of City of Chi.*, 385 F.3d 1104, 1110 (7th Cir. 2004). Accordingly, this claim survives the defendants' motion for summary judgment.

Grade B as an experienced administrative employee, despite her many years of service with the organization.

To support her claims, Toles attempts to adduce evidence that (1) similarly-situated employees not in her protected group were treated more favorably (*i.e.,* they were paid more, received greater merit increases, and received raises more quickly) in 2005, 2007, and 2009, Pl. Resp., Dkt. 318 at 19, (2) Snell allocated the Contact Center a lower percentage of his available merit increase pool because it was comprised mainly of African American employees, *id.* at 19-20, and that (3) Snell gave all Caucasian employees higher performance ratings and merit increases than all African American employees under his supervision. *Id.* at 20-21. Further, Toles points out that despite her years of service and experience at the Y, she was never promoted to Pay Grade B, the pay classification for "experienced administrative personnel." *Id.* at 4.

Despite this evidence, however, Toles has failed to meet her burden of proof under either method of proof because she has not adequately identified and produced evidence of similarly-situated employees not in her protected class who were treated more favorably. Toles contends that Caucasian employees Susan Jarocki, Brenda Welker, and Terrence Roche, were all paid more and received raises and promotions faster than she did. Pl. Resp., Dkt. 318 at 17-18. She fails, however, to offer sufficient admissible evidence that she was similarly situated to each, or any, of these employees in all material respects—particularly with regard to job responsibility, supervisor, and department. *See Bio,* 424 F.3d at 597 ("A similarly situated employee is one who is directly comparable to [the plaintiff] in all material respects." (internal quotations omitted) (citing *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir. 2002))).

Toles' comparison to Jarocki illustrates this point. According to Toles, Jarocki joined the Y in 1992, one year after Toles, but was moved into Pay Grade B in 2006, Pl. Resp., Dkt. 318 at 17-18, while Toles remained in Pay Grade A. Toles has not adduced evidence, however, of who made the personnel decision to place Jarocki in Pay Grade B, what duties and responsibilities Jarocki held at the time she was promoted, in which department Jarocki worked, and to whom Jarocki reported. Without these facts, a reasonable factfinder could not determine that Toles and Jarocki were similarly situated in 2006 or any other time period. *See, e.g., Dority,* 2001 WL 1155286, at *14 ("a plaintiff must provide specific evidence and specific examples of employees who have been treated more favorably" (citing *Harris,* 1998 WL 704056, at *3)).

Toles does identify one similarly-situated employee, Dorrie Ferguson. Both Toles and Ferguson worked in the Contact Center and were supervised by Snell. *See* Pl. Resp., Dkt. 318 at 20. Toles asserts that Snell gave Ferguson a 3.3 performance rating and a 4.2% merit increase and Toles a 2.3 performance rating and 2.7% merit increase for that year. However, Toles runs into trouble again because she has failed to support these facts with admissible evidence. As the defendants object, the information relating to Ferguson, and the other comparators for that matter, is based on a spreadsheet that lacks authentication and foundation.[37] *See* Defs. 56.1 Resp., Dkt. 378 at 22-23, ¶¶ 53-54. *See Fleishman v. Cont'l Cas. Co.,* 698 F.3d 598, 603 (7th Cir. 2012) ("To survive summary judgment, the nonmovant must produce sufficient *admissible* evidence, taken in the light most favorable to it, to return a jury verdict in its favor." (emphasis added) (citing *Berry v. Chi. Transit Auth.,* 618 F.3d 688, 691 (7th Cir. 2010))).

---

[37] The plaintiffs submitted these spreadsheets without any attempt to establish their authenticity. From what can be gleaned from the record, the plaintiffs offer the spreadsheets as "Business Records." *See* Pl. App., Dkt. 326 at 7 (listing the spreadsheets under "Other Business Records"). The plaintiffs then submitted the spreadsheets on a CD-ROM in their native Microsoft Excel format.

Rather than adduce evidence that shows Toles was similarly situated to each of her comparators in every material respect, she again relies on the same faulty argument offered by Plaintiffs Jones and Steels—that she is similarly situated to every single administrative employee at the Y because CEO Nicoll reviewed and had final approval over all salaries, performance scores, and merit increases. *See* Pl. Resp., Dkt. 318 at 17. She further contends that she is similarly situated to all other administrative employees because all entry level administrative and clerical personnel fall into Pay Grade A. *See id.* As explained above, this argument misconstrues the applicable law on comparators, and is therefore an insufficient basis on which to survive summary judgment. At bottom, without evidence of material similarity, this Court cannot, and a jury could not, make a reasonable inference that Toles was not paid as much as the offered comparators—or any other Y employee—*because* of her race.

Further, to the extent that Toles has generally asserted pay discrimination claims based on her failure to be moved or promoted into Pay Grade B, she has failed to support that claim with direct or circumstantial evidence. For instance, Toles contends that Snell gave all Caucasian employees higher merit increase and performance ratings than all African American employees under his supervision. Pl. Resp., Dkt. 318 at 19-20. These facts, if supported by admissible evidence, could have potentially served as circumstantial evidence that Snell was discriminating against African American employees, including Toles. *See, e.g., King,* 678 F.3d at 473 (plaintiff established a pay discrimination claim where the plaintiff showed that "[a]ll of the men were paid more than all but one of the women—and the one woman achieved her $60,000 salary only after six years on the job, while men exceeded the $60,000 line faster"). But, again, Toles has not adduced sufficient admissible evidence to support that claim—all of the evidence related to the purported comparators is based on the inadmissible spreadsheets that lack both foundation and

authentication. As such, there is simply no evidence upon which this Court, or a jury, could base an inference of racial discrimination. Accordingly, the defendants' motion for summary judgment on Toles' pay discrimination claims is granted.

## 2. *Failure-to-Promote Claims*

Like other discrimination claims, a failure-to-promote claim may be proven through either the direct or indirect method. *See Fischer v. Avanade, Inc.,* 519 F.3d 393, 401 (7th Cir. 2008) (citing *Volovsek v. Wis. Dep't of Agric., Trade, & Consumer Prot.,* 344 F.3d 680, 689, 692 (7th Cir. 2003)). The defendants argue that Toles lacks direct or circumstantial evidence of discrimination, and, therefore, must proceed under the indirect burden-shifting method of proof. *Id.* Toles, on the other hand, contends that she may prove her claim under either method.

"Failure to promote can be an adverse action giving rise to liability." *Hill,* 625 F.3d at 1003 (citations omitted). As explained above, to survive summary judgment on an intentional discrimination claim under the direct method, "a plaintiff must offer direct evidence of discrimination—an outright admission that an action was taken for discriminatory reasons—or circumstantial evidence that points to discriminatory animus through a longer chain of inferences." *Everett v. Cook Cnty.,* 655 F.3d 723, 729 (7th Cir. 2011) (citing *Van Antwerp v. City of Peoria, Ill.,* 627 F.3d 295, 298 (7th Cir. 2010)). "Circumstantial evidence can take on many forms, and includes 'evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.'" *Id.* (citing *Sun v. Bd. of Trs.,* 473 F.3d 799, 812 (7th Cir. 2007)). But "[w]hatever circumstantial evidence is offered must, in the end, 'point directly to a discriminatory reason for the employer's action.'" *Id.* (citing *Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir. 2003)).

To survive summary judgment on a failure-to-promote claim using the indirect method, the plaintiff must show "1) [s]he belongs to a protected class, 2) [s]he applied for and was qualified for the position sought, 3) [s]he was rejected for that position[,] and 4) the employer granted the promotion to someone outside of the protected group who was not better qualified than the plaintiff." *Fischer,* 519 F.3d at 402 (citing *Grayson v. City of Chi.,* 317 F.3d 745, 748 (7th Cir. 2003)). Once that *prima facie* case is established, the burden shifts to the defendants to offer a nondiscriminatory justification for their employment action. *Id.* (citing *Emmel v. Coca-Cola Bottling Co.,* 95 F.3d 627, 629 (7th Cir. 1996)). If the defendants meet their burden, the plaintiff must present evidence to show that the defendants' proffered explanation is pretext for discrimination. *Id.* (citing *Emmel,* 95 F.3d at 629).

Toles alleges that the Y discriminatorily failed to promote her on three occasions. Pl. Resp., Dkt. 318 at 7. First, in 2008, the Y failed to promote her to the "restructured" front desk Receptionist/Data Processing Clerk position. *Id.* Second, in 2010, the Y failed to promote Toles to one of the Conference Center Coordinator positions. *Id.* And last, sometime in 2010, the Y did not promote Toles to a Contact Center team lead position. *Id.*

a. *2008 Front Desk Receptionist/Data Processing Position*

Sometime in 2008, Toles' position in the main reception area on the fourteenth floor of the Y's offices, where visitors were greeted, was "restructured." According to the Y, the new position on the fourteenth floor was changed to include a greater focus on typing and data entry skills and less emphasis on receptionist and call center skills. Def. Mot., Dkt. 273 at 4. The new position was also categorized in Pay Grade B, while Toles' position at the time was in Pay Grade A. Defs. 56.1 Resp., Dkt. 378 at 5, ¶ 10. Under the Y's Salary Administration Guidelines, moving from Pay Grade A to Pay Grade B is considered a promotion. *Id.* at 10, ¶ 24. As a result,

compared to Toles' then current position, the new Receptionist/Data Processing Clerk job offered the opportunity to earn more compensation over time.[38]

After the new position was created, Toles and Johanna Pistell, a younger Caucasian woman, applied for the job. Pl. Resp., Dkt. 318 at 3, 8-9. Both candidates took a typing test, with Pistell receiving a higher score than Toles. *Id.* at 8. Toles also interviewed with both Snell and Jensen, the supervisor to whom, according to the Y, the new position would report. Pl. 56.1 Resp., Dkt. 311 at 30, ¶ 47. Because Pistell outperformed Toles on the typing test and had greater technical skills needed for data entry, she received the promotion. *Id.* at 31, ¶ 48.

The defendants contend that these facts end the matter—Pistell performed better on the typing test, had greater technical skill, and was therefore more qualified for the new position. Defs. Reply, Dkt. 377 at 9-10. However, Toles does not dispute that the Y created the new position, that the new position's job description was written to require data entry and technical skills, or that Pistell performed better on the typing test. What Toles does dispute, however, is the legitimacy of the reason for the creation of the new position, and its purported data entry skill requirements, in the first place. According to Toles, the creation of the new position was "a ruse" designed to remove Toles from the fourteenth floor station, where visitors were greeted, because the Y did not believe that she projected the "right image," Pl. Resp., Dkt. 318 at 8, and that the "new position" was really the same as the old position Toles had occupied for several years. *Id.* at 9. After Pistell was chosen for the new Receptionist/Data Processing Clerk job, Toles' desk was moved to the fifteenth floor, which, according to Toles, was less busy and away from the Y's visitors.

---

[38] For 2008, Pay Grade A had a minimum salary of $26,700 and a maximum salary of $40,100. Pl. 56.1 Resp., Dkt. 311 at 16, ¶ 25. Pay Grade B had a minimum salary of $32,200 and a maximum salary of $48,300. *Id.*

*Direct Method:*

Under the direct method, Toles argues that she has sufficient circumstantial evidence to survive summary judgment on her 2008 failure-to-promote claim. Specifically, Toles argues that based on her personal knowledge as Pistell's backup, her old job and the "restructured job" were functionally equivalent. She also argues that the fact she was chosen to, and currently acts as, Pistell's backup undercuts the Y's argument that she lacked the necessary technical skill to retain her position in the main reception area and receive the promotion to Pay Grade B. Toles avers that the Y's personnel decision to replace her with a younger, less-experienced Caucasian employee, performing essentially the same job, shows that the Y wanted a Caucasian, rather than African American, employee greeting visitors at the front desk.

First, Toles argues that she had already been performing whatever data entry responsibilities the new position supposedly entailed, and that Pistell was performing essentially the same job Toles had been doing for several years, but in a higher pay grade. *See* Toles Deposition, Pl. App'x, Dkt. 325, Tab 6 at 19:1-17. If the new position truly had a greater focus on data entry, Toles argues, that new position would have been stationed at the more remote fifteenth floor location, which Toles contends was less busy, rather than in the main reception area on the fourteenth floor. Pl. Resp., Dkt. 318 at 9. Toles notes that even though the new position also included the duties of a receptionist, the Y never considered Toles' receptionist qualifications. Instead, the Y based the promotion decision exclusively on the typing test and data entry skills. *Id.* at 10. Exclusion of receptionist experience is suspicious, Toles argues, because she had eleven years of experience as the Y's full-time receptionist, while Pistell had previously only been a temporary worker. *Id.*

The defendants respond that Toles' "conspiracy theory" is based on conjecture and speculation, which cannot defeat summary judgment. Def. Reply., Dkt. 377 at 9. Further, the defendants contend that it would make little sense for the Y to create a new position in order to remove Toles from the front desk, only to allow her to reapply for that position. *Id.* at 9-10. Rather, as the defendants have emphasized, Toles did not receive the position simply because Pistell outperformed her on the typing test and had stronger data entry and software skills. *Id.* Lastly, the defendants argue that Toles' theory that Pistell could not effectively perform her data processing duties on the fourteenth floor, where visitors were greeted, is supported only by speculation, and, therefore, must be rejected. In fact, according to the Y, the front desk position was changed specifically to enable the employee stationed there to better greet visitors. Defs. Mot., Dkt. 273 at 7.

But the Y fails to explain how the "restructured" responsibilities of the new position actually enabled the front desk receptionist to better greet visitors. In fact, the defendants fail to explain why the position was restructured at all, and how the two jobs (Pistell's versus Toles') actually differed. What can be gleaned from the admissible evidence in the record is based on Toles' personal knowledge: (1) Toles worked in both positions, both full time and as a backup; (2) those positions entailed the same duties and responsibilities; and (3) the only differences between the new and old positions was that the new position was classified in a higher pay grade and staffed by a Caucasian employee. If, as Toles argues, the jobs were essentially the same, the only difference being that she was replaced by a Caucasian temporary worker who was given the opportunity to earn more compensation through merit increases over time, that is sufficient to, at the very least, create a factual dispute as to whether that employment decision was based on racial discrimination—particularly since the defendants have failed to offer evidence

demonstrating that the jobs were functionally different, and that the purported changes enabled the receptionist to better greet visitors.

The Y argues that it would be illogical for it to create a new position with a redesigned job description to remove Toles from the front desk, only to turn around and allow her to apply for that position. Defs. Reply, Dkt. 377 at 9. But if, as Toles argues, the restructuring was a "ruse," it would make perfect sense to allow Toles to reapply for her old position, before moving her to the fifteenth floor and replacing her at the front desk with a Caucasian woman in a higher pay grade. If the application procedure was in fact a sham to remove Toles from the main reception area, allowing her to reapply would be a necessary step to ensuring the process had a façade of fairness. At bottom, there are factual issues as to whether the new job truly entailed additional data entry skills, and whether those skills were even necessary, as the defendants contend, to enable the front desk receptionist to better greet visitors, or whether, as Toles alleges, the new position was essentially the same as the old position.

*Indirect Method:*

Relying on essentially the same evidence, Toles' claim survives summary judgment under the indirect method as well. The defendants do not contest that Toles is a member of a protected class or that she experienced an adverse employment action. They do maintain, however, that Toles cannot establish a *prima facie* case of discrimination because she cannot identify a similarly-situated individual, outside of her protected group, that was treated more favorably, and she cannot show that the Y's justification of promoting Pistell over her was pretext. Defs. Reply, Dkt. 377 at 11.

Toles, however, was similarly situated to Pistell, as both were candidates and eligible for the new Receptionist/Data Processing Clerk position. *See Stinnett v. City of Chi.,* 630 F.3d 645,

647 (7th Cir. 2011) ("the relevant similarity was the similarity of persons eligible for the next promotion"). As the Y emphasizes, Toles was allowed to apply, and was presumably considered, for the position. Defs. Reply, Dkt. 377 at 9. Pistell, however, received the promotion and, therefore, was treated more favorably. And, as discussed above, if there was no functional difference between the two positions, there is at least a factual dispute as to whether Toles was more qualified to keep the job than Pistell. Accordingly, Toles has established all the elements of a *prima facie* case of racial discrimination. The burden then shifts to the defendants to provide a legitimate and nondiscriminatory reason for their employment decision—not only to hire Pistell into the position, but the decision to "restructure" the front desk position.

To that end, the defendants again maintain that Pistell was chosen for the promotion because she was the more qualified candidate. Defs. Reply, Dkt. 377 at 13. But this misses the point—Toles is not challenging the defendants' assertion that they created a new job description for the front desk position, but their assertion that the new position was anything different than the job Toles had been performing for eleven years as the Y's full-time receptionist. The Y provides no legitimate nondiscriminatory reason for their decision to place the main receptionist position in Pay Grade B, require that position to have stronger data entry and software skills, and to station that new position at the main reception area where visitors were greeted. The Y asserts that the changes to the main reception area position were made to enable that employee to better greet visitors. But as explained above, the Y offers no evidence that any changes were needed, that the changes actually enabled the receptionist at that position to better greet visitors, and why it made sense for the main receptionist to be mainly responsible for data entry responsibilities if it was also that employee's job to greet visitors.

Because Toles has adduced sufficient evidence to support her 2008 failure-to-promote claim under either the direct or indirect method, the defendants' motion for summary judgment on that claim is denied.

b. *2010 Conference Center Position*

The defendants also contend that Toles does not have sufficient evidence to survive summary judgment on her claim that Jim Mellor, Director of Finance, failed to hire her for one of the Conference Center Coordinator positions because she is African American. Defs. Reply, Dkt. 273 at 5. According to the defendants, the "Conference Center Coordinator position required experience in cost analysis, projections and webinars, excellent computer skills and proficiency in Microsoft Office," skills that Toles purportedly does not, or at least did not, possess. *Id.* Based on that lack of technical skill, the defendants contend that "there is little doubt" that Toles was not qualified for the Coordinator position. *Id.*

Toles has failed to adduce evidence under either the direct or indirect methods of proof to support her allegations with respect to the Coordinator position. The Y hired two employees to fill the Conference Center Coordinator positions—Nicole Bradley, an African American woman, and Richard Marsoun, who had experience as a Conference Center Coordinator at a local YMCA. Defs. Reply, Dkt. 377 at 14-15. Toles argues that the Y's explanation for hiring Bradley and Marsoun is suspect because (1) the defendants never provided an explanation of Marsoun's prior experience and duties or how that experience would be relevant to the position, (2) the Y promoted Bradley out of the Contact Center despite her lack of experience, and (3) previous coordinator experience was not a prerequisite for the job. Pl. Resp., Dkt. 318 at 11. Toles also claims that the technical skill requirements were exaggerated, and that the job responsibilities were no different than the work Toles had been performing throughout her time at the Y. *Id.* at

11-12. And like her claim regarding the main receptionist position, Toles argues that she has served as a backup Conference Center Coordinator and continues to fill that role despite her supposed lack of technical skill. *Id.* at 12.

None of these allegations supports an inference of racial discrimination under either the direct or indirect methods of proof. For the first position, the Y hired Bradley, an African American woman. Under either method of proof, this fact eliminates the possibility that Toles was not hired for the first coordinator position based on her race. Because Toles and Bradley are both African American, some other factor, or factors, must account for the Y's decision to hire Bradley over Toles. Similarly, under the indirect method Bradley is not outside of Toles' protected class, and, therefore, Toles cannot establish a *prima facie* case on that basis.

Further, Toles does not dispute that Marsoun had prior experience as a Conference Center Coordinator at a local YMCA. *See* Pl. 56.1 Resp., Dkt. 311 at 37; Pl. Resp., Dkt. 318 at 11. Given Marsoun's prior coordinator experience, there is no question he was the more qualified candidate. At bottom, Toles has adduced no evidence that points directly to a discriminatory reason for the Y's decision to hire Marsoun over her for the Coordinator position. Further, under either method of proof, Toles has not adduced evidence that she was more qualified for the position than Marsoun, or that the Y's legitimate nondiscriminatory reason for hiring Marsoun— his prior experience—is pretext for discrimination. Instead, she offers only generalizations, speculation, and conjecture, all of which are insufficient to survive summary judgment. Accordingly, the defendants' motion for summary judgment on Toles' 2010 claim that the Y discriminatorily failed to promote her to a Conference Center Coordinator position is granted.

## F. Kavon Ward

The defendants have moved for summary judgment on Ward's intentional discrimination and retaliation claims, which, according to the defendants, include a discriminatory hiring claim, failure-to-promote claim, and other claims based on "miscellaneous incidents" at the Y's D.C. office. *See* Defs. Mot., Dkt. 261 at 4, 5, 10. In her response, however, Ward clarifies that she is not asserting "a hiring [claim] … and promotion claim … nor is [she] asserting … [that the 'miscellaneous incidents'] are freestanding claims." Pl. Resp., Dkt. 319 at 1 n.1. Ward does contend, however, that those incidents are "evidence of motive and a pattern of discriminatory and retaliatory conduct." *Id.* Accordingly, the defendants' motion for summary judgment on any potential hiring or promotion claim, as well as any potential freestanding claims based on the miscellaneous incidents that occurred in the D.C. office, is granted.

The claims that Ward does assert and support consist of discriminatory and retaliatory termination, discriminatory pay, and discriminatory performance reviews, under Title VII, § 1981, and the DCHRA.[39] Pl. Resp., Dkt. 319 at 13, 32. The defendants contend that summary judgment should be granted in their favor on each of these claims.

### 1. *Performance Review Claim*

Ward alleges that both of the performance reviews she received for 2009 were discriminatory and proceeds on that claim under the direct method of proof. *See id.* at 32. Ward contends that the "meets expectations" ratings that she received were discriminatory and materially adverse because they "likely doomed any chance that [she] would have had for a 'special request' [bonus]—had Haynes advocated for her as she did the white lobbyists." *Id.* at 34. In particular, in 2009 Haynes recommended that Bland receive an "enhanced merit increase" (from 3.5% to 5%) due to his "extraordinary achievement." *Id.* The Y agreed to award Bland a

---

[39] Ward also asserts disparate impact and pattern-and-practice claims upon which, as explained above, the defendants have not moved for summary judgment.

3.75% increase, plus an additional $2,500. *Id.* Similarly, that same year, Haynes gave Adamson a performance score of "exceeds expectations" and recommended that she receive a merit increase and lump sum bonus, which the Y granted. *Id.* From this evidence, in addition to purported evidence of Haynes' "discriminatory motive," Ward contends that a jury could infer that the Y discriminated against her with respect to her performance reviews. *Id.*

To the contrary, however, Ward has failed to marshal sufficient evidence, either direct or circumstantial, under the direct method of proof to survive summary judgment on her claim. First, Ward has not shown that either of her performance scores constituted adverse employment actions. *See Dass,* 675 F.3d at 1068 ("Even though [the plaintiff] is proceeding under the direct method, [she] still must demonstrate she suffered an adverse employment action." (citing *Lewis v. City of Chi.,* 496 F.3d 645, 652-53 (7th Cir. 2007); *Rhodes v. Ill. Dep't of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004))). Ward received positive performance ratings, and her contention that had she received higher performance ratings, Haynes may have put in a "special request" for a bonus for her is merely speculation, and is insufficient to support a claim on a motion for summary judgment. *See Collins,* 715 F.3d at 997 ("[The Court] will not draw inferences 'that are supported by only speculation or conjecture.'" (citing *Harper,* 687 F.3d at 306)). Pl. Resp., Dkt. 319 at 34. More importantly, as the defendants note and the plaintiff admits, Ward was not even eligible to receive a bonus, or any other form of pay raise, during 2009 by virtue of the terms of her initial offer letter. *See id.* at 34; Defs. Reply, Dkt. 371 at 12. As a result, and unlike Jones and Steels, Ward's "meets expectations" ratings had no tangible effect on the terms and conditions of her employment. *See De La Rama v. Ill. Dep't of Human Servs.,* 541 F.3d 681, 686 (7th Cir. 2008) ("At a minimum, the employee must be able to show a quantitative or qualitative change

in the terms or conditions of employment." (quoting *Haywood v. Lucent Techs., Inc.,* 323 F.3d 524, 532 (7th Cir. 2003)).

Second, even if Ward could show that her performance reviews were materially adverse, she has failed to produce sufficient evidence that she was similarly situated to either Bland or Adamson during the relevant time period. Indeed, given that Ward was not eligible for a merit pay raise, it is difficult to imagine how she could have been similarly situated to either employee in regards to merit increases. At bottom, Ward has not adduced any direct or circumstantial evidence from which a reasonable trier of fact could conclude that her performance reviews were either materially adverse or motivated by racial discrimination. Accordingly, the defendants' motion for summary judgment on Ward's claim for discriminatory performance reviews is granted.

### 2. *Compensation Claim*

Like her performance review claim, Ward proceeds on her discriminatory compensation claim under the direct method only. To that end, Ward offers circumstantial evidence to support the contention that Haynes and the Y racially discriminated against her in setting her starting salary. Ward's evidence, however, fails to raise a reasonable inference that she suffered a materially adverse employment action motivated by either Haynes' or Bland's alleged racial discrimination.

Ward contends that she requested a starting salary of $80,000, but only received $70,000, which was the lowest end of the potential salary range for her position. Pl. Resp., Dkt. 319 at 33. But she has failed to show that the Y's justification for setting her salary at the lowest end of the salary range—that Ward lacked the requisite five to seven years of professional experience for the Public Policy Manager position—was pretext for racial discrimination. Def. Reply, Dkt. 371

at 9. Ward argues that even though her salary was set within the range set by the Y in the Public Policy Manager job description, other Caucasian employees received higher starting salaries despite similar deficits in professional experience. *See* Pl. Resp., Dkt. 319 at 33. For instance, Ward contends that Bland received a starting salary of $110,000, which Haynes specially requested on Bland's behalf because that salary exceeded the established range for his position. *Id.* Further, Ward argues that Bland also lacked the requisite five to seven years of experience when he was hired, but still received $40,000 more in starting salary than Ward. *Id.*

But for these facts to have any probative value, assuming they are true, Ward needs to demonstrate that she was similarly situated to Bland or perhaps some other Public Policy Manager, not in Ward's protected group and with a level of experience equivalent to Ward's, who received a higher starting salary—a task she has failed to do. *See, e.g., Good v. Univ. of Chi. Med. Ctr.,* 673 F.3d 670, 675 (7th Cir. 2012) ("The 'similarly situated' prong establishes whether all things are in fact equal." (quoting *Filar v. Bd. of Educ. of City of Chi.,* 526 F.3d 1054, 1061 (7th Cir. 2008)). In her response, Ward makes no effort to establish that she and Bland were similarly situated in all material respects at the times of their respective hires. As the defendants point out, Bland held a director-level position while Ward was hired at a manager-level position, and Bland had different duties and responsibilities. Def. Reply, Dkt. 371 at 10. At bottom, Ward has failed to provide sufficient evidence to support a reasonable inference that any difference in starting pay between her and Bland was motivated by racial discrimination.

Similarly, Ward notes that Adamson was hired in 2004 at a starting salary of $150,000, but Cookab Hashemi, Ward's predecessor, was hired in 2006 at $72,000. Pl. Resp., Dkt 319 at 33. But again, Ward has failed to adduce any evidence that demonstrates that either she or Hashemi were similarly situated to Adamson when they were hired. Instead, Ward concludes

that "there is sufficient evidence from which a reasonable jury could infer that experience alone cannot explain these large spreads [in starting salaries] ($40,000 difference between Ward/Bland and $78,000 difference between Hashemi/Adamson)." *Id.* Simply identifying a difference in pay, however, and concluding that that difference was motivated by racial discrimination is insufficient to create a triable issue of fact. *See, e.g., Anderson,* 699 F.3d at 996 ("In his attempt to construct…a mosaic, [the plaintiff] suggests only that he has already offered evidence of suspicious timing and pretext. Such a conclusory allegation is insufficient to raise an issue of material fact."). As previously explained, such evidence, or lack thereof, does not point "directly to a discriminatory reason for the employer's action," *Good,* 673 F.3d at 675 (citations omitted), but to myriad possible reasons, such as differences in experience, qualifications, duties, and responsibilities. *Id.* Based on Ward's evidence, could her race have been a factor in Haynes' employment decision? Possibly, but as the Seventh Circuit has taught, "guesswork and speculation are not enough to avoid summary judgment." *Id.*

Because Ward has failed to show that she was similarly situated to either Bland or some other employee in all material respects, she has also failed to show that the Y's justification for setting her salary at $70,000 was pretext for intentional discrimination. Ward's circumstantial evidence falls well short of a "convincing mosaic…that [would] allow[] a jury to infer intentional discrimination by the decisionmaker." *Brown,* 700 F.3d at 1105 (citing *Phelan v. Cook Ctny.,* 463 F.3d 773, 779 (7th Cir. 2006)). Accordingly, the defendants' motion for summary judgment on Ward's discriminatory compensation claim is granted.

### 3. *Discriminatory and Retaliatory Termination Claim*

Ward argues that her termination was both discriminatory and retaliatory, and proceeds on both of those claims under the direct and indirect methods of proof. The defendants contend

that Ward's termination claims fail because she has not offered sufficient admissible evidence to survive summary judgment. For the reasons explained below, the Court finds that Ward has produced sufficient evidence to support a reasonable inference of discrimination under the indirect method of proof and retaliation under the direct method of proof.

a. *Discriminatory Termination: Indirect Method of Proof*

According to the defendants, Williams decided to terminate Ward, with input from Gordon, Haynes, and Bland, because Ward violated the Y's zero tolerance policy for workplace violence. *See* William's Dep., Pl. Appx., Dkt. 325, Ex. 12 at 126-27. Williams based her decision on Adamson's report that Ward had "yelled incoherently at [Adamson] and told her 'fuck you and fuck the whole team." Defs. Reply, Dkt. 371 at 13. Williams also testified that she based her termination decision on reports that Ward had used threatening and abusive language towards Haynes and Bland. *See* William's Dep., Pl. Appx., Dkt. 325, Ex. 12 at 127-28. The Y contends that Ward simply has no evidence that Williams had a discriminatory or retaliatory motive when she terminated Ward's employment, particularly given the fact that Williams and Ward are both African American women. *See, e.g.,* Defs. Reply, Dkt. 371 at 14-15. On this basis, the defendants argue that Ward cannot show that she was meeting the Y's legitimate expectations, and that they have proffered a nondiscriminatory justification for the termination, for which Ward has no evidence of pretext.

The plaintiff contends that her termination was discriminatory, in part, because the Y selectively enforced their zero tolerance workplace violence policy by firing Ward, but failing to terminate or even discipline Haynes for similar misconduct. As Ward points out, there is record evidence that Haynes also yelled and used abusive language, in addition to slamming doors and books, but faced no consequences for those actions. Under the indirect method, the first critical

inquiry, then, is whether Ward and Haynes are similarly situated for purposes of establishing a *prima facie* case of intentional discrimination.

As the Seventh Circuit has taught in *Coleman,* when determining whether two employees are similarly situated, "[t]here must be enough common factors…to allow for a meaningful comparison," but the "number [of relevant factors] depends on the context of the case." 667 F.3d at 847 (internal quotations and citations omitted). "In the usual case a plaintiff must at least show that comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (internal quotations omitted) (citing *Gates v. Caterpillar,* 513 F.3d 680, 690 (7th Cir. 2008) (quoting *Snipes v. Ill. Dep't of Corrections,* 291 F.3d 460, 463 (7th Cir. 2002)). Ward has met this legal standard here.

As to the first factor, Ward and Haynes dealt with the same decision-makers. Specifically, Williams and Gordon were aware of and involved in Ward's complaints against Haynes and made the decision to terminate Ward. *See* Defs. 56.1 Resp., Dkt. 372 at 14, ¶ 30; 16, ¶ 35. As to the second factor, Ward and Haynes were both subject to the same standards even though Haynes held a director-level position. Indeed, if, as the Y asserts, they "maintained a…policy prohibiting violence in the workplace during all relevant periods," that policy necessarily applied equally to every employee. Pl. 56.1 Resp., Dkt 310 at 7, ¶ 12. A plain reading of the Y's policy highlights this point. Specifically, "in 2010, the Y's Violence in the Workplace policy stated in part:"

> YMCA of the USA has a responsibility to provide *all employees* with a safe work environment. We take this commitment very seriously. *Violence in our workplace is prohibited.* Examples of unacceptable behavior include the following:…
>
> - Acts that threaten physical violence
> - Acts of intimidation, horseplay, verbal abuse or harassment

- Behavior indicating potential for violence, including throwing objects…
- Acts that endanger the safety of others

Reports of incidents of…threatened violence or violations of [the policy] will be promptly investigated and, following that investigation, appropriate corrective measures will be taken.

[T]hreats of harm…and threats are not acceptable conduct, are prohibited and are incompatible with our expectations of professional decorum in our workplace. These actions may lead to immediate suspension or termination of employment.

*Id.* at 7-8, ¶ 12 (emphasis added); Defs. 56.1 Resp., Dkt. 372 at 25, ¶ 59; Ex. 97, Pl. Appx., Dkt. 326, Tab 97 at 35.

The policy language demonstrates that the prohibition of violence applies across the board, whether the employee is a lobbyist, supervisor, or director. In particular, the policy states that its aim is to "provide *all* employees with a safe work environment," an unattainable goal if the policy applied to some, but not all employees. *See, e.g., Coleman,* 667 F.3d at 849 ("Since the purpose of the rule is to ensure a 'safe and humane working environment,' there is no objective reason for it to apply with greater or lesser force to employees of certain positions."). Moreover, the prohibition on violence is unequivocal. And as the Seventh Circuit has explained, despite the fact that Haynes held a director-level position, "when uneven discipline is the basis for a claim of discrimination, the most-relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor, rather than job description and duties." *Id.* (internal quotations omitted) (citing *Rodgers v. White,* 657 F.3d 511, 518 (7th Cir. 2011)). On that point—the third and final factor—Ward has shown that Haynes engaged in comparable, if not more serious, misconduct.

According to Ward, at the April 12, 2010, staff meeting, Haynes slammed a book on the conference table and screamed at her. Defs. 56.1 Resp., Dkt. 372 at 12, ¶ 25. Ward then reported this incident to Gordon. *Id.* at 13, ¶ 26. Gordon testified that she thought Haynes' conduct in the

meeting was "inappropriate" and "serious." *Id.* at 13, ¶ 27. Ward took the following day off, but when she returned to work, Bland allegedly told Ward that she "should be careful because [Haynes] and I are your supervisors so when you get upset like you are now or when you look at us a certain way there could be consequences such as what occurred on Monday [the day of the staff meeting incident]." *Id.* at 14, ¶ 28. Ward then lodged a second complaint. *Id.* at 14, ¶ 29. Gordon subsequently forwarded Ward's complaints to the Y's legal department and Williams for investigation. *Id.* at 14, ¶ 30.

Karyn Boston then traveled to the D.C. office and investigated the April 12 staff meeting incident. *Id.* at 15, ¶ 32. Boston interviewed witnesses to determine whether Haynes had slammed a book during the meeting, as Ward alleged. *Id.* One witness, Torrence Montgomery, testified that Haynes had indeed slammed a book "out of nowhere." *Id.* Bland, however, denied that Haynes had slammed the book, and Boston never asked Haynes about the incident. *Id.* Further, according to Ward, the end result of the investigation was that her complaints were substantiated. Ward testified that both Gordon and Boston informed her that Haynes had engaged in "unethical behavior." Pl. 56.1 Resp., Dkt. 310 at 38, ¶ 57. Despite that finding, however, the Y did not resolve the investigation by disciplining Haynes, but by moving Ward out of the D.C. office to the D.C. metropolitan YMCA. *Id.*; Defs. 56.1 Resp., Dkt. 372 at 16, ¶ 36. In fact, Haynes testified that she was never even told the outcome of the investigation. Defs. 56.1 Resp., Dkt. 372 at 16, ¶ 36.

"In a disparate discipline case, the similarly-situated inquiry often hinges on whether co-workers 'engaged in comparable rule or policy violations' and received more lenient discipline." *Coleman,* 667 F.3d at 850 (citing *Naik v. Boehringer Inqelheim Pharms., Inc.,* 627 F.3d 596, 600 (7th Cir. 2010) (quoting *Patterson v. Ind. Newspapers, Inc.,* 589 F.3d 357, 365-66 (7th Cir.

2009))). "Comparators must have 'engaged in similar—not identical—conduct to qualify as similarly situated.'" *Id.* (citing *Peirick v. Ind. Univ.-Purdue Univ. Ind. Athletics Dep't,* 510 F.3d 681, 691, 698) (university tennis coach "accused of using abusive language, unsafe driving, leaving students behind during a road trip, and pitting the students against the administration" was similarly situated to coaches who "did not engage in the exact same misconduct" but who "violated the very same rules") (quoting *Ezell v. Potter,* 400 F.3d 1041, 1050 (7th Cir. 2005))). "[T]he critical question is whether they have engaged in conduct of comparable seriousness." *Id.* at 851 (citing *Peirick,* 510 F.3d 689). Of course, the plaintiff denies that she engaged in the misconduct for which she was terminated. But the critical question here is not whether Ward actually engaged in the alleged misconduct, but whether Haynes received more lenient discipline for a comparable violation of the Y's rules and policies.

The analysis here is fairly straightforward. As noted above, there is record evidence that Ward's complaint concerning the staff meeting incident had been substantiated. And yelling and slamming a book is at least as serious a violation of the Y's policy as yelling at a co-worker over the phone, particularly since the Y's policy explicitly lists intimidation and throwing objects as examples of prohibited behavior. In this case, one employee was terminated for her alleged violation of the policy, while another received no discipline at all. To be sure, the defendants contend that Haynes and Ward are not comparable because there is no evidence that "other [employees] complained to Williams and Gordon about Haynes' alleged conduct, let alone that Haynes' conduct caused them to fear her." Defs. Reply, Dkt. 371 at 26. But as just explained, Ward filed a complaint concerning Haynes' conduct. And the issue at summary judgment is not the impact of that alleged misconduct (such as how fearful it made co-workers), but whether the

comparators engaged in similar violations of the employer's rules. Accordingly, for purposes of summary judgment, Ward and Haynes are similarly situated.

Having met her burden of establishing a *prima facie* case, the burden of proof shifts from Ward to the Y, who must proffer a legitimate, nondiscriminatory justification for their adverse employment decision. To that end, the Y again offers Ward's alleged violation of the zero tolerance policy for workplace violence. Accordingly, the burden of proof shifts back to the plaintiff to offer evidence that the Y's justification is pretext for racial discrimination.

Here, Ward attempts to show pretext by arguing that the Y failed to follow its internal procedures for handling complaints by failing to investigate Haynes' misconduct, that the Y's six-day delay in terminating Ward is suspicious, and that Ward's conduct arguably did not even violate the Y's policy which mostly applied to "acts" as opposed to, presumably, yelling or making angry comments to other employees. Pl. Resp., Dkt. 319 at 26. None of these points are particularly persuasive, although the Court notes that it is at least questionable whether yelling at a co-worker over the phone and using obscenities truly qualifies as a violation of the Y's policy on workplace violence.

The plaintiff also argues, in her responsive brief and by separate motion, that the defendants should be barred from relying on Williams' and Gordon's testimony to meet their burden of proffering a legitimate, nondiscriminatory justification for Ward's termination. *See id.* at 20-22; Pl. Mot. to Strike, Dkt. 366. The plaintiff contends that the employees whom the Y identifies as the decision-makers, Williams and (to a lesser degree) Gordon, refused to testify about the conversations they had with employees in the D.C. office that formed the basis of their decision to terminate Ward. Pl. Resp., Dkt. 319 at 21-22. A review of the deposition transcripts shows that Williams and Gordon did in fact assert attorney-client privilege when asked about

those conversations. *See, e.g.,* Williams's Dep., Pl. Appx., Dkt. 326, Tab 12 at 132:9-17 ("Q. And you [Williams] are refusing to disclose those communications which were the basis of your decision to terminate [Ward's] employment [based on attorney-client privilege]? A. As I've said, yes."); *see also* Gordon's Dep., Pl. Appx., Dkt. 326, Tab 9 at 446-448. According to the plaintiff, Williams's assertion of attorney-client privilege handicaps her ability to show the Y's justification is pretextual because Williams and Gordon are the only sources of information regarding the termination decision. Pl. Resp., Dkt. 319 at 21-22. The defendants respond that Ward is not prejudiced by Williams' and Gordon's assertion of privilege because "[t]here is ample testimony regarding the basis to terminate Ward from Williams, Gordon and Adamson." Defs. Reply, Dkt. 371 at 27. Further, the defendants argue that they have not relied on any of the privileged information to make their arguments, and therefore, neither witness's testimony should be barred. *Id.* at 28.

The Court need not resolve the fact specific issue of whether the decision to terminate an employee is a business rather than a legal decision. *See, e.g., Gomez v. Metro. Dist.,* 2013 WL 2489138, *6-7 (D. Conn. June 10, 2013) (referencing "the always difficult and uncomfortable question of the 'hat' in-house counsel wears" when participating in decisions to terminate an employee); *Perius v. Abbott Labs.*, 2008 WL 3889942, *7 (N.D. Ill. Aug. 20, 2008) ("The attorney-client privilege does not protect business advice, even when the advice is given by an attorney, but it does protect an attorney's *legal* advice about a business decision.") (emphasis in original). The issue is not material here because the plaintiff has already met her burden of proof on this point by establishing that a similarly-situated employee not in her protected group, who engaged in comparable misconduct, was disciplined more leniently. *See Coleman,* 667 F.3d at 853 ("As the Supreme Court, this court, and other circuits have held, a discrimination plaintiff

may employ such comparator evidence to discharge her burden at the pretext stage as well as to satisfy the fourth element of her *prima facie* case."). Accordingly, the plaintiff motion's to strike Williams' and Gordon's testimony from their summary judgment brief, *see* Pl. Mot. to Strike, Dkt. 366, is denied as moot, and the defendants' motion for summary judgment on Ward's discriminatory termination claim is denied.

## b. *Retaliatory Termination: Direct Method of Proof*

Ward survives summary judgment on her retaliatory termination claim under the direct method of proof. As explained above, to prevail on a claim for retaliatory termination, a plaintiff must show "that she (1) engaged in statutorily protected activity; (2) she suffered an adverse employment action taken by the employer; and (3) there was a causal connection between the two." *Northington v. H&M Int'l,* 712 F.3d 1062, 1065 (7th Cir. 2013) (citing *Kodl v. Bd. of Educ. Sch. Dist. 45,* 490 F.3d 558, 562 (7th Cir. 2007)). Here, the defendants do not dispute that Ward engaged in statutorily protected activity or that her termination constitutes an adverse employment action. The sole question, therefore, is whether Ward has produced sufficient evidence to show a causal connection between the protected activities she engaged in and the adverse employment action she suffered.

Under the direct method, Ward may rely on either direct or circumstantial evidence to show that the Y was motivated to terminate her based on her protected activity. As previously explained, circumstantial evidence, as Ward offers here, may include "suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Harper,* 687 F.3d at 307 (citation omitted). Two additional categories of circumstantial evidence recognized by the Seventh Circuit are "evidence…that similarly situated

employees were treated differently…and evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* at 307 n.32. The defendants argue that Ward has failed to present any evidence, or even allege, that Williams retaliated against her. Defs. Reply, Dkt. 371 at 21. Instead, the defendants contend, Ward only offers evidence of a retaliatory motive by Haynes, Bland, and Gordon, and again fails to connect those alleged retaliatory motives to her termination.

As explained above, Ward has already met her burden of showing that she was similarly situated to Haynes, who did not engage in statutorily protected activity, at the time of her termination and, based on that same evidence, establishing a material issue of fact as to whether the Y offered a pretextual reason for her termination. The Court also notes that while Williams is the nominal decisionmaker put forth by the Y, under the "cat's paw" theory of liability, any admissible evidence Ward has offered to show that Haynes, Bland, and Gordon, who Williams testified participated in the decision to terminate Ward, had a retaliatory motive is relevant.[40]

The "cat's paw" theory applies "if a supervisor 'performs an act motivated by [a discriminatory or retaliatory] animus that is intended by the supervisor to cause an adverse employment action, and…that act is a proximate cause of the ultimate employment action.'" *Cervantes v. Caterpillar, Inc.,* No. 11 C 8185, 2013 WL 3224451, at *4 (N.D. Ill. June 25, 2013) (citing *Staub v. Proctor Hosp.,* --- U.S. ----, 131 S. Ct. 1186, 1194 (2011)). "Thus, it is appropriate to impute discriminatory or retaliatory animus to a decisionmaker when 'the party nominally responsible for a decision is, by virtue of her role in the company, totally dependent on another employee to supply the information on which to base that decision.'" *Hicks v. Forest Pres. Dist. of Cook Cnty., Ill.,* 677 F.3d 781, 790 (7th Cir. 2012) (citing *Brewer v. Bd. of Trs. of*

---

[40] Although the plaintiff's responsive brief does not explicitly invoke the "cat's paw" theory, the Court reads Ward's brief as raising it.

*the Univ. of Ill.,* 479 F.3d 908, 918 (7th Cir. 2007)). As already stated, Williams testified that she

based her decision to terminate Ward on the information she received from Haynes, Bland, and

Gordon. Under the cat's paw theory, then, Ward must adduce evidence to show that any or all of

those individuals intended to and proximately caused, through Williams, Ward's termination in

retaliation for her protected activities.

To that end, Ward offers evidence sufficient to raise a reasonable inference that Haynes

and Bland were motivated to retaliate against her. For instance, in October 2009, after Gordon

informed Haynes that Ward filed a complaint concerning Bland's 2009 comment, Haynes started

a log on Ward "after hearing that [Ward] had made several calls to our HR department, consulted

other Y colleagues and word had gotten back to our CEO that she was unhappy with her

treatment for lack of a better characterization." Pl. Resp., Dkt. 319 at 16. Then in January 2010,

Bland lowered Ward's performance scores, and Haynes attempted to lower them even further. *Id.*

Ward complained about the lowered scores given by Haynes to HR. At HR's insistence, the

previous performance scores were reinstated. After this incident, however, Bland began keeping

his own record to document Ward's "substandard performance."[41] *Id.* In an email dated April 8,

2010, Bland emailed a copy of his log to Haynes, who redlined and added comments to the

document. Bland wrote that the log was "about the fourth [he had] of [those], either on

---

[41] The documentation of an employee's substandard performance may, of course, be
perfectly legitimate. The defendants argue that Haynes' and Bland's "documentation of Ward's
performance cannot support her retaliation claim…especially…where there is no evidence that
Williams or Gordon relied upon the documentation or any of the information in either document
to reach their decision to terminate Ward's employment." Defs. Reply, Dkt. 371 at 23. But as
previously explained, Williams and Gordon asserted attorney-client privilege over their
conversations with Haynes and Bland, and by extension, their basis for terminating Ward, so that
assertion is presently unverifiable. In any event, the issue here is not whether Williams relied on
the logs, but whether the logs are relevant to help establish that Haynes and Bland had an intent
to retaliate against Ward. Since they support an argument that their interest in documenting
Ward's performance appears to have arisen directly in response to her protected activities, they
are probative of that issue.

Performance or Attendance."[42] Dkt. 316 at 7, ¶ 24. Haynes replied to the email, suggesting that Bland speak with Vinluan, who had recently placed an employee "on a 90 day probation." *Id.* Haynes noted that it appeared Vinluan was "about to get rid of [that employee]." *Id.* The defendants contend that this email exchange does not support Ward's retaliation claim because "there is no evidence that Bland talked to Vinluan, that he took steps to place Ward on a 90-day probation plan, [or] that Ward was ever placed on such a plan." Defs. Reply, Dkt. 371 at 23. While the defendants' assertions that Bland did not take those actions may be correct, the email exchange is still circumstantial evidence that the purpose of the documentation was to form a basis for terminating Ward—documentation that Haynes and Bland began keeping after Ward filed her complaints of discrimination.

Similarly, Gordon testified that Ward "is the only person in [her] life who's ever called [her] that much in [her] entire life" and that Ward "complained about Audrey Haynes from June 2009 until the day she left." Pl. Resp., Dkt. 319 at 29. According to Ward, Gordon also suggested that Ward could find a job elsewhere if she was concerned that the D.C. office was overly aggressive. *Id.* This evidence could suggest that, rather than deal with Ward's numerous complaints, Gordon thought it may have been better to just terminate Ward—thereby making Ward's complaints a motivating factor in the decision to terminate her.

From these bits and pieces of evidence, a reasonable jury could conclude that Haynes, Gordon, and Bland were seeking a means to terminate Ward due to her statutorily protected

---

[42] The Court notes that the defendants object to the email as lacking foundation and authentication. *See* Defs. 56.1 Resp., Dkt. 372 at 12, ¶ 24. However, the defendants appear to acknowledge the authenticity of the email in their reply brief. *See* Defs. Reply, Dkt. 371 at 23 ("Similarly, Haynes' email to Bland suggesting that he talk with another manager, Monica Vinluan, about placing Ward on a performance improvement plan had no relation whatsoever to Ward's termination."). And in any event, whether or not the email is admissible, Ward has met her burden of production on this claim by showing that she was similarly situated to Haynes.

activity. Specifically, after Ward filed complaints concerning Bland's 2009 comment and lowered performance scores, a reasonable jury could infer that Haynes and Bland began keeping logs on Ward in order to build a basis to terminate her employment. Indeed, Haynes directly cites Ward's complaint as her reason for starting the log. Further, Gordon's apparent frustration with Ward's numerous complaints, and suggestion that she could find a job with another employer, creates at least a triable issue of fact as to whether her recommendations and discussions with Williams about whether to terminate Ward were in part motivated by Ward's complaints. In fact, according to Ward and as noted above, at one point Gordon suggested that if Ward did not like the culture of the D.C. office, she could look for employment elsewhere. Combined with Ward's evidence of pretext and a similarly-situated employee treated more favorably, she has presented enough circumstantial evidence to show that her discrimination complaints may have motivated Haynes, Bland, or Gordon to seek her termination. So far as the record reflects, Williams based her decision to terminate Ward on the information she received from those individuals, which raises a reasonable inference that their retaliatory animus was a proximate cause for the termination. Accordingly, Ward has adduced sufficient evidence to raise a reasonable inference of retaliation, and, therefore, the defendants' motion for summary judgment on this claim is denied.

*     *     *

For the foregoing reasons, the Court:

(1) Denies the defendants' summary judgment motions against plaintiffs Jones, Steels, and Toles to the extent that such motion purports to seek judgment on the disparate impact and pattern-and-practice claims advanced by those plaintiffs;

(2) Grants the defendants' motion for summary judgment with respect to Plaintiff Jones' failure-to-promote, performance evaluation, pay raise, base compensation, and retaliatory discharge claims, and denies the motion as to his discriminatory termination claim;

(3) Grants the defendants' summary judgment motion with respect to Plaintiff Steels' failure-to-promote, telecommuting, and constructive discharge claims, and denies the motion as to her performance evaluation, 2006 pay raise, base compensation, and retaliatory discharge claims;

(4) Grants the defendants' summary judgment motion with respect to Plaintiff Toles' 2001 and 2010 Conference Center Coordinator failure-to-promote, failure to train, performance evaluation, and compensation claims, and denies the motion with respect to her 2008 and 2010 Contact Center team lead failure-to-promote claims;

(5) Grants the defendants' summary judgment motion with respect to Plaintiff Ward's pattern-and-practice claim as to defendant Hite; the Court further grants the motion with respect to the discriminatory hiring, failure-to-promote, performance review, and compensation claims, and denies the motion with respect to Plaintiff Ward's discriminatory and retaliatory discharge claims.

Entered: June 18, 2014

_____
John J. Tharp, Jr.
United States District Judge

**TABLE 1: Summary of Counts and Claims**

| "Counts" | "Claims" | Plaintiffs | | | | Defendants | |
|---|---|---|---|---|---|---|---|
| | | Jones | Steels | Toles | Ward | YMCA | Hite |
| I | 18 U.S.C. 1981 (evaluations, compensation, promotions) | X | X | X | X | X | X |
| II | 18 U.S.C. 1981 (termination) | X | X | X | X | X | X |
| III | 18 U.S.C. 1981 (retaliation) | X | X | | X | X | X |
| IV | Title VII (evaluations, compensation, promotions; disparate treatment and disparate impact) | X | X | X | X | X | |
| V | Title VII (termination; disparate treatment and disparate impact) | X | X | | X | X | |
| VI | Title VII (retaliation) | X | X | | | X | |
| VII | IHRA (evaluations, compensation, promotions; disparate treatment and disparate impact) | X | X | X | | X | |
| VIII | IHRA (termination; disparate treatment and disparate impact) | X | X | | | X | |
| IX | IHRA (retaliation) | X | X | | | X | |
| X | DCHRA (evaluations, compensation, promotions; disparate impact and disparate treatment) | | | | X | X | |
| XI | DCHRA (termination; disparate treatment and disparate impact) | | | | X | X | |
| XII | DCHRA (retaliation) | | | | X | X | |